Transcript of the Testimony of

**Gary Tuli**


**Date:**

November 23, 2020


**Case:**

APRIL JOHNSON vs CITY OF SAN ANTONIO

1           UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF TEXAS
2               SAN ANTONIO DIVISION

3    APRIL JOHNSON, an          )
     individual, A.N.E.R.,      )
4    ("a minor child"), an      )
     individual,                )
5                               )
           Plaintiffs,          )
6                               )
     vs.                        )
7                               )  No. 5:19-cv-00733-DAE
     THE CITY OF SAN ANTONIO,   )
8    OFFICER GARY TULI (BADGE   )
     #517), individually and    )
9    in his official capacity,  )
     OFFICER JESSICA OSORIA     )
10   (BADGE #1422),             )
     individually and in her    )
11   official capacity,         )
     OFFICER DANIEL GROCE       )
12   (BADGE #1182),             )
     individually and in his    )
13   official capacity, AND     )
     DOES 1 through 25,         )
14                              )
           Defendants.          )
15                              )

16

17        * * * * * * * * * * * * * *
         ORAL VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF
                     GARY TULI
18               November 23, 2020
                (Reported Remotely)
19        * * * * * * * * * * * * * *

20        THE ORAL VIDEOTAPED VIDEOCONFERENCE DEPOSITION

21   of GARY TULI, produced as a witness at the instance of the

22   Plaintiffs, and duly sworn, was taken in the above-styled

23   and numbered cause on the 23rd day of November, 2020, from

24   10:03 a.m. to 5:47 p.m., before RACHELLE THOMPSON, RPR,

25   CRR, Certified Shorthand Reporter in and for the State of

Gary Tuli

November 23, 2020
Pages 2 to 5

Page 2

1  Texas, reported by stenographic and computer-aided
2  transcription, in the Law Offices of Charles Frigerio, 111
3  Soledad, Suite 840, San Antonio, Texas 78205, pursuant to
4  the Federal Rules of Civil Procedure, the First Emergency
5  Order Regarding the COVID-19 State of Disaster, and the
6  provisions stated on the record or attached hereto.
7
8          APPEARANCES
9  FOR THE PLAINTIFF(S):
10     ARTESSIA K. HOUSE, ESQ.
       TESS HOUSE LAW, PLLC
11     (Via Videoconference)
       6840 San Pedro Avenue
12     San Antonio, Texas  78216
       (210) 249-2985
13     Tess@tesshouselaw.com
14
    FOR THE DEFENDANT CITY OF SAN ANTONIO:
15
       MICHAEL J. URBIS, ESQ.
16     ASSISTANT CITY ATTORNEY - LITIGATION DIVISION
       (Via Videoconference)
17     100 West Houston Street
       18th Floor
18     San Antonio, Texas  78205
       (210) 207-8975
19     Michael.urbis@sanantonio.gov
20
    FOR THE DEFENDANT OFFICER GARY TULI (individually):
21
       CHARLES S. FRIGERIO, ESQ.
22     HECTOR SAENZ, ESQ.
       LAW OFFICES OF CHARLES S. FRIGERIO, P.C.
23     (Via Videoconference)
       Riverview Towers
24     111 Soledad, Suite 840
       San Antonio, Texas  78205
25     (210) 271-7877
       Csfrigeriolaw@sbcglobal.net

Page 3

1  FOR THE DEFENDANTS OFFICER GROCE AND OFFICER OSORIA:
2     CLARISSA RODRIGUEZ, ESQ.
      DENTON NAVARRO ROCHA BERNAL & ZECH, P.C.
3     (Via Videoconference)
      2517 North Main Avenue
4     San Antonio, Texas 78212
      (210) 227-3243
5     Clarissa.rodriguez@rampage-sa.com
6
    ALSO PRESENT:
7     (Via Videoconference)
8     Megan Villarreal, paralegal
9     Evan Wilkinson, KTA video host
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1                 INDEX
   WITNESS                          PAGE
2  GARY TULI
3     Examination by Ms. House          9
4     Errata Sheet                    287
      Reporter's Certification        289
5
6              EXHIBITS
7  NO.          DESCRIPTION           PAGE
8  T. Exh. 1   Civilian phone video,   270
               Bates-stamped COSA000271
9
   T. Exh. 2   Officer Tuli's BWC video,   89
10             Bates-stamped COSA000265
11 T. Exh. 4   Officer Tuli's Coban Video-Rear,  277
               Bates-stamped COSA000267
12
   T. Exh. 5   Officer Groce's Coban       190
13             video-front, Bates-stamped
               COSA000245
14
   T. Exh. 6   Officer Carrasco's BWC video #1,  202
15             Bates-stamped COSA000235
16 T. Exh. 7   Officer Carrasco's BWC video #2,  203
               Bates-stamped COSA000236
17
   T. Exh. 9   Officer Cavazos' BWC video,  231
18             Bates-stamped COSA000237
19 T. Exh. 10  Officer Hooten's BWC video,  239
               Bates-stamped COSA000249
20
   T. Exh. 11  Sgt. Hensley's BWC video,   250
21             Bates-stamped COSA000246
22 T. Exh. 32  Supplement Police Report by  147
               Officer Tuli, Bates-stamped COSA
23             000028-000029 (2 pages)
24 T. Exh. 70  Photograph of Gary and Melissa  200
               Tuli, Bates-stamped JOHNSON000200
25             (1 page)

Page 5

1              EXHIBITS CONTINUED
2  NO.          DESCRIPTION           PAGE
3  T. Exh. 70A  Photograph of Gary Tuli and   25
4               children, Bates-stamped
                JOHNSON000201 (1 page)
5  T. Exh. 70B  Photograph of Melissa Tuli's  27
6               Facebook page, Bates-stamped
                JOHNSON000202 (1 page)
7  T. Exh. 70C  Photograph of the Tuli family,  28
8               Bates-stamped JOHNSON000204
                (1 page)
9  T. Exh. 70D  Photograph of Gary and Melissa  29
10              Tuli, Bates-stamped JOHNSON000205
                (1 page)
11 T. Exh. 70E  Photograph depicting Gary Tuli  30
12              and kids at rodeo, Bates-stamped
                JOHNSON000206 (1 page)
13 T. Exh. 70F  Photograph of Tuli family at   30
14              restaurant, Bates-stamped
                JOHNSON000270 (1 page)
15 T. Exh. 70G  Photograph of Tuli family at   31
16              restaurant, Bates-stamped
                JOHNSON000209 (1 page)
17 T. Exh. 70H  Photograph of Tuli family      31
18              reunion, Bates-stamped
                JOHNSON000211 (1 page)
19 T. Exh. 70I  Photograph depicting Gary Tuli  32
20              and daughter Jordan,
                Bates-stamped JOHNSON000212
21              (1 page)
22 T. Exh. 70J  Photograph of Gary Tuli and    32
                daughter Jordan, Bates-stamped
23              JOHNSON000213 (1 page)
24 T. Exh. 70K  Photograph of Gary Tuli and son  32
                Tyson, Bates-stamped
25              JOHNSON000214 (1 page)

Gary Tuli

November 23, 2020
Pages 6 to 9

Page 6

EXHIBITS CONTINUED

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| T. Exh. 70L | Photograph of Gary and Melissa Tuli, Bates-stamped JOHNSON000215 (1 page) | 33 |
| T. Exh. 71 | Photograph of Gary Tuli, Bates-stamped JOHNSON000196 (1 page) | 41 |
| T. Exh. 71A | Photograph of Gary Tuli, brother and cousin, Bates-stamped JOHNSON000197 (1 page) | 41 |
| T. Exh. 71B | Photograph depicting Gary Tuli with Highway Patrol car, Bates-stamped JOHNSON000198 (1 page) | 42 |
| T. Exh. 78 | San Antonio Police Department General Manual Section 200 - Rules and Regulations, Bates-stamped COSA000335 (1 page) | 143 |
| T. Exh. 79 | San Antonio Police Department General Manual Section 501, Use of Force Policy, Bates-stamped COSA000618-000628 (11 pages) | 154 |
| T. Exh. 80 | San Antonio Police Department General Manual, Section 611 - Mentally Ill Persons, Bates-stamped COSA000770-000779 (10 pages) | 178 |
| T. Exh. 81 | San Antonio Police Department General Manual Section 3.04 Bates-stamped COSA000335-000336 (2 pages) | 274 |

Page 7

P R O C E E D I N G S

(Proceedings commenced at 10:03 a.m.)

THE REPORTER:  We're on the record.  Today's date is November 23rd, 2020.  The time is 10:03 a.m.  This is the deposition of Gary Tuli and it is being conducted remotely by agreement of the parties or in accordance with the current Emergency Orders.  The witness is attending from the law offices of Charles S. Frigerio, located at 111 Soledad, Suite 840, San Antonio, Texas, 78205.

My name is Rachelle Thompson, CSR No. 4003, with Kim Tindall & Associates.  I am administering the oath and reporting the deposition remotely by stenographic means.  My business address is 16414 San Pedro Avenue, Suite 900, San Antonio, Texas 78232.

The witness has been identified to me through his Texas driver's license.

Would counsel please state their appearances for the record.

MS. HOUSE:  My name is Attorney Artessia House.  I represent April Johnson, next of friend for minor child, A.N.E.R.

MR. FRIGERIO:  Charles Frigerio, representing Officer Tuli.

MS. RODRIGUEZ:  Clarissa Rodriguez, representing defendants Daniel Groce and Jessica Osoria.

Page 8

MR. URBIS:  Yes.  Michael Urbis, for the City of San Antonio.

THE REPORTER:  Sir, if you'd raise your right hand, please.

GARY TULI,

having been first duly sworn, was examined and testified as follows:

THE WITNESS:  Yes, ma'am.

MS. HOUSE:  I would like to take care of some stipulations first.  Is everyone in agreement to waiving objections to the reporter's qualifications, counselors?

MR. FRIGERIO:  She's qualified.  I mean, I use the same firm.

MS. HOUSE:  Okay.  But waiving any objections that may exist?

MR. FRIGERIO:  To her qualifications?

MS. HOUSE:  Yes, sir.

MR. FRIGERIO:  I have no objection to her qualifications.  She's qualified.

MR. URBIS:  I have no objections to her qualifications.

MS. RODRIGUEZ:  No objections.

MS. HOUSE:  Any objections -- waiving any objections to defects in the deposition notice, if there

Page 9

be any?

MR. FRIGERIO:  Not to the notice itself.  I will obviously be raising objections pursuant to the rules during the deposition.

MS. HOUSE:  Okay.  Any objections to the notice itself?

And are we stipulating to preserving until trial all objections except as to form?

MR. FRIGERIO:  Form or nonresponsive in accordance with the Federal Rules of Civil Procedure.

MS. HOUSE:  Okay.  Can we stipulate to -- that this deposition will go along in accordance to the rules of Federal Civil Procedure as Charles stated?

MR. FRIGERIO:  Yes.

MS. RODRIGUEZ:  Yes.

MR. URBIS:  Sure.

MS. HOUSE:  Thank you.

DIRECT EXAMINATION

BY MS. HOUSE:

Q.  Good morning, Mr. Tuli.  Can you please state your name for the record?

A.  Gary Shawlee Tuli.  Good morning.

Q.  Gary, can you spell your middle name?

A.  S-h-a-w-l-e-e.

Q.  And I'm not going to use your first name out of

Page 10

1  respect for you, sir. We haven't had a chance to meet.
2  My name is Artessia House. I'm the attorney that's been
3  hired to represent April Johnson on behalf of a minor
4  child, A.N.E.R.
5        As you know, there's a lawsuit going on and
6  with all that's going on, it can appear very adversarial
7  especially when there's court proceedings. Let me tell
8  you, sir, I am not here to be adversarial with you.
9  That's not my goal. I have questions for you, but my
10 ultimate responsibility when it comes to interaction
11 between you and I is to be both professional and polite.
12 Okay?
13    A. Yes, ma'am.
14    Q. All right. If I'm not, I am hoping -- you see
15 all these lawyers here in the room. I'm hoping they call
16 me out on it. Okay?
17        Have you ever had your deposition taken
18 before?
19    A. Negative, no.
20    Q. Okay. And so I just want to -- and I'm sure your
21 attorney has gone over -- through the rules with you. I
22 just want to insure that you understand them because my
23 goal is not to make you feel uncomfortable or like you're
24 violating any deposition rules. Okay?
25    A. Yes, ma'am.

Page 11

1     Q. Now, you understand that the parties have agreed
2  that we're having to take your deposition remotely. You
3  understand?
4     A. Yes, ma'am.
5     Q. And I want to confirm that we're doing this
6  because of COVID-19, and in order to maintain social
7  distancing, we're taking your deposition using Zoom
8  software. You understand that?
9     A. Yes, ma'am.
10    Q. Okay. And you're aware that the parties have
11 agreed to take your deposition remotely via Zoom; is that
12 correct, sir?
13    A. Yes, ma'am.
14    Q. What kind of device are you using in order to
15 take this deposition?
16    A. I've got a Macbook.
17    Q. Does the Macbook belong to you, sir?
18    A. It's my wife's, but yes.
19    Q. Is your e-mail open?
20    A. No. So this is going to sound dumb, but I don't
21 have my own e-mail. I use the city e-mail or I have my
22 wife check my e-mails for me because --
23    Q. No problem. Simple with technology, right?
24    A. Right.
25    Q. Understood. Do you have any messenger apps open?

Page 12

1     A. No, ma'am.
2     Q. And you're -- you said you're physically located
3  in your attorney's office. Are you in a conference room?
4     A. Yes, ma'am. I'm in a conference room.
5     Q. Is there anyone else physically present in this
6  room with you?
7     A. Yes, ma'am.
8     Q. Who is present?
9     A. Hector, last name Saenz.
10       MR. FRIGERIO: Hector Saenz in my office.
11 BY MS. HOUSE:
12    Q. And who is Hector Saenz?
13       MR. FRIGERIO: He's an attorney with my
14 office. He's on the pleadings, Counsel.
15 BY MS. HOUSE:
16    Q. Okay. Has anyone else -- is there anyone else
17 besides Mr. Saenz?
18    A. Negative, no.
19    Q. Has anyone asked you to have any messenger
20 software open during your deposition?
21    A. No.
22    Q. Now, I know at the beginning of this you were
23 looking down. Do you have your cell phone on you right
24 now, sir?
25    A. Yes, ma'am. I was turning the volume off to make

Page 13

1  sure --
2     Q. Okay. Could you just refrain from using that
3  while we are actively in this proceeding? It's okay, you
4  know, for -- if your attorney and the rules allow during
5  breaks and lunch, but during this proceeding if you could
6  leave that on silent and not in use.
7     A. Yeah, for sure, ma'am.
8     Q. And is the chat box open either on your cell
9  phone or on the computer?
10    A. No, ma'am.
11    Q. Okay. Did you review anything prior to this
12 deposition?
13    A. What do you mean, like my report and stuff?
14    Q. Yeah.
15    A. Yes.
16    Q. Did you review your report?
17    A. Yes, ma'am.
18    Q. What else did you review?
19    A. We had an internal affairs investigation. We
20 went over all the -- but this was, you know, years ago now
21 but -- is that what you mean?
22    Q. Yes, sir.
23    A. Okay. Yeah. So yeah, we -- I went over
24 virtually all of the material, the evidence, everything.
25 But like I said, it's maybe a year -- over a year ago now.

Page 14

1   Q.  Okay.  Did you review body camera footage?
2   A.  Yes, ma'am.
3   Q.  And whose body camera footage did you review?
4   A.  All of ours.
5   Q.  When did you review that?
6   A.  Several years ago.
7   Q.  Is there anything else you reviewed prior to this
8  deposition?
9   A.  No.
10   Q.  Outside of your personal lawyer, who did
11  you talk to about this deposition?
12   A.  This particular deposition?
13   Q.  Yes, sir.
14   A.  No one.
15   Q.  Well, it must have been your wife because she let
16  you use her --
17   A.  Oh, yeah.  You mean like official people or --
18  yeah, I spoke to the wife.
19   Q.  Anyone?
20   A.  Yeah.  No, just told the wife I have a deposition
21  coming up, so things like that.  I'm sure I told a friend,
22  you know.
23   Q.  Okay.  You said a friend.  Would this friend be
24  an officer?
25   A.  Yeah.  Yes, ma'am, I mean --

Page 15

1   Q.  No, that's fine.
2   A.  Yeah, I guess, I'm saying, you know, in normal
3  conversation with friends or -- I don't know if I told any
4  official people or anyone official that, that I had a
5  deposition besides my attorney.
6   Q.  But what officers did you have
7  conversations with about your deposition?  Would Officer
8  Osoria have been one of them?
9   A.  No.  She works in a different -- she works in a
10  different service area now.  I haven't spoken to her in a
11  while, a long time.
12   Q.  Do you -- what officers would you have spoken to?
13   A.  Guys I've rode with.  I think last night we were
14  drinking coffee and I left a little bit early last night,
15  and, hey, why are you leaving early?  I've got this
16  deposition in the morning, things like that, but it wasn't
17  like we went into detail or anything.
18   Q.  Okay.  I just want to know, but thank you.  Thank
19  you for letting me know.
20      You drinking coffee now, sir?
21   A.  No, actually hot tea.
22   Q.  Okay.  Did you have a meeting about the
23  deposition today with any other person outside of your
24  lawyers?
25   A.  No, ma'am.

Page 16

1   Q.  Okay.  And you do understand that you're under
2  oath and that your testimony can be used at the formal
3  hearing of this case?
4   A.  Yes, ma'am.
5   Q.  And even though this proceeding is informal, it
6  has the same significant force and effect as testimony
7  before a judge and jury and you are to submit to the same
8  penalties of perjury as if you were sitting before a judge
9  and jury in a courtroom.  Do you understand this?
10   A.  Yes, ma'am.
11   Q.  Given that this is an informal setting today, if
12  you need to take a break at any time, just let me know.
13  I'll get to a stopping point and then we'll take a little
14  recess.  I have some like 15-minute breaks set in at like
15  11:30, I believe.  Do you think you can last that long?
16   A.  Sure.
17   Q.  Okay.  But let me know if the tea tells you
18  otherwise --
19   A.  Yes, ma'am.
20   Q.  -- and I'll give you a break.
21      I'm going to ask you questions about your
22  background and about facts relating to this lawsuit.  The
23  court reporter is here to record the questions and your
24  answer.  And after this deposition, the court reporter
25  will prepare a booklet containing the printed questions

Page 17

1  and answers.  Do you understand?
2   A.  Yes, ma'am.
3   Q.  She may offer this electronically, I'm not sure
4  but I'll let her give you that option.
5      If you don't understand a question for any
6  reason, or you feel a question is unclear, then I want you
7  to please stop me and ask the question.  Do you
8  understand?
9   A.  Yes, ma'am.
10      MR. FRIGERIO:  This might be a good time in
11  the proceedings for me to state that I would like the
12  deposition sent to my office for his signature.
13      THE REPORTER:  Okay.
14      MS. HOUSE:  And you have Charles' info- --
15  we'll get that later.
16      THE REPORTER:  Yes, ma'am.
17  BY MS. HOUSE:
18   Q.  But if you don't understand, ask me to stop and
19  explain and I will.
20   A.  Yes, ma'am.
21   Q.  Also, Officer Tuli, because the court reporter
22  can only type what someone says, I'm going to ask that you
23  answer by speaking.  Okay?
24   A.  Yes, ma'am.
25   Q.  If you nod your head yes or shake your head no,

Page 18

1  the court reporter won't be able to type that into the
2  record. Okay? You understand?
3      A. Yes, ma'am.
4      Q. Okay. And if you answer the question, I'll
5  assume that you heard and understood it and you've given
6  me your best recollection. Okay?
7      A. Yes, ma'am.
8      Q. If you realize that an answer that you gave
9  earlier was incorrect or incomplete, please say so. Say
10  that you want to correct or supplement your earlier answer
11  and you'll be allowed to do so. Okay?
12      A. Yes, ma'am.
13      Q. If you don't know or don't remember the
14  information necessary to answer a question, please say so.
15      A. Yes, ma'am.
16      Q. Please do not speak at the same time I am
17  speaking and I'm going to do my best, Officer Tuli, not to
18  speak when you're speaking because the court reporter will
19  have difficulty recording both of us at the same time.
20  Okay?
21      A. Yes, ma'am. I understand.
22      Q. Have you taken any medications within the last
23  24 hours?
24      A. No, ma'am.
25      Q. Do you feel -- let's see. When I say -- I just

Page 19

1  want to let you know I'm going to explain some verbiage,
2  and if ever you hear some verbiage or language that you
3  are unclear about, let me know.
4          When I say "incident" or "injury," will you
5  please assume to me that I mean the alleged incident or
6  injuries of May 20th, 2017, unless I specify otherwise?
7      A. Yes, ma'am.
8      Q. If I say "SAPD" or "employer" will you please
9  assume with me that I'm referring to San Antonio Police
10  Department unless I specify otherwise?
11      A. Yes, ma'am.
12      Q. And I say your employer, correct, SAPD. And if I
13  say "minor child" or "14-year-old girl," will you assume
14  with me that I am referring to the minor child, and if I
15  say "A.N.E.R." that I'm referring to the minor child
16  that's represented by April Johnson in this suit, right?
17      A. Yes, ma'am.
18      Q. And that you were involved with on May 20th,
19  2017, unless I specify otherwise. Okay?
20      A. Yes, ma'am.
21      Q. Officer Tuli, are you ready to proceed with your
22  deposition?
23      A. Sure. Yes, ma'am.
24      Q. Okay. Let's get you started. I will say I've
25  allotted -- we're allotted seven hours. I'm hoping we

Page 20

1  don't take that long. I know that's a lot for your first
2  deposition, but I will do my best to get us through, okay?
3      A. I'll do my best also, ma'am.
4      Q. Thank you so much. Well, Mr. Tuli, let me ask
5  you, can you just tell me a little bit about yourself?
6      A. Like what do you want to know?
7      Q. Sure. So let's start off with you have a family?
8      A. Yes, ma'am.
9      Q. Okay. So --
10      A. A wife and four kids.
11      Q. Okay. So wife and four kids?
12      A. Yes, ma'am.
13      Q. What is your -- your wife's name is Melissa Tuli;
14  is that correct?
15      A. Yes, ma'am.
16      Q. And how long have you been married?
17      A. We just had our 15-year anniversary.
18      Q. Wow. Congratulations on that.
19      A. Thank you.
20      Q. And tell me about the ages of your kids. Well,
21  actually, tell me about your kids. Let's start with the
22  littlest one first.
23      A. Okay, yeah, she's a two-year-old daughter. She's
24  a meth baby that we adopted from someone here in
25  San Antonio and she's been with us since she was two days

Page 21

1  old.
2      Q. All right. So this baby came through CPS care?
3      A. Yes, ma'am.
4      Q. Okay. Congratulations on creating your new
5  forever family.
6      A. Thank you.
7      Q. Did you change her name?
8      A. Yes. We changed her name, yes.
9      Q. What's her new name?
10      A. Do I have to tell you guys or is this private
11  stuff?
12      Q. Well, your family dynamic is allowable, sir.
13      A. Yeah. Her name is Leilani. We named her after
14  my sister.
15          THE REPORTER: I'm sorry, could you say that
16  again?
17          THE WITNESS: Leilani. That's
18  L-e-i-l-a-n-i.
19  BY MS. HOUSE:
20      Q. Leilani? That's a very pretty name. Let me ask
21  you, what's your heritage?
22      A. I'm Samoan.
23      Q. Okay. And Leilani you said is two. And then who
24  is next in line?
25      A. My -- I have a six-year-old Tyson. He's actually

Gary Tuli

Page 22

1  Leilani's older blood brother and he was a heroin baby,
2  and we got him when he was two weeks old.
3     Q.  Were you -- is anyone in your family related to
4  the biological parents?
5     A.  Not at all, no.  What happened is we got Tyson
6  when he was a baby, and his biological mom, birthed
7  Leilani and she was a drug baby.  So CPS called me out of
8  the blue and said, hey, would you like a newborn baby?
9  And the next day we had a baby.
10    Q.  Awesome.  Congratulations.  Okay.  You know, it's
11  always pretty special to keep biological children
12  together; so you were able to offer that opportunity for
13  them?
14    A.  Uh-huh.
15    Q.  Awesome.  Okay.  Then who is next?
16    A.  Then I have my 10-year-old son Gunner.
17    Q.  Okay.
18    A.  And my --
19    Q.  Is he your biological child?
20    A.  Yes, ma'am.  My two old -- eldest, I guess that's
21  how you'd say it, they are my bio kids.
22    Q.  Got it.  And then who is your oldest?
23    A.  Jordan.  She's 15.
24    Q.  Jordan is 15.  What month is Jordan's birthday?
25    A.  November.

Page 23

1     Q.  Okay.  She's a November baby.
2         I am going to pull up some pictures and I
3  want to make sure that we are -- I just want to get to
4  know you.
5         So this is Melissa, right?
6     A.  Yes, ma'am.
7     Q.  And do you remember when this -- it says June 6,
8  2006.  Do you recognize this?
9     A.  Yeah.  That's my graduation photo.
10    Q.  Okay.  And pictured are you and Melissa; is that
11  correct?
12    A.  Yes, ma'am.
13    Q.  And is this a fair and accurate representation of
14  you and Melissa in this graduation photo?
15    A.  Excuse me, you asked what?  Is it a what?
16    Q.  Sure.  Is it a fair and accurate representation
17  of the picture you took at your graduation?
18    A.  Yeah, it's us.
19    Q.  Okay.  Yeah, sure.  No, I'm just asking, sir.
20  Let me tell you something about the law because I know
21  this is your first deposition.  We do a lot of formalities
22  that maybe don't make sense in the outside legal world,
23  but we have to do it for law.  So thank you for your
24  patience, okay?
25         Okay.  And this is a picture that was posted

Page 24

1  on Facebook?
2     A.  Sure.
3     Q.  Well, it says Melissa Tuli?
4     A.  Yes, ma'am.
5     Q.  And this is your wife's Facebook, correct?
6     A.  Yes, ma'am.
7     Q.  Okay.  And has this been modified in any way?
8     A.  Not that I can think of, no.
9         MS. HOUSE:  So I'm going to submit what has
10  been marked as Trial Exhibit No. 70 into evidence.  One
11  moment, please.
12         (Plaintiffs' Trial Exhibit No. 70 marked.)
13  BY MS. HOUSE:
14    Q.  Okay.  I'm going to show you the next picture.
15  What do you recognize this next picture to be?
16    A.  That's either my graduation photo or the day
17  before graduation.
18    Q.  Okay.  You said it was the day before or the day
19  of?
20    A.  Either/or.  We have -- when you graduate from the
21  academy, you have what's called family day.
22    Q.  Okay.
23    A.  I believe that's the day before graduation.
24  That's when you get your badge, the ceremony and all of
25  that.

Page 25

1     Q.  Okay.
2     A.  So it's one of those days.
3     Q.  And who is pictured with you in this photo?
4     A.  It's my daughter and my son.
5     Q.  Okay.  And who took this photo?
6     A.  I have no idea.
7     Q.  Okay.  But you've seen this photo before,
8  correct?
9     A.  I guess, yes, ma'am.  Sure.
10    Q.  Okay.  And this is a fair and accurate
11  representation of the photo that was taken on that day?
12    A.  Sure.  Yes, ma'am.
13    Q.  And when you say daughter and son, I want to
14  clarify, that would be Jordan and Gunner?
15    A.  Yes, ma'am.
16    Q.  Okay.  Has this picture to your knowledge been
17  modified in any way?
18    A.  No, ma'am.
19        MS. HOUSE:  I'd like to admit what has been
20  marked as Plaintiffs' Exhibit 70-A into evidence.
21        (Plaintiffs' Trial Exhibit 70A marked.)
22        MR. FRIGERIO:  This isn't the proper form
23  and we don't have a judge here to admit or deny since this
24  is a deposition.  It's not the trial starting yet, just so
25  the record is clear.

Page 26

1      MR. URBIS: And also for the record we're
2   not agreeing to the admission of any -- it's a trial. You
3   can label them how you wish, but don't take that as any
4   agreement on the City's part.
5          MS. RODRIGUEZ: Same. I agree. I just want
6   to understand where it comes Plaintiffs' Trial Exhibit 70
7   and not just deposition exhibits. And where are the other
8   exhibits that are even leading up to number 70. So I
9   believe that I agree that these should be just considered
10  deposition exhibits and used in that regard.
11         MS. HOUSE: Thank you, Clarissa. Well, as
12  you're aware we can have the freedom to label exhibits how
13  we will. My deposition exhibits are labeled trial
14  exhibits for the purpose of trial. And we will be using
15  other exhibits. It just so happens that this is the order
16  that this one came up and this is how we're submitting it.
17  BY MS. HOUSE:
18    Q.  Okay. We're going to move on to the next
19  picture, Gary, because I'm still -- I'm sorry about all
20  the interruption. I'm still trying to get to know you.
21         You will see here this is a screenshot of
22  your wife's Facebook page. Do you recognize it?
23    A.  Do I recognize the Facebook page?
24    Q.  Yes, sir.
25    A.  Yes, ma'am.

Page 27

1     Q.  Okay. And in the background you will see that
2   there is a picture of -- is this you and your family?
3     A.  Yes, ma'am.
4     Q.  Okay. And in the -- can you explain what you see
5   in the profile picture?
6     A.  My wife and my daughter.
7     Q.  Jordan?
8     A.  Yes, ma'am.
9     Q.  Is this a fair and accurate representation of
10  your wife's Facebook page, sir?
11    A.  Yes, I think so.
12         MS. HOUSE: I'm going to label that as
13  Plaintiffs' Trial Exhibit 70B.
14         (Plaintiffs' Trial Exhibit 70B marked.)
15  BY MS. HOUSE:
16    Q.  Looks like here's another picture, Mr. Tuli. Do
17  you recognize this post, Facebook post?
18    A.  I mean, I recognize the picture. I don't know if
19  I recognize the post itself. I don't -- but, yeah.
20    Q.  Okay. What do you recognize this picture to be?
21    A.  I think we went to a monster jam that day.
22    Q.  What is -- is that big trucks?
23    A.  Yes, ma'am.
24    Q.  Awesome. And then Gunner, does he have on
25  headphones?

Page 28

1     A.  Yes, ma'am.
2     Q.  Okay. So it's you, Gunner and your wife?
3     A.  And my daughter.
4     Q.  And your daughter.
5          MS. HOUSE: I'm going to label this as
6   Plaintiffs' Trial Exhibit 70C.
7          (Plaintiffs' Trial Exhibit 70C marked.)
8   BY MS. HOUSE:
9     Q.  Okay. And is this picture celebrating your
10  Samoan culture?
11    A.  No. It's just --
12    Q.  Okay.
13    A.  It's just a picture.
14    Q.  Okay. What are you dressed in?
15    A.  Well, my wife -- it's what's called a puletasi
16  and I have on a ié faitaga, but we're going to a family
17  reunion. We're not celebrating any kind of Samoan
18  culture. That's just how we dress when we go out, we go
19  to church, when you go to family reunions, whatever. It's
20  just an outfit.
21    Q.  Okay. So this is regular attire for you?
22    A.  Well, you know, when you're dressing up. This is
23  like church clothes.
24    Q.  Okay. But you recognize this picture?
25    A.  Yes, ma'am.

Page 29

1          MS. HOUSE: I'm going to label that as
2   Plaintiffs' Trial Exhibit 70D.
3          (Plaintiffs' Trial Exhibit 70D marked.)
4   BY MS. HOUSE:
5     Q.  And Mr. Tuli, tell me what's going on in this
6   photo.
7     A.  Me and my kids are posing. I don't know.
8     Q.  Okay. But you're at the rodeo, looks like,
9   because I recognize those lights in the background. Is
10  that the rodeo?
11    A.  It could be. It could be some other carnival. I
12  don't know, to be honest. It could be the rodeo. I don't
13  know.
14    Q.  Is that little -- so who is the young man in your
15  hands?
16    A.  That's Tyson.
17    Q.  Okay. So then who is next to you?
18    A.  Gunner and Jordan.
19    Q.  Okay. Tyson, Gunner, and Jordan. So you had
20  Tyson by this time?
21    A.  Yes, ma'am.
22    Q.  Actually, Melissa wrote it. She said rodeo.
23    A.  Oh, okay. There you go.
24         MS. HOUSE: I'm going to mark it as
25  Plaintiffs' Trial Exhibit 70E.

Gary Tuli

Page 30

1            (Plaintiffs' Trial Exhibit 70E marked.)
2    BY MS. HOUSE:
3        Q.   And here you are again, it looks like though,
4    that Tyson is a little younger than the picture in the
5    rodeo, right?
6        A.   I don't know.  Scroll back up.  I don't know.  He
7    looks the same age.  I don't know.  I couldn't tell you,
8    to be honest.
9        Q.   Okay.  So this is the same --
10       A.   He got a haircut.
11       Q.   Oh, that's what it is?
12       A.   Maybe, who knows.
13       Q.   Okay.  But you recognize this photo?
14       A.   Yes.
15       Q.   Looks like you all are at dinner, a restaurant
16   maybe?
17       A.   Yeah.  I don't know which restaurant but --
18       Q.   Okay.  That's not a problem.  You don't have to
19   know.
20            MS. HOUSE:  I'm going to label this as
21   Plaintiffs' Trial Exhibit F, 70F.
22            (Plaintiffs' Trial Exhibit 70F marked.)
23   BY MS. HOUSE:
24       Q.   These are more dinner photos.  Do you see that,
25   sir?

Page 31

1        A.   Yes, ma'am.
2        Q.   Okay.  This is you and your wife and the kids
3    out.  It looks like hibachi.  Was it hibachi?
4        A.   Probably.  I have no idea.
5        Q.   Yeah, you don't remember a lot.  You keep saying
6    I have no idea.
7        A.   I mean, clearly we're at dinner but I don't know
8    which restaurant it is.
9        Q.   Okay.  Is this a family reunion that you were
10   referring to earlier?
11       A.   Yes.
12       Q.   Okay.  Well, you have a large family.  This is
13   your family or your wife's?
14       A.   My family.
15            MS. HOUSE:  Okay.  I'd like to mark this as
16   Plaintiffs' Trial Exhibit 70H.
17            (Plaintiffs' Trial Exhibit 70G and 70H
18            marked.)
19   BY MS. HOUSE:
20       Q.   Okay.  Now, this is your oldest, right?  Jordan?
21       A.   Yes, ma'am.
22       Q.   Okay.  And is this a fair and accurate
23   representation of you and Jordan?  Y'all took a picture on
24   that day, whatever day?
25       A.   Yeah.

Page 32

1        Q.   Okay.  I'm going to show you the next picture.
2            MS. HOUSE:  I'm sorry.  That's Plaintiffs'
3    Trial Exhibit 70I.
4            (Plaintiffs' Trial Exhibit 70I marked.)
5    BY MS. HOUSE:
6        Q.   Here's another picture of -- I guess this is you
7    and Jordan?
8        A.   Yes, ma'am.
9            MS. HOUSE:  Okay.  I'm going to mark that as
10   Plaintiffs' Trial Exhibit 70J.
11            (Plaintiffs' Trial Exhibit 70J marked.)
12   BY MS. HOUSE:
13       Q.   And then here's you and Tyson, right?
14       A.   Yes, ma'am.
15            MS. HOUSE:  Okay.  And I'm going to mark
16   that as Plaintiffs' Trial Exhibit 70I -- K, right.
17            (Plaintiffs' Trial Exhibit 70K marked.)
18   BY MS. HOUSE:
19       Q.   And here is you and Melissa.  This looks like The
20   Pearl.  I think I recognize that background.  Do you
21   recognize, sir?
22       A.   Yeah, I think that is The Pearl.
23       Q.   Okay.  You have a pretty active family, huh?
24       A.   Sometimes, sometimes no.  It just depends.
25       Q.   It depends on dad's work schedule, right?

Page 33

1        A.   Sometimes, yes, ma'am.
2            (Plaintiffs' Trial Exhibit 70L marked.)
3    BY MS. HOUSE:
4        Q.   Okay.  Gary, tell me -- you were telling me about
5    your life, like it feels like I know quite a bit about
6    your family and you are a father of four, and you've
7    adopted two children and you have two bio children.
8            Where are you from?
9        A.   I'm from L.A.
10       Q.   Okay.  California?
11       A.   Uh-huh.
12       Q.   How did you get to San Antonio?
13       A.   I always knew I was going to be a police officer.
14   California, they were not hiring.  There was like a hiring
15   freeze and then they started hiring, but Texas -- we've
16   had a better economy here the entire time; so I looked at
17   different police departments here in Texas, everywhere
18   from Dallas to Austin and I ended up here in San Antonio.
19       Q.   Now, did you apply for any departments in
20   California?
21       A.   A long time ago I applied for LAPD.
22       Q.   Okay.  Was that a rigorous process?
23       A.   From what I remember, it was exactly the same as
24   here.
25       Q.   Okay.  And then what happened with that process?

Gary Tuli

Page 34

1    A.  I got two speeding tickets in the matter of like
2  a week or two, something like that, if I remember
3  correctly, and I got disqualified for like a year or
4  something.  So I went to the military instead.
5    Q.  Got it.  Well, when you were disqualified, you
6  didn't reapply?
7    A.  Well, I was planning on it, but the economy hit
8  real bad.  And so --
9    Q.  Oh, yeah, especially California, right?
10    A.  Yeah.  I was planning on it, but it just didn't
11  happen.  California -- the police departments that were
12  hiring because, you know, I was in the military so I had a
13  lot of friends who were in the reserves who were also
14  police officers, like cities like Oakland or San Francisco
15  when they were hiring, they just weren't -- they were
16  either laying off the guys who were on probation or they
17  weren't hiring at all.  So it just felt safer to come to
18  Texas, that's all.
19    Q.  Okay.  So when you got the speeding tickets, were
20  you in the application process?  Like what stage of the
21  process were you?
22    A.  So if I remember correctly, you know, it's called
23  the hiring process, I don't know, but I took a written
24  test and I passed that.  I took an oral interview and I
25  passed that.  And then I think I had to -- I was coming up

Page 35

1  on a PT test or something, but like I said, I got two
2  speeding tickets in the matter of like a week or two.
3    Q.  Was that so by LAPD?
4    A.  You know, to be honest, I don't even remember.
5    Q.  Okay.
6    A.  I had to -- I had to -- when I submitted my
7  package here, it was, you know, because you have to
8  mention every time you had a traffic ticket and it was
9  like really hard because I was calling California Highway
10  Patrol, the DMV, hey, I don't remember exactly who gave me
11  the tickets, and it was a pain in the butt, but I don't
12  remember who -- I don't know if it was LAPD or the highway
13  patrol or, you know.
14    Q.  So you said you were disqualified for LAPD.  Did
15  you do any type of law enforcement activities, anything in
16  California?
17    A.  No.  No.
18    Q.  Okay.  So what did you -- how old were you when
19  you applied for that position, if you remember?
20    A.  Twenty-one.
21    Q.  Okay.  So if you were that young, you must
22  have -- you had another job.  What job were you doing at
23  that moment?
24    A.  Oh, I had -- man, before I went to the military,
25  I had a lot of jobs.

Page 36

1    Q.  Tell me about them.
2    A.  I worked at Walmart.  I worked at the grocery
3  store.  I worked at -- I worked for Pitney Bowes.  I
4  worked for a pest control company.  Man, what else did I
5  do?  Yeah, all kind of stuff.
6    Q.  Is it fair to say that you have consistently
7  worked all of your adult life; is that fair to say?
8    A.  Yes, ma'am.
9    Q.  Okay.  And where did you -- so since you were --
10  you went to high school in L.A.?
11    A.  Yes, ma'am.
12    Q.  Where did you go to high school?
13    A.  I graduated high school in Whittier, California
14  which is right off -- it's in L.A. County but I graduated
15  from Whittier High School.
16    Q.  And then so you didn't immediately go to college
17  after graduating?
18    A.  I took a few classes but, you know, I didn't go
19  to like a four-year school or anything like that, you
20  know, just community --
21    Q.  Okay.  Where?
22    A.  Cerritos Community College.
23    Q.  Can you spell that?
24    A.  Cerritos, C-e-r-r-i-t-o-s.  Cerritos.
25    Q.  Okay.  And what were you studying?

Page 37

1    A.  Just -- I was just going to school because --
2    Q.  Okay.  Just to say you went to school?
3    A.  Yes, ma'am, that's what we do.
4    Q.  Okay.  But you took some community college
5  courses and you were like, this California thing ain't
6  working.  Texas was calling my name, right?
7    A.  Well, way later.  I went to the -- I went off to
8  the military.  I did six years in the military, but I was
9  stationed in California the entire time, went on a couple
10  of deployments but --
11    Q.  Okay.  So you were in the Air Force, right?
12    A.  Yes, ma'am.
13    Q.  How old were you when you enrolled?
14    A.  I was 22 years old.
15    Q.  Twenty-two.  So when did you enlist?
16    A.  When I was 22.
17    Q.  Do you know the date, the year?
18    A.  Yeah.  The day I went to basic training was
19  January 8th, 2007.
20    Q.  Okay.  And why did you pick the Air Force?
21    A.  So again, at the time I didn't realize that all
22  the branches were different.  I actually went to the Navy
23  office and he was on the phone, and the Air Force
24  recruiter came out and asked me what I was doing and so
25  three or four months later I was off to basic training in

Gary Tuli

Page 38

1 the Air Force.
2      Q.  Okay.  So that was just a fluke, an opportunity
3 just arose and you went -- why not the Army?
4      A.  Again, so a buddy of mine -- the reason I even
5 thought about the Navy was a buddy of mine that I was
6 doing pest control with, he was in -- he was a prior
7 Marine and he said, hey, you should go to the Navy
8 because, you know, the Navy is way better than the Marine
9 Corps.  And I was like, oh, I'm already married.  I don't
10 know if I can go into the military.  Well, I could go into
11 the military and I did, but like I said, I kind of thought
12 all the branches were the same.  The Air Force guy just
13 happened to come out.  I thought they were all on the same
14 team, to be honest.  I didn't realize that he was stealing
15 me from the Navy until --
16      Q.  Okay.  Can you walk me through your military
17 career?  So you talked about that you, on January 8, 2007,
18 you said you started basic training?
19      A.  Yes, ma'am.
20      Q.  Okay.  Can you just walk me through your military
21 career as far as job assignments?
22      A.  Yeah.  I was -- let me see, so obviously I came
23 to basic training here in San Antonio, here in Lackland.
24 And then from there I went to tech school up in Wichita
25 Falls.  I think I was up there for about six months.  And

Page 39

1 then from there I went out to Travis Air Force Base in
2 northern California.  I was there for a couple of years.
3 And then I got deployed to the United Arab Emirates for
4 almost four months.  And then from there I went back to
5 Travis Air Force Base.
6          And I changed from a flight line gig to
7 what's called a CRW or contingency response wing.  So I
8 went to a new unit where we did bare base openings.  So
9 from there I deployed to Romania.  And then I deployed to
10 Jordan with countless other TDYs here in the United
11 States, yeah.
12      Q.  Okay.  That's a lot --
13      A.  And then I came here.  Once I got off of active
14 duty, I came here to Lackland.  I was in the reserves at
15 the 433rd for two-and-a-half more years before I got
16 completely out of the military.
17      Q.  Okay.  And so what were your job duties
18 specifically?
19      A.  So it was -- I got kind of lucky.  I don't want
20 to bore you guys, but I got kind of lucky.  I started off
21 as a generator mechanic.  I was working on generators, air
22 conditioning, jet engines.  I was working all that but
23 then I got lucky when I went over to CRW where it was more
24 like a civil engineering kind of gig.
25      Q.  Okay.

Page 40

1      A.  But yeah, like I said, I don't want to bore you
2 guys.
3      Q.  No problem.  And so you said you got of the
4 military.  What year was that?
5      A.  I got out -- I got off of active duty in January
6 of 2013.
7      Q.  Okay.  So if you got out of active duty -- are
8 you still -- are you in the reserves?
9      A.  Not anymore, no, ma'am.
10      Q.  You said not anymore.  When did you -- when were
11 you in the reserves?
12      A.  So when you get off -- when I got off active
13 duty, I went directly into the reserves from -- I'm sorry.
14 I got the dates wrong.  I went to basic training on
15 January 9th.  I got out of active duty on January 8th in
16 2013.  So I got the dates backwards, but nonetheless, so
17 -- and from there I was automatically in the reserves, and
18 I stayed in the reserves until July of 2015.
19      Q.  Okay.  And when you got out, were you -- how were
20 you discharged?  Was it administrative or punitive?
21      A.  Oh, no, it was an honorable discharge.
22      Q.  Okay.  Honorable discharge.  Okay.  I think we
23 have -- I'm going to show you -- is this you?
24      A.  Yes, ma'am.
25      Q.  Tell me about this picture because when I saw it,

Page 41

1 I laughed.
2      A.  I was taking selfies.  I don't know.
3      Q.  And is this in -- so do you remember what stage,
4 what year you were?
5      A.  No, to be honest, no.  Again, it's a selfie.  I
6 couldn't tell you.  It looks like I'm in my house though.
7 It doesn't look like I'm anywhere so --
8          MS. HOUSE:  And that was Plaintiffs Trial
9 Exhibit 71.
10          (Plaintiffs' Trial Exhibit 71 marked.)
11 BY MS. HOUSE:
12      Q.  Tell me what's going on in this picture.
13      A.  This is at my brother's wedding, and that is my
14 cousin and my baby brother.
15      Q.  Oh, okay.  You have a very tight family, sir?
16      A.  Yes, ma'am.
17          MS. HOUSE:  Okay.  I labeled that as
18 Plaintiffs' Trial Exhibit 71A.
19          (Plaintiffs' Trial Exhibit 71A marked.)
20 BY MS. HOUSE:
21      Q.  You're in your more formal gear there, right?
22      A.  Yes, ma'am, we were in a -- I went to a wedding.
23      Q.  Okay.  And then I'm going to move on to -- oh,
24 tell me about this one.
25      A.  Actually, I do remember this picture.  We -- the

Gary Tuli

November 23, 2020
Pages 42 to 45

Page 42

1 Travis Air Force Base is about an hour outside of
2 Sacramento and that's also where the California Highway
3 Patrol Academy is.  And we had a -- I don't know, a field
4 trip to the Highway Patrol Academy.  And we went out there
5 and we got to see all their training and look at some cool
6 stuff.  This is one of the photos.
7       (Plaintiffs' Trial Exhibit 71B marked.)
8 BY MS. HOUSE:
9    Q.  Did you find that inspiring to want to go back to
10 your original goal of law enforcement?
11    A.  I already knew I was going to be a cop forever,
12 the whole time I was in the military.  It was happening
13 so --
14    Q.  Military was just a detour, huh?
15    A.  Yes, ma'am.  Yes, ma'am.  And I'm glad it
16 happened, but yeah, the plan has always been I was going
17 to be a police officer.
18    Q.  Let me ask you because you said you're glad it
19 happened and I'm glad you said that.  What essential
20 skills were you able to pick up from the military that
21 have translated to you being a law enforcement officer?
22    A.  I'd say the, you know, I didn't do law
23 enforcement in the military, but, you know, the
24 dependability, just the life experience, you know.  You
25 meet all kind of different people, which that helps when

Page 43

1 you become a police officer, just the experience as a
2 whole.  It's just all kind of benefits, I mean --
3    Q.  Awesome.  Okay.  Can I ask you, how tall are you?
4    A.  Six-two.
5    Q.  You're pretty tall --
6    A.  Yes, ma'am.
7    Q.  -- Officer Tuli, and how much do you weigh?
8    A.  Right now, I don't want to tell you.  No, I'm
9 just -- I'm about 225, 230.
10    Q.  225, 230.  Now, okay.  Why do you say you don't
11 want to tell me?  Does that mean you're on the higher side
12 of where you'd like to be?
13    A.  Yeah, I'm getting kind of fat.
14    Q.  Okay.  Mr. Tuli, let me ask you though, on May
15 20, 2017, you were doing a lot of sweating that day, do
16 you remember?
17    A.  Yeah, I always sweat.
18    Q.  You also joked at some point about -- you were
19 like, oh, I'm sweating because I'm fat.  Do you remember
20 saying that?
21    A.  No, but I wouldn't -- I wouldn't -- I wouldn't
22 deny saying that.  That's something I probably would say.
23    Q.  Okay.  Were you about 225, 230 then or were you
24 like heavier?
25    A.  To be honest, I was probably in better shape back

Page 44

1 then so -- a good weight for me is about 215 to 220.
2    Q.  Okay.
3    A.  That's when I'm in good shape, so --
4    Q.  So what -- does good shape include drinking warm
5 tea?  Does that help with your weight?
6    A.  No.  I just like tea.
7    Q.  Oh, okay.  So when you say -- okay.  I want to be
8 clear because people have their own ideas.
9    A.  No, I just like drinking hot tea.  It makes me
10 feel good sometimes so --
11    Q.  Okay.  So when you say "better shape," were you
12 just working out more then?
13    A.  Yeah, just to be up front, I was in pretty good
14 shape back then.  I was working out.  I was lifting.  I
15 was, you know, exercising a lot more.  I was just in
16 better shape.
17    Q.  And so -- and probably because you all are
18 required to take -- are you required to take fitness tests
19 as part of your job?
20    A.  No.  You're not -- it's not mandatory but it's
21 highly recommended, you know.
22    Q.  Okay.  And so --
23    A.  I mean, other departments may be different but on
24 San Antonio specifically, it's not mandatory that you take
25 and pass a fitness test every year, but we still take

Page 45

1 fitness tests.  You can volunteer to take the fitness test
2 every year and --
3    Q.  Do you volunteer to take the fitness test every
4 year?
5    A.  Yes, ma'am.
6    Q.  Okay.  Do you do that to show up your fellow
7 colleagues?
8    A.  No.  I'm going to be honest with you.  The only
9 reason I do that is because the higher you score on the PT
10 test, the more comp time you get off.  So that's the only
11 reason.  If it wasn't for the comp time, I wouldn't do it.
12    Q.  Understood.  Have you passed every single test
13 you've taken?
14    A.  Yes, ma'am.
15    Q.  And is it also fair to say that you understood
16 how to pass those tests because you were required to take
17 those type of fitness tests in the military, right?
18    A.  Yes, ma'am.
19    Q.  But you came in like a pro?
20    A.  No, no, no.  So I'm not a very fast runner.  I'm
21 stronger than people, but I'm not very fast though.
22    Q.  Understood.  So let me ask you about the fitness
23 test.  Well, do they ask you to run in the fitness test
24 for SAPD?
25    A.  For SAPD?  So again, not to bore anybody but to

Page 46

1  get onto the department, you have to do what's called the
2  Cooper -- I don't know, even know if you have to do that
3  anymore, but when I came onto the department, you had to
4  do what's called the Cooper's test. And that consists of
5  doing X amount of push-ups in a minute, X amount of
6  sit-ups in a minute, run a mile and a half in, you know, X
7  amount of time. You have to do a dummy drag. What else?
8  Yeah, I think that was it. So there's -- yeah, but you
9  had to do all of that. I don't know what the requirements
10  are now, but when I came in, you had to do all of that,
11  which is similar to the Air Force PT test.
12      Q.  Okay. Well, tell me about -- because push-ups,
13  ugh, tell me about -- how many push-ups can you do in a
14  minute?
15      A.  Right now I can probably knock out about 45 to
16  50.
17      Q.  Whoa, really?
18      A.  Yeah. If I was doing Air Force push-ups, I can
19  probably do 70.
20      Q.  Wait. What are the -- what's the difference
21  between a regular and an Air Force push-up?
22      A.  Air Force push-ups are weak.
23      Q.  Okay. But you've got to tell me, like explain --
24      A.  I'm just messing around, ma'am.
25      Q.  Okay. I know you're a joker so it's all cool, so

Page 47

1  am I but you've got to explain the difference. What's the
2  difference between an Air Force push-up and a regular
3  push-up like?
4      A.  So I mean, a normal push-up you go all the way
5  down and come all the way up. The Air Force push-up you
6  only have to break the 90-degree angle at your elbows; so
7  you don't have to go all the way down, basically.
8      Q.  So your son's name is Gunner and then your arms
9  -- you must have the gun show going on, right?
10      A.  No, no, no. I'm -- again, I'm -- I got Dad bod
11  going on.
12      Q.  Got it. But then you did in 2017, right?
13      A.  Yes. I was in a lot better shape back then yes,
14  ma'am.
15      Q.  Where did you work out? Did you work out at home
16  or --
17      A.  I just do random cross-fit or I have like a
18  little home gym that I use, you know. I don't go to the
19  gym or anything, I just --
20      Q.  Okay. You said random cross-fit, cross-fit is
21  not random.
22      A.  But you know what I mean. You can do like random
23  cross-fit exercises or whatever. You don't have to go to
24  a cross-fit gym to do cross-fit kind of things. You know,
25  I got a weight bench. I got -- you know, I got pull-up

Page 48

1  bars directly across from my house, you know. I don't
2  need to pay any money. I can work out at home for free.
3      Q.  That's fair. That's fair. So you told me about
4  -- a little bit about how you -- the application process
5  for SAPD. What was required in order to apply for SAPD?
6      A.  You had -- again, this is just going off memory.
7  I'm not -- I don't know if things changed, but you can't
8  have anything more than class E misdemeanors. You can't
9  have more than X amount of traffic violations. You've got
10  to be a citizen. You've got to have a high school
11  diploma. You can't -- what else. Oh, you got to pass the
12  written test. You got to pass the PT test. You got to
13  pass the psychological test. You got to pass the physical
14  test. Then you got to get clearance from a doctor, yeah.
15      Q.  Okay.
16      A.  If I'm missing anything, sorry.
17      Q.  No, it's not a problem because I know -- I mean,
18  how long have you been with SAPD?
19      A.  So I started the police academy on, I believe it
20  was, January 28th of 2013, and then I've been a police
21  officer since September of that year, which I believe was
22  September 12th, so ...
23      Q.  And have you -- so you told me about there's so
24  many tests that you go through. I know that the speeding
25  test stopped you in L.A., the speeding tickets. So I'm

Page 49

1  assuming the speeding tickets didn't stop you in
2  San Antonio?
3      A.  No, because there's a huge time lapse in when the
4  last time I got the speeding ticket. So the issue with
5  L.A. wasn't that I got the speeding tickets, it was that I
6  got them within the last year or two years, whatever the
7  requirement was back then. By the time I came to
8  San Antonio, I hadn't had a speeding ticket for
9  seven years, give or take.
10      Q.  Okay. Were you involved in any wars during your
11  military duty?
12      A.  Like, yeah, in support of Iraqi Freedom, Enduring
13  Freedom.
14      Q.  Okay. That's huge. And what year was that?
15      A.  Let me see. I went to UAE in 2009, I believe.
16      Q.  Okay.
17      A.  Then I went to Jordan in 2012.
18      Q.  Okay.
19      A.  Then I went to Romania -- I think it was Romania
20  in 2011 -- or it might have been 2012.
21      Q.  Let me -- in connection with your military duty,
22  did you have any type of diagnosis such as PTSD?
23      A.  Oh, no. Oh, were you asking like if I was in
24  combat or anything?
25      Q.  Yes.

Page 50

1    A.  Oh, no, no.  I never saw any combat or anything
2    like that.
3    Q.  Got it, okay.
4    A.  I was --
5    Q.  No, okay.  You know, I'm not in the military so I
6    don't know the lingo --
7    A.  Oh, No.
8    Q.  -- so have patience with me.  Okay.
9         So -- but did you ever receive a diagnosis
10   from your military service?
11   A.  Yeah.  I can't hear anything very often.  My
12   hearing is bad.
13   Q.  Hearing -- when did that happen?  Did that happen
14   while you were doing the Iraqi Freedom?
15   A.  So this is -- again, I don't want to bore
16   anybody, but I thought you could not be a police officer
17   if you had any kind of service-related disabilities.  So I
18   never went to the hospital and I never filed any claims
19   with the VA.  Once I became a police office and I realized
20   that was entirely untrue, then I filed a claim with the
21   VA, and a few years later they gave me a small disability
22   for hearing.
23   Q.  Okay.  And so -- what is your -- are you
24   100 percent?
25   A.  No, no, I'm like 10 percent.  It's like the

Page 51

1    lowest of the low.
2    Q.  And so what exactly is your service-connected
3    disability?  What's it called formally?
4    A.  Tinnitus, I think.  Tinnitus, I have a constant
5    ringing in the ears and I can't hear that often.
6    Q.  Okay.  And do you remember what year you were --
7    that occurred?
8    A.  I was already out of the Air Force, but --
9    Q.  Had you already started with SAPD, like did it
10   happen --
11   A.  Well, that was the thing.  I didn't know you
12   can -- I didn't know you can make a claim with the VA.  So
13   I made my claim with the VA after I had already been out
14   of the military.
15   Q.  Got it.
16   A.  So I want to say 2017, 2018, give or take.
17   Q.  2017, 2018 but you said 2017.  Would it have been
18   before this incident or after?
19   A.  To be honest, I don't know.
20   Q.  You don't know?  It's okay.  That's fair.  Like,
21   I mean, a lot of time has passed.
22        Okay.  So you said you hear ringing and
23   sometimes you can't hear.  Is it like a bubble, like if
24   there's water in your ear?
25   A.  No.  It's more like -- like if it's quiet, I will

Page 52

1    have like this really high pitch ringing my ear, so I have
2    to always have like other noise going on.  Like I have to
3    sleep with the fan on or else it's -- it's like a ringing.
4    I don't know how else to describe it.  It's like -- you
5    ever watch a movie and a bomb blows up and then it gets
6    quiet and you hear that little (makes noise) -- sorry,
7    Ms. Thompson.
8         But yeah, that's what I'll hear if it's
9    quiet.  So I normally have to have some kind of white
10   noise or something going on or else it will start really
11   bothering me.  Also, it seems like when I'm talking to
12   people, sometimes I'm like, what did you say?  What?  Can
13   you speak up a little bit, you know, so ...
14   Q.  Got it.  Were you -- did you -- are you required
15   to let SAPD know or it's like it doesn't affect you to the
16   point where you had to tell them?
17   A.  I don't know, to be honest.
18   Q.  Okay.
19   A.  I don't know.
20   Q.  But no one has ever asked you about it, right?
21   A.  No.
22   Q.  Okay.  And so you didn't voluntarily just say,
23   hey, let me tell you about this, to be fair, right?
24   A.  I think when you first get hired they ask you if
25   you have any service-related disabilities and, you know,

Page 53

1    at the time I did not have any service-related
2    disabilities.
3    Q.  Got it.  Okay.  So at the time you didn't have
4    it.  And then they've never asked for an update so there
5    was no outlet to provide that update; is that fair?
6    A.  I think so.  Yes, ma'am.
7    Q.  Okay.  Thank you.  No problem.
8         Let me ask you about -- so you passed your
9    test.  Talk to me about your training that you have gone
10   through with SAPD.
11   A.  Yes, ma'am.  So you start the academy off and you
12   -- it's a variety of subjects that you get trained on,
13   anywhere from penal code, code of criminal procedure,
14   all -- I mean, you -- it'd probably be easier for you to
15   ask, have you had training on this as opposed to me just
16   listing things because there's so much training.  You're
17   in the academy for almost nine months and then you go out
18   and you do ride-alongs for another three-and-a-half months
19   so you're in constant training for over a year.
20   Q.  Okay.  Why don't you, if you could be specific,
21   what -- because I don't know.  You know better than I do,
22   tell me what specific trainings do you recall that you've
23   done.
24   A.  Oh, I mean, again, we've got tactics, methods of
25   arrest; you've got use of force.  You've got, like I said,

Page 54

1  penal code. You've got cultural diversity. You've got --
2  I mean, you've got crisis intervention training. You've
3  got training on family violence. You've got training on
4  first aid, you know, self aid buddy care. I mean, again,
5  there's -- there's so much stuff. There's so much
6  training. Driving, the list goes on.
7      Q.  Okay. Are there any trainings on filling out
8  documentation or are there just like handbooks on that?
9      A.  Oh, you mean like report writing? So yeah,
10 you've got training on report writing. You've got
11 specific on how to -- how to write our report writing
12 system. You've got crash documents. You've got -- again,
13 whatever document a police officer can fill out, we train
14 on that.
15     Q.  Okay. All right. I may circle back and ask you
16 about some of that stuff.
17         What trainings have you -- did you have
18 in -- let me ask you, what is your yearly requirement in
19 order to -- like, do you have a yearly requirement to
20 maintain, like, certification or license?
21     A.  Yes, ma'am. So the State of Texas you have to
22 have X amount of training every year and every other year.
23 The San Antonio Police Department, we just make sure all
24 that is done every year and we all go to a week of
25 in-service training every year.

Page 55

1      Q.  Okay. So it's a week of in-service training?
2      A.  Yes, ma'am. And that can range from all sort of
3  topics that entire week, anywhere from -- you name it,
4  sexual harassment, firearms qualification, driving
5  qualifications, just everything you get re-qualed on
6  virtually everything you can.
7      Q.  And who does this training?
8      A.  The academy staff.
9      Q.  The academy staff. And outside of just -- and
10 everyone does this, you said, right? Everyone in the
11 State of Texas?
12     A.  No, no, San Antonio. We take our training above
13 and beyond the state. So I think the State of Texas is
14 you have to get recertified every two years on most
15 things, and then depending on which department you work
16 for, you may not even go to in-service. You have to go
17 get that training on your own, whether you go to ACOG or
18 something or you do online training or whatever. But
19 San Antonio, we take everything we need and we make sure
20 officers are trained.
21     Q.  Okay. All right. Above and beyond that
22 in-service and the training that SAPD requires you to do,
23 have you had to do any type of, like, extra training, like
24 remedial training?
25     A.  So I went back to the academy to go over some

Page 56

1  de-escalation.
2      Q.  Okay. When did you do that?
3      A.  I want to say it was in 2017.
4      Q.  Would that have been before or after this
5  incident?
6      A.  After.
7      Q.  Okay. After. Did you ever go to any remedial
8  training before this incident?
9      A.  No, ma'am.
10     Q.  Okay. Have you had to go -- since that 2017
11 de-escalation, how -- well, tell me about the training.
12 How long was it?
13     A.  So I spent two weeks at the academy.
14     Q.  Okay. Where is the academy located?
15     A.  On the south side. I don't know the exact
16 address.
17     Q.  Sure.
18     A.  It's way south though.
19     Q.  When you say spent, do you feel like -- is it
20 like school, you go there in the morning, leave in the
21 evening?
22     A.  Yeah. It's like an all-day school, so...
23     Q.  How many people were in your class? Is it just
24 you alone or is it like --
25     A.  For my graduating class or -- is that what you

Page 57

1  mean?
2      Q.  De-escalation school.
3      A.  Oh, it was -- so with that -- so with the
4  de-escalation, there was -- I actually went down there
5  more and helped out with training more than anything, but
6  with the de-escalation, so what they do is during
7  in-service they put on a class, a de-escalation class. So
8  that is whatever the in-service students are there, that's
9  when I got the training, but I was there for two weeks.
10 So I got that two times. For the other two weeks or for
11 the rest of the two weeks I was out there, I helped out
12 with, you know, the cadets or whatever they needed me to
13 do.
14     Q.  Okay. So you helped -- what did you -- okay. So
15 you said you did the two weeks two times?
16     A.  No, no, no, let me clarify, okay?
17     Q.  Okay.
18     A.  So they sent me to the academy. The goal was to
19 make sure I got the de-escalation training. That was the
20 remedial part. But while I was there, I also -- the
21 de-escalation was only like a four-hour block and I did
22 that twice. I did it the first week and I did it the
23 second week. So that was just, again, a four-hour block
24 that I just did with the rest of the in-service.
25         But as far as the rest of the two weeks

**Page 58**

1  while I was there, I helped out with training here and
2  there; you help out training the cadets, you help out
3  whatever they do at the academy, just kind of, you know,
4  go around teaching and helping out.
5      Q.  Okay.  And so what did you learn at
6  de-escalation, like what did they go over?
7      A.  Use-of-force continuum.  What else do they do at
8  de-escalation.  They do use-of-force continuum, you know,
9  make sure, you know, you don't -- you know not to get too
10  excited or not to take things further than they need to
11  go, you know.  I don't know.  It's a four-hour block.  I
12  don't know if I can recall every single thing.  They go
13  over methods of arrest, TASER use, joint manipulation,
14  verbal, you know, just stuff.
15      Q.  You said joint manipulation.  What is joint
16  manipulation?  What is that?
17      A.  Like if -- like jiu jitsu kind of stuff.
18      Q.  Like they teach it to you?
19      A.  Yeah, so we don't hurt -- so we don't hurt a
20  suspect in an arrest.  You know, they try to go over, you
21  know, instead of, you know, hitting -- for example,
22  instead of hitting a suspect with your baton 50 times, if
23  I can get him into custody by manipulating his wrist, then
24  no one is hurt and it's fine, something like that.
25      Q.  Got it.  Did you find it useful?

**Page 59**

1      A.  Yeah.
2      Q.  Okay.  What did you find most useful?
3      A.  I don't know.  That's kind of a weird question.
4  I don't know.  It's training -- training is good for you.
5  Training is good for all of us.  It doesn't hurt to get
6  trained on something, you know.  Like it.
7      Q.  Okay.  But what did you find most useful about
8  the use-of-force training?  Like, what stuck out to you
9  the most, as it related to that May incident?  What stuck
10  out to you the most?
11      A.  I don't know.  It wasn't the first time I've been
12  trained on use of force.  It's just a refresher, you know.
13      Q.  But it was a little bit different, right, to be
14  fair, because it was remedial training, right?
15      A.  Yeah, but it had nothing to do with the May
16  incident.
17      Q.  Oh.  So what did it have to do with?
18      A.  I got into -- I arrested a guy either the day
19  before or a couple of days before where I had to use
20  force.  The department felt that I probably should have
21  de-escalated a little more before I used force and we did.
22      Q.  Okay.  That's fair.  Thank you.
23          I think you said they got you to do -- start
24  doing training you said, right?
25      A.  Yeah, I mean, you help out.  This is what we all

**Page 60**

1  do.  We go to the academy.  If there's something you can
2  help out with, whether it's PT or scenario training or --
3  I mean, I wasn't teaching -- I wasn't given full-blown,
4  you know, total criminal procedure lessons but, you know,
5  if they need a body here or, you know, you need help
6  cleaning guns, you know, just helping.
7      Q.  Got it.  Okay.  Let me ask, so what is your
8  official title right now with SAPD because I don't think I
9  know.
10      A.  Patrolman.  Is that what you mean?
11      Q.  Yes, sir.
12      A.  Patrolman.
13      Q.  And what is your job assignment?
14      A.  I work on the east patrol.
15      Q.  Are you on a flex schedule?
16      A.  No.  I work -- it's called T shift or Tango
17  shift.  I work from 5:00 in the afternoon until 3:00 in
18  the morning.  And then I get, you know, three days off a
19  week.
20      Q.  Okay.  You use those days to spend with your
21  children, your family?
22      A.  Uh-huh.  Yes, ma'am.
23      Q.  During COVID, are they at home doing virtual
24  learning?
25      A.  So my kids finally went back to school.  My wife

**Page 61**

1  is still working from home though.
2      Q.  Okay.  So in 2017 were you a patrolman then?
3      A.  Yes, ma'am.
4      Q.  And what area were you assigned to patrol, if you
5  were assigned one?
6      A.  East patrol.
7      Q.  Okay.  So that was still the same -- have you --
8  let me ask you, how long have you been assigned to east
9  patrol?
10      A.  Since 2014.
11      Q.  Okay.  So since 2014 to present, you've been at
12  east patrol?
13      A.  Yes, ma'am.
14      Q.  And can you explain to me what areas east patrol
15  covers?
16      A.  East patrol covers all the way from the northeast
17  side all the way to the southeast side.  So, I mean, all
18  the way out past 1604, there's three different -- there's
19  three different sections in the east patrol service area,
20  which it would be the northeast side, the east side, and
21  then the DB side, I guess that would be so...
22      Q.  So on a regular night, that's a large spread.  On
23  a regular night you are patrolling all of that area?
24      A.  So I'm -- remember I said there's three different
25  sections in the east patrol area.

Gary Tuli

Page 62

1    Q.   Yes, sir.
2    A.   I'm assigned or my patrol -- so my service area
3  is the northeast side.
4    Q.   Got it.
5    A.   So my particular district would be -- I don't
6  know if you know the area, but from like North Foster all
7  the way to like mid-crown area, that would be my district,
8  but I also help out in the district right next door, which
9  would be -- again, they're all numbers but, you know, that
10  whole northeast side.  Pretty much the side that I work on
11  is -- let me see, so it would go from the 10 and 1604 all
12  the way up to, like, Walzem and 410 --
13    Q.   Okay.
14    A.   -- all the way up Harry Woods, all that area.
15    Q.   Okay.  So the night -- May 20th, when you
16  responded to that quinceañera, was that in your district?
17    A.   That was in my neighboring district, but it was
18  in my service area.
19    Q.   Got it, neighboring district service area.  But
20  you're allowed to respond to that, right?
21    A.   Yes.  It's not only allowed, you're kind of
22  expected.
23    Q.   Sure.  At that time in 2017, May 20th, can you
24  explain your chain of command for me?
25    A.   Let me see.  That night -- who was working.  So

Page 63

1  you have a night captain that works -- I think he works,
2  you know, depending on who it is, but they may work
3  downtown or they may work at the north sub station, but
4  you have a night captain who is pretty much in charge of
5  everything.
6    Q.   Okay.
7    A.   And then that rolls down to -- to -- each shift
8  has a lieutenant.
9    Q.   Okay.
10    A.   And each -- underneath each lieutenant is two or
11  three sergeants, and then underneath the sergeants are all
12  patrolmen.
13    Q.   Got it.  So who is your sergeant?
14    A.   My sergeant back then or right now?
15    Q.   Then.
16    A.   I believe it was Reed.
17    Q.   Okay.  And who were the other two sergeants, do
18  you recall?
19    A.   No.  Let me see.  So I know -- I don't know if
20  Sergeant Berrigan -- I don't know if he was a lieutenant
21  back then or if he was still Sergeant Berrigan, but
22  Berrigan was out there.
23    Q.   Who is Sergeant Hensley?
24    A.   Reed.  Sorry.  Sorry, Reed Hensley.
25    Q.   Oh, okay.  Oh, y'all are on first-name basis?

Page 64

1    A.   No.
2    Q.   Don't let him hear you say that, right?
3         Okay.  So Sergeant Hensley was in charge of
4  you that night, right?
5    A.   Yes.  He was my first-line supervisor, yes,
6  ma'am.
7    Q.   First-line supervisor.  Okay.  I like how you say
8  that.  And then there's a lieutenant over him, right?
9    A.   Yes.  And I don't remember if at the time because
10  since then, Sergeant Berrigan has promoted and so I don't
11  remember if at the time he was still Sergeant Berrigan or
12  if he was Lieutenant Berrigan yet.  I can't remember, to
13  be honest.
14    Q.   So maybe Berrigan?
15    A.   Yeah, but he could have been -- he could have
16  been lieutenant or sergeant back then.  I can't remember.
17    Q.   Got it.  And then there's the night captain,
18  right?
19    A.   Right, which I don't even know who the night
20  captain was that night.
21    Q.   No problem.  And then there's --
22    A.   I don't even know who the night captain was last
23  night, so ...
24    Q.   Understood.  Understood.  I wanted to know when
25  you arrived May 20th -- and we're going to break in a

Page 65

1  little bit -- who was the highest-ranked officer present
2  when you arrived?
3    A.   So the way the ranking system works, all of us
4  patrolman are all the same rank.  Now you have
5  probationary patrolman who are on probation, but it's not
6  like the military where you have, you know, you have -- an
7  E-4 can tell an E-3 to, you know, pound sand or whatever.
8  It's not like that.  We're all the same rank.  So all of
9  the officers that were there, we're all patrolman.
10    Q.   Okay.  So when you arrived, everyone that's there
11  is pretty much ranked the same and you each had similar
12  job duties, correct?
13    A.   Yes, ma'am.
14    Q.   Was there a sergeant called to the scene when you
15  first arrived?
16    A.   When I first arrived, not that I recall, no.
17    Q.   Whose job would it have been, like anyone could
18  have called the sergeant?
19    A.   Well, you only call a sergeant if you need a
20  sergeant.
21    Q.   Got it.
22    A.   So when we first got there, it wasn't -- it
23  didn't start off to be one of those calls where it's like,
24  hey, get a supervisor up here right away, you know.  It
25  wasn't like that.

Page 66

1    Q.  Let me ask you then, what facts trigger having --
2  needing a sergeant present?
3    A.  Well, any time you do -- well, it can be all kind
4  of things, but that night in particular, because there was
5  a use-of-force, you have to a have a sergeant that comes
6  out for general manual -- and so we did, you know, we
7  requested a sergeant.
8        But by -- I think by the time we actually
9  did use-of-force, sergeants may have already been on the
10  way, you know, because there was a lot of keying up over
11  the radio; there's a, you know, large crowd, you know,
12  contingently getting violent, you know, so they may have
13  already been on the way but ...
14    Q.  I want to make sure that I didn't miss anything
15  that you told me.  You told me you had been eastside
16  patrol 2014 to 2020, right?
17    A.  Yes, ma'am.
18    Q.  What did you do before eastside patrol?
19    A.  I was on my rides.  So I worked -- you do your
20  patrol rides when you first graduate from the academy.
21  You do your patrol rides for three-and-a-half months; so I
22  started off on east daylight and then I went over to west
23  night shift or dogwatch, and then I worked central.  And
24  then I got off my rides in the downtown area and I worked
25  downtown a few more weeks before I got transferred to the

Page 67

1  eastside.
2    Q.  Okay.  Have you received any type of promotions?
3    A.  No.
4    Q.  Okay.
5    A.  I wasn't eligible for a promotion until, I don't
6  know, this is my seventh year -- so yeah, this will be --
7  I tested twice and so that was -- before then I wasn't
8  eligible to promote.
9    Q.  Okay.  What do you mean -- what does tested twice
10  mean?  Because I don't understand that language.
11    A.  So we all start off as a patrolman.  To become a
12  detective, you have to be on for five years.  You have to
13  be a patrolman for five years and then you're eligible to
14  take a written test.  If you score high enough on the
15  written test and they're promoting the right amount of
16  people, then you can be promoted to detective.  So I
17  haven't been promoted to detective yet.
18    Q.  Okay.  Have you tried to take the written test?
19    A.  Yes, ma'am.
20    Q.  Okay.  So you're going to keep trying to escalate
21  up?  That's your goal?
22    A.  Yeah, eventually.
23    Q.  Okay.  And how much do you -- are you getting
24  paid right now?  Like, what's your salary?
25    A.  Well, I think this -- I think in 2019, I think I

Page 68

1  made 69.
2    Q.  69.  What was it in 2017?
3    A.  I don't remember, to be honest, but it's been
4  around that, around that.
5    Q.  Around that, okay.  And I'm going to -- because
6  we have a couple of minutes.  Actually, the break I had
7  was at 11:30.  Are you still good?
8    A.  I'm tough.
9    Q.  Okay.  So we'll probably have like 15 more
10  minutes and then we'll take a break, give you a little
11  bathroom break and then we'll come back.  If you want to
12  go through and Charles doesn't object, I'm here too with
13  you so --
14    A.  I'm here for you.  I promise if I need to pee or
15  something, I'll say it, okay.
16    Q.  Okay.  Thanks.  All right.  So May 20th, 2017,
17  and I got the day right; is that correct?
18    A.  Yes, I believe so.
19    Q.  And you know this day very well; is that fair to
20  say?
21    A.  Yes, I guess.
22    Q.  Well, a lot happened that day, right?
23    A.  Yes.
24    Q.  Okay.  Can you just from the beginning -- and
25  when I say from the beginning, whether you woke up that

Page 69

1  night or whether you were, you know, on patrol in the
2  neighboring district, can you just walk me through that
3  night?  So let's start at like 12:00 a.m.
4    A.  So we'll start at 5:00, okay, because normally
5  that's when I start my shift then, 5:00 in the afternoon.
6    Q.  You're talking about 5:00 p.m. May 19th?
7    A.  When did -- the incident happened after midnight?
8        MR. FRIGERIO:  After midnight on the 21st so
9  you went on duty on the 20th.
10        THE WITNESS:  Yeah, I went on duty on the
11  20th, so that day.  So May 20th at 5:00 p.m. starts off
12  like any patrol shift, answered a few calls.  Strangely, I
13  do remember arresting a guy before that, but arrested a
14  guy.
15  BY MS. HOUSE:
16    Q.  What did he get arrested for?
17    A.  If I remember right, it was family violence and
18  aggravated assault.
19    Q.  Okay.  And he was on the scene when you
20  responded.
21    A.  No, no, no, this is earlier.  This is way
22  earlier.
23    Q.  But he was on the scene of the domestic violence
24  of his incident?
25    A.  Oh, yeah, yes, ma'am.

Gary Tuli

Page 70

1    Q.   And how was his behavior at that time?
2    A.   So he had a knife.  He had a prior history of
3  assaulting police officers.  His -- I want to say his --
4  his boyfriend or his husband was standing outside yelling
5  and screaming, and when I pulled up he had a knife.  I
6  told him to put his knife down and put his hands behind
7  his back and he did that and then he went to jail.
8    Q.   What time did that happen?
9    A.   I remember it was daylight.  I don't remember
10 exactly what time but it was still daytime.  The sun
11 hadn't gone down yet.
12   Q.   Sure.  And then what happened?
13   A.   Yeah, the night progresses, you get dispatched
14 out to the quinceañera over on Walzem and then everything
15 happened.
16   Q.   Walk me through from the time you were dispatched
17 until the time you leave.  Just walk me through what
18 happened.
19   A.   Okay.  If memory serves me correctly, okay, again
20 this was dang near, you know, four years ago now almost,
21 you know, or three-and-a-half years, but -- so there's --
22 we get dispatched to a large fight.  I was right in the
23 area and at the venue where they have -- where they had
24 the quinceañera that night, there's normally no one there.
25 The -- directly across the street there is a bar though.

Page 71

1  So when they dispatched us to the large fight, initially I
2  went to the bar thinking that's where the fight was.
3  Well, when we got there, everyone at the bar was like, no,
4  it's not us.  I don't know what you're talking about it;
5  so it was odd.
6          And then I just happened to see a crowd
7  walking out from across the street, and I go oh, maybe
8  that's who they're talking about.  So we go there.  And I
9  don't remember exactly who was with me when -- I do
10 remember I was the first on scene, but I don't remember
11 who was with me.
12   Q.   When you say someone -- someone was riding with
13 you or were they in their own vehicle?
14   A.   No, we're following each other around.  We call
15 them running partners, running buddies, but yeah, every
16 officer had their own vehicle unless they're on their
17 rides or they're doing some kind of special task.
18   Q.   Okay.
19   A.   When we get there, there's a large crowd forming
20 outside.  They're all exiting the -- I guess it's called a
21 venue, but they're all exiting the venue.  And there is a
22 guy who is laying on the ground and he's all beat up.
23 He's swelled shut.  He's unconscious.  Somebody beat him
24 up pretty bad.
25          Spoke to the woman who -- I'm pretty sure

Page 72

1  she's the one who threw the quinceañera but her name is
2  Ms. Ybarra, and what she told us was that this guy was --
3  the guy who was assaulted, he was in her Army unit, and he
4  was too drunk and he was flirting with the girls.  So she
5  told her ex-husband --
6    Q.   When you say "the girls," would this have been
7  the young girls at the quinceañera or --
8    A.   I don't know.  She --
9    Q.   Okay.
10   A.   You know, the girls.  I don't know if it was the
11 younger girls or the older women, I don't know.  She just
12 said he was -- and I don't even know if she used the word
13 "flirting" or what, but he was making advances on women
14 and it was -- it was uncomfortable enough for her to go
15 tell her ex-husband who was also at the party, hey, can
16 you take care of this guy.
17          And if I remember correctly, I don't think
18 she meant, like, take care of him, beat him up.  I think
19 she meant like get him a ride home, but the ex-husband and
20 his friends, apparently they were the ones who decided
21 instead of getting this guy a ride home or make him leave
22 or whatever, they beat him up really bad and then they
23 left.
24          So we got an ambulance out to help this guy
25 out.  We were going to take a report, you know, an

Page 73

1  assault, bodily injury report and list her ex-husband as
2  the suspect and have this guy file at-large or something
3  or file on him a later date.
4          So then from there --
5    Q.   Now, do you remember at this time -- you said you
6  don't remember what officers were with you?
7    A.   I know eventually -- eventually there's Groce,
8  there's Osoria, there's Cavazos, there's Sarah Carrasco,
9  Willie Hooten was out there; Tiffany Stewart was out there
10 eventually, but I'm saying when I first got there I don't
11 remember the -- you know, because it takes us a while to
12 get there sometimes.  So I don't remember if it was
13 Jessica next to me or if it was -- I'm sorry, Officer
14 Osoria, or if it was Cavazos.  I don't know exactly who is
15 there but eventually everyone started showing up.
16   Q.   Okay.  And then what happened?
17   A.   Oh, okay.  I thought you were going to ask
18 something.
19   Q.   No.  Sorry.  Go ahead.
20   A.   I'm new to the Zoom thing so --
21   Q.   It's all good.  I mean, hey, I'm taking your cue,
22 when I hear silence, you don't have to apologize.  I'll
23 just ask questions.  Okay?
24   A.   And so from there, you know, everything --
25 there's some little kids, like little kids, you know, 5,

Gary Tuli

Page 74

1  6, 7 years old, I don't know, but we were kind of playing
2  with them, kind of high-fiving. Everything is kind of
3  chill, you know.
4         This group of girls shows up and
5  Ms. Johnson, she clearly wants to fight these girls,
6  right? And I don't know what -- well, at the time I
7  didn't know why they all wanted to fight each other, but
8  Ms. Johnson was, like, you know, causing a huge
9  disturbance wanting to fight these girls. I'm telling
10 these girls to leave. I told them, these girls, hey, back
11 off.
12         I remember there was an old woman there.
13    Q.  Okay.
14    A.  And she -- "Hey, Officer, please, we're trying to
15 get our family in the car or we're trying to leave," okay,
16 hey, take care then, you know, because this is getting out
17 of hand and Ms. Johnson is trying to fight these girls.
18 So we back off.
19         I go talk to Ms. Johnson, "Hey, Ms. Johnson,
20 you need to calm down." And again, I was just -- I don't
21 want to say building a rapport but me and Ms. Johnson were
22 just friendly with each other. I was playing with her
23 kids.
24         MR. FRIGERIO: Officer, for the purpose of
25 the record, could you mention April Johnson as the mother

Page 75

1  and then her child as Miss Johnson so we --
2         THE WITNESS: Yeah.
3         MS. HOUSE: Well, for the record, her child
4  is A.N.E.R.
5  BY MS. HOUSE:
6    Q.  But it was this April Johnson that you're talking
7  about to be clear, right?
8    A.  Yeah, April Johnson.
9    Q.  But Mr. Tuli, let me ask you, when you responded
10 do you remember April -- seeing April Johnson on the floor
11 with the actual person that had been assaulted?
12    A.  There was a lot of people kind of giving first
13 aid to that guy.
14    Q.  Okay.
15    A.  It could have been her, I don't -- I don't
16 particularly remember if it was her giving first aid or
17 not.
18    Q.  Okay.
19    A.  But there was definitely someone there. I do
20 remember there was someone giving first aid and kind of
21 you know, fanning him down or holding his head or, you
22 know, whatever.
23    Q.  Do you remember what happened in the middle
24 because you're talking about -- so there were people
25 giving first aid. Do you remember how the fighting broke

Page 76

1  out, if you know?
2    A.  Are you talking about with the new group of girls
3  that showed up?
4    Q.  Well, from where you -- what you were talking
5  about because you stated Ms. Johnson -- there was a huge
6  disturbance and you said Ms. Johnson and these girls are
7  fighting or trying to fight, like, do you know what caused
8  that or no?
9    A.  At the time I didn't. From what I understand,
10 again, this is months later when, you know, you looked at
11 the internal affairs report, and you looked at all that,
12 from what I understand --
13    Q.  Well, you don't have to tell me what you learned
14 after the fact, just what you knew at that time.
15    A.  At that time, no, I had no idea why they were
16 fighting. I didn't know why they were upset. I just know
17 that there was a group of girls and Ms. April Johnson and
18 they wanted to fight each other.
19    Q.  Okay. You can continue.
20    A.  So from there we kind of break that up.
21 Ms. Johnson is upset, Ms. April Johnson, she's upset.
22 She's, you know, again, I don't -- to be honest, I don't
23 know exactly what she was upset about but she was upset at
24 this group. She wasn't upset at me in particular. Like I
25 said, me and her, we were just being friendly with each

Page 77

1  other, you know.
2         But from there, the group of girls that she
3  wanted to fight somehow kind of shifted from being
4  directly in front of us to being over off to the side of
5  us at this point. And again, I, you know, "Hey,
6  Ms. Johnson, you need to calm down. You have little kids
7  here." I didn't know that she had -- she had A.N.E.R. I
8  didn't know that that was her daughter at that moment and
9  that she had another teenage boy there, but I knew she had
10 the little kids. Hey, you need to calm down, you got
11 these little kids and she keeps, you know, charging,
12 trying to fight this group of girls.
13         And so she kind of charges past and I kind
14 of grab her, like hey, knock it off and she doesn't
15 listen. So I wrap my arms around her and I carried her
16 away from this group of girls that she wanted to fight.
17         When I did that though, all the crowd got
18 angry. I mean, hey -- you start hearing things like, hey,
19 you can't touch her, can't do that, and all I was keeping
20 her from a fight. You start hearing the crowd -- you
21 start hearing all kind of random, you know, stop, police
22 brutality, whatever, all kind of just crazy nonsense, and
23 all I was doing was breaking -- was keeping her from
24 attacking a group of people.
25         I take her over to the side of my car to get

Gary Tuli

Page 78

1  away from the crowd and the crowd was still hollering, and
2  you hear all kind of cuss words, you know, I mean, it was
3  clear that when I grabbed her they got angry.  And I take
4  her over to the other side of my car.
5       When I grabbed her my body -- so our body
6  cameras are stuck to us with a magnet, all right?  And so,
7  you know, you bump it the right way, it falls off.  So
8  when I grabbed her, I guess that bumped it the right way;
9  it fell off.
10       But when I take her on the side of my car,
11  she's, you know, yelling, "I want my kids, I want my
12  kids."  And at this point, what I learned later was her
13  13-year-old son, he comes up and he rips his shirt off and
14  he, you know, he wants to fight me, he's "Don't touch my
15  mom."
16     Q.  You said you learned later he wants to fight you?
17     A.  No, no.  I learned later that he was her son.
18     Q.  Oh.  Got it.
19     A.  I thought he was just --
20     Q.  You saw this 13-year-old kid saying --
21     A.  I thought it was just some dude that wanted to
22  fight me.  So -- and I'm telling him, like, hey, back up,
23  you know, who are you, or whatever, get out of here.  And
24  so she starts yelling, "Hey, that's my son.  Please don't
25  hurt him.  Where's my kids?"  "Hey, ma'am, calm down."  So

Page 79

1  she starts to calm down.  Everything is getting calm
2  again.  Again, I don't know --
3     Q.  You give her a command and she does calm down,
4  you're saying?
5     A.  Yeah, initially, yeah.  Yes, ma'am.
6     Q.  Okay.
7     A.  And then she starts to calm down, "Where's my
8  kids."  One of the other officers brings over the two
9  little kids that we were just playing with, brings over
10  those kids and she's kind of chilling out.  Now, the crowd
11  is still -- is still yelling and kind of going nuts
12  because they're upset.  And again, we're on the other side
13  of my vehicle.  And so, most of the crowd can't really see
14  what's going on on the other side of my vehicle, but you
15  can still hear the crowd is getting more agitated.
16  They're yelling.  They're screaming.  I don't know if
17  they're yelling at each other or if they're yelling at
18  police officers or -- but, like I said, Ms. Johnson, her
19  two younger kids were now with her and she was calm and
20  not doing anything for the time being.
21       And suddenly, there's a large fight that
22  breaks out on the other side of the vehicle.  It's a, you
23  know, a huge rumble, I guess.  But there's a large fight
24  where multiple people were involved, bunch of parents are
25  breaking up the fight.  Police officers are breaking up

Page 80

1  the fight.  And so now I think we're looking at, you know,
2  this is the second or third fight and the crowd is just
3  going nuts, you know.
4       We go over there and we start breaking up
5  the fight.  The guy who just wanted to fight me, ripped
6  his shirt off, that was her son.  He's involved in this
7  fight now.  They're all hitting each other.  And then we
8  break up this fight.  And then, I guess, Ms. Johnson
9  wasn't calm anymore.  I don't know what happened.  She was
10  calm on the side of my car, but she wasn't calm anymore.
11  She's screaming.  She's yelling.  The crowd is yelling.
12  And at this point, you know, we're just telling people,
13  hey, get back, go home, get out of here.  And then what's
14  her name, A.N.E.R. -- is that how we're --
15     Q.  Yes.
16     A.  A.N.E.R., we -- she closed distance on me.  She's
17  yelling and screaming.  Hey, get back, you know, just
18  create some space, you know, hey -- I kind of put my arm
19  out and create some distance, hey get back, and she balled
20  her fist up, strikes me in the face, and I immediately
21  responded with a reactionary compliant strike.
22       And two other officers got involved where we
23  had to -- because she wasn't -- she was not compliant.  We
24  were giving her commands, put your hands behind your back.
25  She's not complying.  She's not -- she's not -- she's not

Page 81

1  putting her hands behind her back.  She's still fighting
2  and pulling away and struggling, and at this point she's
3  under arrest.
4       We -- after, you know, a minute or so, we
5  finally get her hands placed behind her back, and we get
6  her in handcuffs.  It took three officers to do that.  And
7  while we're doing that, the entire crowd is now going
8  crazy.  I mean, I'm telling the other officers, "Hey,
9  watch my back; make sure these guys don't hurt me, you
10  know, make sure these guys don't attack us," you know, so
11  other officers are kind of --
12       THE REPORTER:  Can I get you to slow down
13  just a little bit?  Slow down.
14       THE WITNESS:  I'm sorry.
15       THE REPORTER:  Thank you.
16       THE WITNESS:  And then from there, once we
17  get her in handcuffs, I guess her breasts became exposed.
18  And then immediately, hey -- and I'm telling the female
19  officer on scene who is right there, "Hey, adjust her top,
20  fix her top, fix her shirt," and she, "Don't touch me, get
21  off of me, leave me alone."
22       There's a huge crowd around us.  So we walk
23  her away from the crowd and we take her over to the side
24  of my patrol car to get away from the crowd and, you know,
25  she's not letting the female officer fix her top.  You

Page 82

1 know, she's moving and yanking and so we kind of walk her
2 over away from the crowd, you know, boys, women, guys,
3 again -- she's exposed, you know.
4         We get onto the other side of the vehicle,
5 "Hey, stop moving." I told her multiple times, "Stop
6 moving so she can fix your top." She's still not
7 complying, you know. She's not letting Officer Osoria fix
8 her top. So the next best thing that we can do to keep
9 her from being exposed was put her in the back of the car
10 where the windows are tinted and no one can see her.
11         We did that. Oh, Ms. -- while we're over on
12 the side of the car, Ms. Ybarra comes up, and Ms.
13 Ybarra's, you know, interfering with the public duties and
14 we're telling Ms. Ybarra, get back, get back. And to be
15 fair, Ms. Ybarra was kind of calm, but I don't know her,
16 you know what I mean? And she was asking me, let me fix
17 her top. And I don't know this woman. Why -- on what
18 planet would I allow a stranger to grab another woman's
19 top, you know.
20         But with that said, we get her to back off.
21 We put her in the car. A minute or two goes by, and then
22 double-check with Ms. -- Officer Osoria, "Hey, can you see
23 if she's going to let you fix her top?" She goes in. She
24 let's her fix it.
25         And then from there we get an ambulance out

Page 83

1 to check on A.N.E.R., and she had zero injuries. We
2 photographed that she had zero injuries. She told us she
3 didn't have any injuries. She was placed under arrest for
4 assault on a police officer. She was transported downtown
5 where she was booked. And here we are today, so ...
6 BY MS. HOUSE:
7     Q.  Okay. Right. And here we are today. Thank you
8 so much, Mr. Tuli, for giving me your account. Is
9 there -- in thinking back on what happened on May 20th, is
10 there anything else, like any blanks you want to fill in
11 or anything else do you think you need to share?
12     A.  No.
13     Q.  From your point of view?
14     A.  No. I mean, there would have never been an
15 arrest if Ms. Johnson and A.N.E.R. and J1, the guy with
16 the shirt off, I don't know his name, but there would have
17 never been an arrest if they had not caused a huge
18 disturbance and got this crowd on the verge of a riot.
19 There would have never been an arrest. I don't -- at this
20 point in my career, I don't particularly enjoy arresting
21 people. I'd rather sit around and drink coffee and eat
22 donuts.
23         But again, that night A.N.E.R. committed a
24 felony in our presence and view and we had to make an
25 arrest. And they were, quite frankly, causing -- I mean,

Page 84

1 we were on the verge of a riot. We would have never got
2 involved with this if she had just chilled out.
3     Q.  Sure. And then after that night, you understand
4 that -- what is your understanding of A.N.E.R.'s felony
5 charge, if you know?
6     A.  From what I understand is assault on a police
7 officer is a felony. She got charged. She went to jail.
8 She was released at some point, and at some point the
9 charges were dropped.
10     Q.  Okay. And then what happened after that?
11     A.  I sat on admin duty for, I don't know, two or
12 three months while they -- while Internal Affairs did an
13 investigation. I went viral, you know, it was all over,
14 you know, national news. Family members called me up,
15 "Hey, is this you?" People start making Memes about me,
16 you know, all kind of nonsense. Internal Affairs did a
17 full- blown investigation, and then I went back to work
18 and got cleared.
19     Q.  Okay. You were arrested though, right?
20     A.  Yes, ma'am. I was arrested about close to a year
21 and a half later.
22     Q.  Okay. And what were you charged with?
23     A.  Official oppression.
24     Q.  Anything else?
25     A.  From what I -- official oppression and falsifying

Page 85

1 police report or something like that.
2     Q.  Okay. And who was your attorney?
3     A.  Therese Huntzinger.
4     Q.  Is that a -- it's a female?
5     A.  Yes, ma'am.
6     Q.  Okay. And did you hire this attorney?
7     A.  Yes, ma'am.
8     Q.  So this was private -- you privately hired her?
9     A.  No. The -- we're all a part of CLEET or we
10 should be a part of CLEET. I'm a part of CLEET. CLEET
11 recommended that I choose her as an attorney, but CLEET
12 actually paid for it because the charges stemmed from
13 something that happened in the line of duty.
14     Q.  Okay. And are you a part of the police union?
15     A.  Yes, ma'am.
16     Q.  Did they assist with your legal fees?
17     A.  It's just CLEET.
18     Q.  Okay.
19     A.  The union doesn't normally pay for legal battles.
20     Q.  Okay.
21     A.  At least on the individual police officer.
22     Q.  Okay. Do they assist in any way with anything
23 related to that incident?
24     A.  To be honest, not that I know of, no.
25     Q.  Okay.

Page 86

1   A.  I mean, Mike Helle was very nice to me and we
2   talked about it, but there's nothing they can do.  We just
3   got to let the process pan out.
4       Q.  Right.  And I think that's what we're trying to
5   do here now.  And I'm just here to get the facts, like I
6   said.
7           So as far as Charles, your current attorney,
8   Mr. Frigerio is concerned, who recommended he be your
9   lawyer here?
10      A.  It's -- it was automatically assigned to me from
11  the City.
12      Q.  Okay.  And is the City covering the bill for
13  that?
14      A.  I believe so.
15      Q.  Okay.  So there's no -- like, no money out of
16  your SAPD pocket, right?
17      A.  Oh, no.  I lost tons of money.
18      Q.  How did you lose tons of money?
19      A.  I couldn't work any overtime.  I couldn't work
20  any off-duty gigs.  I almost -- remember, I told you I
21  have a two-year-old daughter.  At the time CPS was going
22  to remove her from our home.  I had to spend close to
23  $10,000 on an attorney for that.  Yeah, I lost tons of
24  money.  I did the math -- oh, and then so normally when
25  you foster a child, because she was a drug baby but you

Page 87

1   have to foster her while you give the birth mom a chance
2   to clean up her act, not get off -- or get off drugs,
3   whatever.  But normally when you foster a child, the State
4   gives you a stipend.  We didn't get any of that.  You
5   know, everything that we did came directly out of our
6   pocket.  We lost -- I think I did the math one day, and it
7   was easily $30,000 in just that year of me waiting for the
8   process to play out.
9       Q.  Okay.  And you have no control over how long IA
10  takes to do their investigation; is that fair to say?
11      A.  Well, they have to be done within six months, but
12  Internal Affairs was done a long time ago.  The District
13  Attorney's office that --
14      Q.  Okay.  The District Attorney's office chose to
15  file charges?
16      A.  From what I understand, yes, ma'am.
17      Q.  And at that time, it was Nico LaHood that was in
18  office, correct?
19      A.  Yes, ma'am.
20      Q.  However, your charges -- well, what was the
21  disposition of your charge?
22      A.  It was dropped for -- what is it called,
23  insufficient evidence.
24      Q.  Okay.  But that was under -- the D.A. at that
25  time is still the D.A., that would be Joe Gonzalez; is

Page 88

1   that correct?
2       A.  Yes, ma'am.
3       Q.  Do you know Joe Gonzalez?
4       A.  No, ma'am.
5       Q.  Okay.  Do you know Nico LaHood?
6       A.  No, ma'am.
7       Q.  And who was the prosecutor, do you know?
8       A.  I don't know.
9       Q.  Had you ever attended a court proceeding on that
10  charge?
11      A.  Yeah.  Every time I went to court, they just --
12  what is it called when you postpone it to the next month?
13      Q.  Okay.
14      A.  Yeah, every time -- I went to court, I would say,
15  once a month, and every time I went, they just pushed it
16  back to the following month.
17      Q.  Okay.  Are you still good or do you need a break
18  because I think this next section may be a little long.
19  Do you want to take a break now?
20      A.  Yeah.  If you want to take a break.  We can do
21  that.
22          MS. HOUSE:  Yes.  So can we take a 15-minute
23  break here?
24          MR. FRIGERIO:  Okay.
25          MS. RODRIGUEZ:  Sure.

Page 89

1           MR. URBIS:  Okay.
2           THE REPORTER:  Off the record at 11:42 a.m.
3           (Recess taken, 11:42 a.m. - 12:00 p.m.)
4           THE REPORTER:  Back on the record at
5   12:00 p.m.
6   BY MS. HOUSE:
7       Q.  I'm going to share a trial exhibit with what has
8   been marked as Petitioner's Trial Exhibit No. 2.
9           (Petitioner's Trial Exhibit No. 2 marked.)
10  BY MS. HOUSE:
11      Q.  And Officer Tuli, this is your body-worn camera
12  footage.  Okay?
13      A.  Okay.
14      Q.  You said you hadn't seen this in a couple of
15  years?
16      A.  Yeah.  It's been a while.
17      Q.  Okay.  So I'm just going to play it for you to
18  refresh your memory, and I'm going to stop maybe around
19  13 seconds in.
20      A.  Okay.
21      Q.  Let me know if on your end you cannot hear the
22  volume, okay?
23      A.  Yes, ma'am.
24      Q.  All right.  Thank you.
25          (Video played.)

Gary Tuli

Page 90

```
1        THE WITNESS:  Am I supposed to be hearing
2  something right now?
3  BY MS. HOUSE:
4     Q.  You do not hear something?
5     A.  No, I'm sorry.
6     Q.  You couldn't hear any of the body camera footage?
7     A.  No.  I thought -- normally, there's like a buffer
8  when you turn your body camera on.  There's a buffer and I
9  thought it was in that -- in that buffer where there's no
10 sound.  It takes like 30 seconds or something.  I thought
11 that's what it was, but I didn't hear anything.
12    Q.  Okay.  So initially there was a buffer and then
13 the sound was on.
14       MS. HOUSE:  Did anyone else hear the sound?
15       THE VIDEOGRAPHER:  I did not hear.
16       MR. URBIS:  I did not hear anything.
17       THE VIDEOGRAPHER:  You may need to have --
18 show the exhibits, turn up the volume on the PC.
19       MS. HOUSE:  If I show the exhibit from my
20 screen, are you able to -- can we try that?
21       THE VIDEOGRAPHER:  Yeah, we can try that.
22 We'll just have to hear it on your screen and on your
23 computer and then we should be able to pick it up.
24       MS. HOUSE:  Okay.  Sure.  Let me go ahead
25 and try that.
```

Page 91

```
1        THE VIDEOGRAPHER:  Okay.
2  BY MS. HOUSE:
3     Q.  Officer Tuli, I'm going to try this again.  Let
4  me know if you don't hear anything, but you're right.
5  There is a buffer, right?  There will be a period in time
6  where you don't hear anything and you just see things, but
7  something -- but sounds should come on --
8     A.  Okay.
9     Q.  -- at some point.
10    A.  Okay.
11       (Video played.)
12 BY MS. HOUSE:
13    Q.  Did you hear any of that, Officer Tuli?
14    A.  Negative, ma'am.  There's no sound.
15    Q.  Let me try it one more time.  I think I was
16 muted.
17       (Video played.)
18 BY MS. HOUSE:
19    Q.  You hear sound now?
20    A.  Yes, ma'am.
21    Q.  Okay.  Do you see who is on the ground with the
22 alleged victim?
23    A.  No, ma'am.  I can't tell who that is.
24    Q.  I'll keep playing.
25       (Video played.)
```

Page 92

```
1  BY MS. HOUSE:
2     Q.  Okay.  Whose -- that's your flashlight, sir?
3     A.  Probably.
4     Q.  Okay.  And you see there's a man on the ground,
5  correct?
6     A.  Yes, ma'am.
7     Q.  And his head is on the lap of -- that's
8  April Johnson.  Do you recall April Johnson, sir?
9     A.  Do you mean do I recall her doing that or do I
10 recall what she looks like?
11    Q.  Do you recall what she looks like?
12    A.  Not particularly, no.
13    Q.  Okay.  But you recall seeing this scene?
14    A.  Yes, ma'am.
15    Q.  And now that we're refreshing your memory with
16 this body camera footage, you see this man on
17 April Johnson's lap?
18    A.  Okay.
19    Q.  Okay.  We're going to keep playing.
20       (Video played.)
21 BY MS. HOUSE:
22    Q.  Okay.  Do you recall who is coming up to you,
23 sir?
24    A.  I think that's the -- what's her name, the --
25    Q.  Jenny Ybarra?
```

Page 93

```
1     A.  Yeah, Ybarra.  Ms. Ybarra.  I'm sorry.
2     Q.  Okay.  How would you describe April Johnson's
3  demeanor at this time?
4     A.  Looking at the body camera, she looks like she's
5  trying to be helpful.
6     Q.  Okay.  And you didn't have any problems with her
7  demeanor at this point, right?
8     A.  Not that I recall, no.
9     Q.  Okay.  We're going to fast-forward a little.
10       (Video played.)
11 BY MS. HOUSE:
12    Q.  Who is the officer right here (indicating)?
13    A.  That looks like Officer Cavazos.
14    Q.  Okay.  And is this an officer right next to him
15 to the right?
16    A.  It appears to be, but I don't know -- I don't
17 know who that is.
18    Q.  Okay.  That's fair.
19       (Video played.)
20       THE WITNESS:  I can tell now.
21 BY MS. HOUSE:
22    Q.  Who is that?
23    A.  That's Officer Osoria.
24    Q.  Okay.  Prior to this date, did you know Officer
25 Osoria?
```

Page 94

1    A.   Yeah.  Yes, ma'am.
2    Q.   How did you know her?
3    A.   She's a fellow patrolman.
4    Q.   Okay.  How long had you known her?
5    A.   I think at the time she was kind of a boot, so
6  not very long.
7    Q.   Oh, what does boot mean?
8    A.   I'm sorry.  She was new.
9    Q.   Oh, new, okay.
10    A.   She was fairly new at the time.  I don't know how
11  new she was, but not long.
12    Q.   Okay.  Not a problem.  Here you are explaining to
13  Officer Cavazos your understanding as to what went on
14  because Jenny told you, right?
15    A.   Sure.
16    Q.   Oh, you don't remember?  I'll play it.  Let me
17  just go ahead and play it, okay?
18    A.   Okay.
19         (Video played.)
20  BY MS. HOUSE:
21    Q.   Officer Tuli --
22    A.   Yes, ma'am.
23    Q.   -- do you see (Redacted) in this picture?
24    A.   Is that her right there?  I don't know if that's
25  her or not but --

Page 95

1    Q.   In the purple dress, sir?
2    A.   Yes, if that's her.
3    Q.   All right.
4         (Video played.)
5  BY MS. HOUSE:
6    Q.   I'm going to stop the video right here.  Let me
7  ask you, Mr. Tuli, now that you have refreshed your memory
8  with part of your body camera, is it starting to become a
9  little bit more clear to you as to what happened on that
10  evening starting May 20th up until May 21st of 2017?
11    A.   Yes, ma'am, sure.  Yes, ma'am.
12    Q.   Okay.  Now, you all first responded to an
13  incident involving two adult males, correct?  Well, adult
14  males rather, right?
15    A.   Yes, ma'am.
16    Q.   And I believe, was it -- you're the one that
17  called EMS, right?
18    A.   Yes.  That was me who said, "Hey, start EMS this
19  way."
20    Q.   Okay.  Now, you were explaining to Officer
21  Cavazos that -- when you explained to him, you said, it
22  wasn't a big deal.  What do you mean by that?
23    A.   Probably that it wasn't a big deal.
24    Q.   Okay.  And at that time how many people would you
25  describe were present on the scene?

Page 96

1    A.   Officers or just people in general?
2    Q.   Well, let's talk about that.  That's a very good
3  question.  Thank you for asking that.  So how many people,
4  non-officers, would you say were present during that time?
5    A.   If I were to guess, at least 50 to 60 people, if
6  I were to guess.
7    Q.   And could you describe the demographic of the
8  crowd?
9    A.   You mean like their nationality?
10    Q.   Sure, and ages.
11    A.   Age range from little kids all the way up to
12  elderly people.  There was a ton of people there, all, you
13  know, mixed black, white, Hispanic.  There was all kind of
14  people there.
15    Q.   Okay.  And were there mostly kids present?  Is
16  there a majority, like, were there mostly kids or mostly
17  adults present?
18    A.   I don't know.  You mean like little kids?
19    Q.   Well, when I say "kids," I'm talking about youth.
20    A.   Like people under 18?
21    Q.   Sure.
22    A.   Sure, yeah.  There was probably a lot of people
23  there that were under 18.
24    Q.   Okay.  And during this time, were you able to
25  assess why those kids were just standing around this

Page 97

1  victim?
2    A.   Somebody got beat up and other people were
3  watching.  That's what crowds do sometimes.  I don't
4  understand the question.
5    Q.   Sure.  No problem.  And I'm not trying to trick
6  you.  Let me tell you, Mr. Tuli, I'm a straight shooter.
7  I'm not trying to trick you with any of my questions.  I'm
8  just -- I wasn't there, right?  You were there, so I'm
9  just trying to ascertain as to what was going on.
10         And so you have a man bleeding on the floor,
11  right?  Is that correct?
12    A.   Yes, ma'am.
13    Q.   At any point in time did any of the patrolman
14  say -- try to secure the scene and get all the individuals
15  to leave the scene?
16    A.   Oh.  So, yeah, now I understand.  Okay.  So at
17  that point, everyone was -- so a typical crime scene where
18  there's a lot of people, as long as people aren't being
19  violent or causing disturbances, we do what we did there
20  that night.  We just kind of called EMS and, you know,
21  there were people helping out.  There was obviously people
22  who were, you know, doing what is it called, first aid,
23  you know.
24         The crowd at that point in time, they were
25  just standing there.  There was no need to start yelling

Gary Tuli

November 23, 2020
Pages 98 to 101

Page 98

1 at people or anything. They were just standing there at
2 that moment.
3     Q.  Okay.  So you said there was no need to like
4 secure the scene because it was pretty peaceful?
5     A.  At that point, yes, ma'am.
6     Q.  Okay.  I am going to continue playing the video
7 so that we can see what happened thereafter, okay?
8     A.  Yes, ma'am.
9         (Video played.)
10 BY MS. HOUSE:
11     Q.  Could you hear that, Mr. Tuli?
12     A.  I couldn't hear or see anything.
13     Q.  Oh, okay.
14     A.  I thought you were getting something ready.  I'm
15 sorry.
16     Q.  No, I'm not.  I'm going to share with you -- this
17 is going to be shared from another screen, the trial
18 exhibit screen.
19         Sir, do you recognize this?
20     A.  Yeah.  That's from the general manual.
21     Q.  Okay.  And what do you recognize it to be?
22     A.  Crime scene duties.
23     Q.  Okay.  And you're familiar with this, correct,
24 because you are required to review this material?
25     A.  Yes, ma'am.

Page 99

1     Q.  And you reported that when you arrived, you were
2 the first on the scene, correct?
3     A.  Yes, ma'am.
4     Q.  Okay.  I'm going to scroll down.
5     A.  Uh-huh.
6     Q.  Can you read -- if you see .03 Physical Evidence,
7 it says, D "The first officer to arrive at the scene of a
8 crime automatically assumes a responsibility of securing
9 the crime scene area from unauthorized intrusions to
10 protect any physical evidence."
11     A.  Yes, ma'am.
12     Q.  Are you familiar with this particular section,
13 sir?
14     A.  Yes, ma'am.
15     Q.  Okay.
16         (Video played.)
17 BY MS. HOUSE:
18     Q.  I'm going to rewind a little bit and play what I
19 believe you didn't hear.
20     A.  Okay.
21         (Video played.)
22 BY MS. HOUSE:
23     Q.  Now, to the right, what do you see, sir?
24     A.  People standing around.
25     Q.  Okay.  And you said that you saw no need to

Page 100

1 secure the scene, but you understand the manual required
2 you to secure the scene because you just described it as a
3 crime scene?
4         MR. FRIGERIO:  Objection; form of the
5 question.  He never said that.  You incorrectly described
6 that back.  He never said he did not have that duty.
7 That's a form -- objection; form.
8         THE WITNESS:  Yeah.  Ma'am, the scene is
9 secure at this point.  We use terms like this when we go
10 to any crime scene, EMS is waiting -- the EMS would be
11 standing around waiting to see if it's safe for them to
12 come.  You know, if this was a shooting or something, it
13 would have been different because there's actual physical
14 evidence to secure.
15         In something like this, all we do is take
16 statements.  The crime scene is secure at this point.
17 BY MS. HOUSE:
18     Q.  In fact, on the left side you'll see that there's
19 people right by -- right behind April Johnson.  You'll see
20 that correct, sir?
21     A.  Is April Johnson the one sitting down?
22     Q.  Yes, sir.
23     A.  Okay.
24     Q.  There are people there, right?
25     A.  Yes, ma'am.

Page 101

1     Q.  And in fact, in front of you, there is a female
2 right in front of you in the middle of this shot, correct?
3     A.  Yes, ma'am.
4     Q.  But I just want to point out, you stated that
5 there was no need to secure the scene.  You felt no need
6 at this time, you're stating, because there was no fights
7 and nothing was going on.
8     A.  Right.  To clarify, the crime scene at this point
9 is secure.
10     Q.  What makes it secure?
11     A.  The fact that there's no physical evidence to
12 collect.  There's nobody crying or fighting or doing
13 anything at this point.  EMS is safe and they can come in
14 and treat the victim.
15     Q.  At this point in time, how many patrol officers
16 do you recall are present?
17     A.  At some point in the incident, a lot of patrol
18 officers showed up.  At that moment right there, I don't
19 know how many of us were there.  I can see there was at
20 least three of us because I saw there was me -- there's
21 myself, there was Officer Osoria and Officer Cavazos.  So
22 there was at least three of us, but like I said, I don't
23 know when all the other officers started showing up.
24     Q.  Sure.  And you can see my screen, correct?  I
25 want to make sure.

Gary Tuli

Page 102

1    A.  Yes, ma'am, I can.
2    Q.  Thank you, sir.  Now, prior to this point, no
3  altercations had occurred, right?
4    A.  Except for the guy who got beat up.
5    Q.  Okay.  After that one, no other altercations
6  occurred, correct?
7    A.  Up until the -- this other group of women or
8  people showed up.
9    Q.  Okay.
10    A.  But in between that time, I would agree, yes,
11  everything was fairly calm.
12    Q.  All right.  So I'm going to fast-forward to what
13  you were talking about, all of a sudden a confrontation
14  occurred, correct?
15    A.  Uh-huh.
16    Q.  Okay.  Let's play that.
17        (Video played.)
18  BY MS. HOUSE:
19    Q.  Sir?
20    A.  Yes, ma'am.
21    Q.  The woman in the purple, was it your
22  understanding that she was invited to the event?
23    A.  I have no idea who that woman is.
24    Q.  What was your understanding as to why she was
25  there?  What did she tell you?

Page 103

1    A.  I don't remember.  I have no idea.  Yeah, that
2  one with the purple hair?
3    Q.  Yes, sir.
4    A.  Yeah, I don't know her at all.
5    Q.  But this is recorded from your body camera.  Did
6  you hear what was being said to you from her?
7    A.  Yeah, but I don't remember.  I mean, this was,
8  again, three-and-a-half years ago.  I don't remember what
9  was being said.
10    Q.  And sir, I'm not asking you -- to be fair from
11  your memory.  I'm asking you to describe what's going on
12  from your footage, what she told you.
13        So what did she tell you, according to your
14  footage?
15    A.  From what I can see right here, it seems like two
16  women are starting to argue with each other.
17    Q.  Okay.  And the woman told you specifically though
18  that something happened.  Did you hear what she said?
19    A.  No.
20    Q.  Okay.  I will play it again --
21    A.  Okay.
22    Q.  -- so that you can hear.  And if you can't hear,
23  let me know.  I think I have it at max volume, Mr. Tuli.
24    A.  Okay.  Remember we talked about my hearing
25  though.  No, I'm just kidding.

Page 104

1    Q.  No, that wasn't a joke.  It's technical things,
2  right?  We're here by Zoom so there is only so much I can
3  do on my end.
4        I'm going to press play as to when people
5  start arriving.  Let me ask you, at this point that
6  gentleman is still on the floor, correct?
7    A.  I don't recall.  I can't -- if he is -- I know
8  the ambulance shows up at some point, and they transport
9  him.  I don't know if he's still on the ground at this
10  point.  I don't know.
11    Q.  How about this.  I think maybe it will be easier
12  for me to just let it play out --
13    A.  Okay.
14    Q.  -- so that you can see --
15    A.  Okay.
16    Q.  -- the events.
17        (Video played.)
18  BY MS. HOUSE:
19    Q.  Officer Tuli, now there's two male officers.  Can
20  you identify -- so one you've already identified as
21  Officer Cavazos, right?
22    A.  Uh-huh.  Yes, ma'am.
23    Q.  Who is the other officer?
24    A.  I think that's Officer Groce.
25    Q.  Okay.  I'm going to continue playing, okay?

Page 105

1    A.  Yes, ma'am.
2    Q.  Let me ask you, is this helping you remember?
3    A.  Sure.  Yes, ma'am.
4    Q.  Okay.  Thanks.
5        (Video played.)
6  BY MS. HOUSE:
7    Q.  Mr. Tuli, so this is the -- you were talking
8  about joking and playing with kids.  You remember that,
9  right?
10    A.  Yes, vaguely, yes, ma'am.  I do remember, yes,
11  ma'am.
12    Q.  Okay.  And so that's a reflection of how you were
13  trying to keep things light; is that fair to say at that
14  point?
15    A.  Well, I also like kids.  There were little kids
16  there.  It was funny.
17    Q.  Okay.  And this is your body camera footage,
18  correct?
19    A.  Yes, ma'am.
20    Q.  Okay.  To your knowledge, had this been -- this
21  is -- this is what was produced from the City of San
22  Antonio.  So far do you believe that it's been altered in
23  any way?
24    A.  Not that I can imagine, no, ma'am.
25    Q.  Okay.  And this was Bates-stamped COSA000271 for

Gary Tuli

Page 106

1  the record.  No, it's not.  Excuse me.  It is
2  COSA000267 -- 265, excuse me.
3       I'm going to keep playing, okay,
4  Officer Tuli?
5  A.  Yes, ma'am.
6       (Video played.)
7  BY MS. HOUSE:
8  Q.  Okay.  At this point, Officer Tuli, how many
9  officers do you see -- do you observe on the scene?
10  A.  I just saw Officer Carrasco and Officer Stopper,
11  so then that's two.  Then we saw Groce already, so that's
12  three; we saw Cavazos, four; myself is five, and Osoria --
13  there's at least six of us there at this point.
14  Q.  Okay.  At least six, so more and more officers
15  are coming, correct?
16  A.  Yes.
17  Q.  And you also see now -- there's a gentleman right
18  here.  Do you see my pointer?
19  A.  Yes, ma'am.
20  Q.  Who is this gentleman?
21  A.  It looks like an EMS guy, but I don't know him.
22  Q.  Okay.  Sure.  But finally, first responders come
23  to assist the initial incident you responded to, correct?
24  A.  Second responders.  No, I'm just kidding.  I'm
25  kidding.  Yes, ma'am.

Page 107

1  Q.  I'm going to continue playing.
2  A.  Yes, ma'am.
3       (Video played.)
4  BY MS. HOUSE:
5  Q.  Do you recognize anyone else as the video pans?
6  A.  That might be the A.N.R. -- A.N.E.R.
7  Q.  Okay.  So you see her?
8  A.  Yeah.  That's Officer Carrasco, Osoria.  I can't
9  tell who that officer is in the back.  That might be an
10  ambulance guy.
11  Q.  Okay.
12       (Video played.)
13  BY MS. HOUSE:
14  Q.  And how would you describe A.N.E.R.'s demeanor at
15  this point?
16  A.  Right here?
17  Q.  Yes, sir.
18  A.  Chill, I don't know.  Standing there.  She's not
19  doing anything.
20  Q.  Yeah.  There's a lot of people standing there,
21  right?
22  A.  Yeah, she's not doing anything.
23  Q.  Not doing anything.  Now, behind though, around
24  here --
25  A.  Uh-huh.

Page 108

1  Q.  -- what do you observe?  That's a large crowd,
2  right?
3  A.  I would say so, yes, ma'am.
4  Q.  Okay.  Do you know if any -- it looks like most
5  of the officer presence is around the first victim you
6  came to respond to, correct?  Is that fair to say?
7  A.  It seems so, yes, ma'am.
8  Q.  Do you know what's going on with this large crowd
9  in the background?
10  A.  No, ma'am.
11  Q.  Okay.  And at this point, I haven't heard anyone
12  tell anyone to go home.  Do you know that to be different?
13  A.  So far, no.  I don't know.  I don't know, no.
14  Q.  That's fair.
15  A.  I don't know if anybody -- if any other officers
16  said anything.  Obviously, I didn't say anything like
17  that, so ...
18  Q.  I'm going to keep playing.
19  A.  Yes, ma'am.
20       (Video played.)
21  BY MS. HOUSE:
22  Q.  I'm going to pause.  Back here where my arrow is,
23  you see April Johnson is still where she is, correct?
24  A.  Okay.  I mean, it looks blurry, I mean, but if
25  you're saying it's her, then it's her, yes, ma'am, I

Page 109

1  agree.
2  Q.  But do you know that's a different woman that's
3  on the floor?
4  A.  I don't know -- again, from here I cannot tell
5  who that is.  And at the time I didn't know who she was.
6  If you're saying it's April Johnson, I'll take your word
7  for it.
8  Q.  Sir, this is a woman?
9  A.  From what I can see.  I can't tell anything.  It
10  looks blurry to me.  But what I'm saying, if you're saying
11  it's her, then I'll take your word for it.
12  Q.  Well, I'm trying to ascertain what you see and
13  what you observe.  And so if it's blurry, I'll keep
14  playing.  Let me know at any point in time if you're able
15  to see the woman, okay, more clearly.
16  A.  Okay.
17       (Video played.)
18  BY MS. HOUSE:
19  Q.  Who is this officer that walked up to you saying
20  "rowdy quince"?
21  A.  That was Officer Sarah Carrasco.
22  Q.  And how do you know Officer Carrasco?
23  A.  She is a police officer with me.
24  Q.  Does she work in your unit?
25  A.  She works the dogwatch shift or the C shift, but

Gary Tuli

November 23, 2020
Pages 110 to 113

Page 110

1  we work in the same section.
2      Q.  I'm sorry.  I don't understand the lingo.
3      A.  So there's four shifts on the entire department.
4  There's the daylight shift; there's the mid-shift or the B
5  shift where they work from, like, 1:00 in the afternoon
6  until like 9:00; there's the T shift, which I work is from
7  5:00 to 3:00 in the morning, and then there's the night
8  shift or the dogwatch shift where they come on at like
9  10:00 and they get off at like 6:00 or 7:00 in the
10  morning.  So there's an overlap in the shifts.
11      Q.  Okay.  Thank you for explaining that.  I'm going
12  to keep playing the video.
13          (Video played.)
14  BY MS. HOUSE:
15      Q.  So Officer Tuli, EMS has arrived by this point,
16  correct?
17      A.  Yes, ma'am.
18      Q.  Let me ask you, as to -- since you were the first
19  officer on the scene, what did you believe was going to
20  happen once that victim was secured with EMS?
21      A.  That we would all leave and the reporting
22  officer, which is able -- I believe it was Daniel Groce's
23  district that night; so he would have taken over the
24  report responsibility, and he would have gave in
25  general -- you give the victim a case number and give them

Page 111

1  advice on how to follow-up with the follow-up unit to
2  press any charges if they want.
3      Q.  Let me ask you, okay, so who was going to give
4  the victim that information; would it be you or Groce?
5      A.  It would have -- so if Groce would have never
6  showed up, it would have been me, but since Groce showed
7  up, it's his district.  He has report writing
8  responsibility at that point.  It was going to be Groce.
9  That's why I was giving Groce all the info.
10      Q.  Understood.  At that point who was highest
11  ranking officer present when Groce arrived?
12      A.  We're all the same rank.
13      Q.  Okay.  So we're still talking about patrolman
14  here, right?  Am I saying it correctly?
15      A.  Yes, ma'am.
16      Q.  I want to be respectful.
17      A.  No, you're doing great.  I want to be respectful
18  too.
19      Q.  Awesome, yeah.  Thank you.  Okay.
20          (Video played.)
21  BY MS. HOUSE:
22      Q.  As to Mr. Woznack, Mr. Tuli, at any point in time
23  did you ever approach him and try to engage in a
24  conversation with him?  Because I didn't see it on your
25  body camera.

Page 112

1      A.  I don't think I did.  He seemed -- if I remember
2  correctly, he was unconscious in and out; so
3  there was really nothing I could ask him.
4      Q.  Okay.  But I never did see you approach him.  Did
5  any other officer, because I didn't see it either in the
6  body camera in yours, did any other officer ever approach
7  him to see if he was okay?
8      A.  I don't know.
9      Q.  Okay.  I'm going to keep playing for you, okay?
10      A.  Yes, ma'am.
11          (Video played.)
12  BY MS. HOUSE:
13      Q.  At this point in time Mr. Tuli, EMS has taken the
14  victim, correct?
15      A.  It looks like they are about to take him, but
16  yes.
17          (Video played.)
18  BY MS. HOUSE:
19      Q.  But to be clear, they removed the victim from the
20  floor and you saw them go towards the left; did you see
21  that?
22      A.  Yes, ma'am.
23      Q.  Okay.  Who is Willie?
24      A.  Willie Hooten.
25      Q.  Willie Hooten sounds like that's your friend?

Page 113

1      A.  He is my friend.  He's another police officer.
2      Q.  Okay.  Because Willie had a special chant.
3      A.  Yes, yes, and Willie still gets that chant to
4  this day.  Willie is my friend.
5      Q.  Okay.  I'm going to continue playing with Willie,
6  okay?
7      A.  Yes, ma'am.
8      Q.  Video with Willie coming through.
9          (Video played.)
10  BY MS. HOUSE:
11      Q.  Did you hear Ms. Ybarra say, "Y'all roll deep."
12  Did you hear her say that?
13      A.  I think that's what she said, yes, ma'am.
14      Q.  And what did you take her to mean by that?
15      A.  That there's a lot of us.
16      Q.  Okay.  That there's a lot of you.  Would you
17  agree with that, y'all rolled deep that night?
18      A.  It -- so sometimes we take a lot of people to the
19  scene and sometimes we don't.  In this situation, to be
20  honest, there was a lot of people there.  We don't really
21  know anything -- you know, we're not done with the call
22  yet so I would say we were actually -- probably should
23  have had more officers out there, to be honest but --
24      Q.  And thank you, Mr. Tuli.  Let me ask you, if you
25  believed there should have been more officers, whose

Page 114

1  responsibility would it have been to call for more
2  officers? Because I know you called for EMS, right?
3       A.  Uh-huh.
4       Q.  You were the first -- you called for EMS. You
5  did that role, right?
6       A.  Uh-huh.
7       Q.  You stated Officer Groce was there. Whose
8  responsibility would it have been to say, let's get more
9  officers down here?
10      A.  Well, there is no -- there is no, hey, it's your
11 job to call more officers kind of title. It's -- it --
12 depending on the situation, it can be any officer who
13 says, "Hey, send us some more officers, please," or, "Hey,
14 cancel anyone else coming out. Everything is fine here."
15          In a situation with well over 50, 60 people,
16 probably seven, eight officers normally wouldn't suffice
17 but, you know, it is what it is. We work with what we
18 have.
19      Q.  Understood. How many officers do you believe
20 would have sufficed?
21      A.  I don't know. It just depends. How many
22 officers does it take to quell a riot. It just really
23 depends.
24      Q.  But at this time, I mean, what riot do you see up
25 to this point?

Page 115

1       A.  Yeah, right now everything's pretty calm.
2       Q.  Okay. I'm going to continue playing the video.
3       A.  Yes, ma'am.
4          (Video played.)
5  BY MS. HOUSE:
6       Q.  Okay, sir. When you said, "Stop pushing," who
7  were you talking to?
8       A.  To be honest, looking at the video camera, I
9  can't tell, but obviously, I saw somebody pushing somebody
10 and I said stop. Just looking at the camera, I can't tell
11 who I was saying that to though.
12      Q.  Okay. Now, the purple lady is going to say
13 something and this is where I was before --
14      A.  Okay.
15      Q.  -- that I'm ending up at, so if you could listen
16 carefully, and if you can't hear or you need to, you know,
17 put your volume up on your computer, go ahead and do so,
18 so you can hear what's being said, okay?
19      A.  Yes, ma'am.
20      Q.  All right.
21          (Video played.)
22 BY MS. HOUSE:
23      Q.  Okay. She's asking for something, isn't she?
24      A.  It sounded like she said something about a
25 granddaughter being 14 and pressing charges.

Page 116

1       Q.  Pressing charges, okay. If she wanted to press
2  charges, who would have been the officer taking her
3  report?
4       A.  It depends on -- again, it depends on what she's
5  saying. I can't -- people walk up to us all the time and
6  say things like, "I want to press charges," and you got to
7  get to the bottom of that, "What are you pressing charges
8  for? What happened." Somebody just saying, "I want to
9  press charges" doesn't mean an officer is going to give
10 her a report number and press said charges. I don't know
11 what she was talking about at this point.
12      Q.  Understood. Did you ever follow-up with her as
13 to what she wanted to press charges for?
14      A.  Not that I recall, no.
15      Q.  Do you know if any other officers, if you know,
16 followed-up with her to see who she wanted to press
17 charges against?
18      A.  I don't know. Did she ever follow up with any of
19 us? I don't know.
20      Q.  Okay. I'm going to keep playing the video.
21      A.  Yes, ma'am.
22          (Video played.)
23 BY MS. HOUSE:
24      Q.  Okay. You can see here -- who do you see getting
25 rowdy because you describe that people, you know, you

Page 117

1  described some behavior that caused the initial
2  disturbance. What can you describe based on what you see
3  as to what's going on in this initial disturbance?
4       A.  Well, right here, it looks like some women are
5  arguing with each other.
6       Q.  What woman appears to be the aggressor in this
7  situation?
8       A.  I can't tell who's talking, but it seems like the
9  person on the right side of my screen.
10      Q.  Which one?
11      A.  The camera paused but --
12      Q.  This one?
13      A.  Yeah, seems like that.
14      Q.  All right. I'm going to continue pressing play.
15          (Video played.)
16 BY MS. HOUSE:
17      Q.  Can you identify this person here?
18      A.  No.
19          (Video played.)
20 BY MS. HOUSE:
21      Q.  Okay. Do you identify who this was?
22      A.  No. I still don't know who that is. I'm sorry.
23      Q.  You don't recall that being Jenny Ybarra?
24      A.  Oh, is it her?
25      Q.  I'll play, maybe you can see. I'll back it up a

Page 118

1　little bit.  Maybe you can see a little more.  I'll press
2　play.  She comes in view of your body camera so --
3　　A.  Okay.
4　　Q.  -- let me press play.
5　　　　(Video played.)
6　BY MS. HOUSE:
7　　Q.  Okay.  Did you -- were you able to identify her?
8　　A.  I don't -- I don't know any of them, but again, I
9　don't want to -- if you say that's her, then sure it's
10　her.  I don't know her.
11　　Q.  I'm not providing testimony, Mr. Tuli, to be --
12　to be clear.  I'm just asking you questions as to what you
13　observe and what you remember.  Remember, I'm only here to
14　get facts like -- and not to give -- provide testimony
15　just to be clear.  So I really -- I'm just here to
16　understand your side.
17　　　　　MR. FRIGERIO:  Objection to form.  He said
18　he didn't know; so he doesn't know.
19　BY MS. HOUSE:
20　　Q.  I'm going to continue playing so that you can see
21　what happened, okay?
22　　A.  Yes, ma'am.
23　　　　(Video played.)
24　BY MS. HOUSE:
25　　Q.  Okay.  So from that altercation, you pulled away

Page 119

1　the person that you believe needed to be pulled away; is
2　that correct?
3　　A.  Yes, ma'am.
4　　Q.  Okay.  That wasn't April Johnson.  It was Jenny
5　Ybarra; is that correct?
6　　A.  Sure.  Yes, ma'am.
7　　Q.  Okay.  And so when you stated April Johnson was
8　being an aggressor, at this point when has April Johnson
9　been an aggressor?
10　　A.  Not yet, but she clearly becomes the aggressor.
11　　Q.  So we're -- okay.
12　　A.  It's not yet, but people aren't aggressive until
13　they become aggressive, you know.  She was not the
14　aggressor at first, and then apparently it's clear that
15　she does become the aggressor.
16　　Q.  And so -- but this first altercation she's not.
17　Can we agree on that?
18　　A.  Yes, ma'am.
19　　Q.  Okay.  Thank you so much for your honesty.  I'm
20　going to keep playing.
21　　　　(Video played.)
22　BY MS. HOUSE:
23　　Q.  Is this Officer Groce talking?
24　　A.  Yes, ma'am.
25　　Q.  Okay.  Thank you.

Page 120

1　　　　(Video played.)
2　BY MS. HOUSE:
3　　Q.  And Officer Tuli, you see a lot of officers
4　standing around, correct?
5　　A.  Yes, ma'am.
6　　Q.  And at this point, your body camera doesn't pick
7　up anyone still -- no one has told anyone to leave the
8　scene, correct?
9　　A.  It sounds like it, yes, ma'am.
10　　Q.  And still to this point, you've told specifically
11　no one to leave the scene, right?
12　　A.  Not yet, no, ma'am.
13　　Q.  I'm going to keep playing the video.
14　　　　(Video played.)
15　BY MS. HOUSE:
16　　Q.  Does the woman with the purple hair listen to
17　you, sir?
18　　A.  I don't know -- I don't know if it's choppy where
19　you are but it's real choppy.  I don't even know where the
20　woman with the purple hair is anymore.
21　　Q.  Okay.  I will rewind.
22　　　　(Video played.)
23　BY MS. HOUSE:
24　　Q.  Do you see the one right here with the purple
25　hair?

Page 121

1　　A.  Oh, yeah, I do.
2　　Q.  And she is making sounds with her hands, right?
3　　A.  Okay.
4　　Q.  Okay.
5　　　　(Video played.)
6　BY MS. HOUSE:
7　　Q.  Okay.  Do you identify who this woman is right
8　here, sir?
9　　A.  No, ma'am.
10　　Q.  Okay.
11　　　　(Video played.)
12　BY MS. HOUSE:
13　　Q.  She doesn't look familiar?
14　　A.  No.  Like I said, I don't know if it's -- if your
15　camera -- or if your video is doing the same thing, but
16　the sound is coming out very clear, but it's really choppy
17　on our end.  It's like --
18　　Q.  When you say it's choppy, the video is choppy?
19　　A.  Yes, ma'am.
20　　Q.  And I don't know what you see on your end.
21　　　　MS. HOUSE:  I'm going to ask the other
22　lawyers.  Does this video look choppy to you?
23　　　　MR. FRIGERIO:  It is choppy, but I mean,
24　we're not here to give testimony, but it is choppy.
25　　　　MS. HOUSE:  Okay.  And when you say

Gary Tuli

Page 122

1  "choppy," can you see images?
2          MR. FRIGERIO:  Images that aren't clear.
3  BY MS. HOUSE:
4      Q.  Okay.  And I think that's just the body camera
5  footage, but let me know if for some reason, Officer Tuli,
6  if you just really can't see something.  But you did see
7  the purple hair, correct?
8      A.  Yes.
9      Q.  Okay.  I'm going to continue playing.
10         (Video played.)
11  BY MS. HOUSE:
12     Q.  Sir, did you hear the word "weapon"?
13     A.  Right now?  I don't know.  There's a lot of stuff
14  being said.  I don't know, if you want to replay it again,
15  but no, I didn't.
16     Q.  So you didn't hear someone say, "She got a
17  weapon"?
18     A.  I don't know.  Push play again.
19     Q.  Okay.  I'll push play again.  Sure.
20         (Video played.)
21  BY MS. HOUSE:
22     Q.  Did you hear that?
23     A.  I actually did, yes, ma'am.  I did hear that.
24     Q.  Okay.  Now, you directed the crowd at this point,
25  you said, just go in any direction, correct?

Page 123

1      A.  Yes, ma'am.
2      Q.  You said go in any direction, go to any direction
3  but here, whatever direction they wanted to go.  That was
4  your directive, correct?
5      A.  Yes, ma'am.
6      Q.  What -- in this case what do SAPD policies and
7  procedures tell you to do?
8      A.  Keep the peace.
9      Q.  What else?
10     A.  You mean when people are about to fight?  It's
11  our job to keep the peace.
12     Q.  Okay.  Do they tell you to do anything else?
13     A.  There's all things you can do or you shouldn't do
14  I mean, what do you mean?  I guess to clarify the
15  question, in this situation particularly, it was -- the
16  most important thing was to keep the peace and keep people
17  from getting hurt.
18     Q.  Okay.  Were there enough officers present on the
19  screen to make sure people were escorted away from the
20  scene to their vehicles?
21     A.  No.  We don't -- you don't escort people away to
22  their -- to their vehicles.  You -- you keep the peace.
23  You keep people from assaulting each other if that's the
24  case, but it's not the police officer's job -- unless
25  people are going to jail or there's, you know, crimes

Page 124

1  being committed, we don't normally say, "Hey, let me walk
2  you to your car individually."  Let me get 60 police
3  officers out here to walk each individual person to their
4  vehicle and make sure that they're safe, we don't normally
5  do that.
6      Q.  Did you feel at this point in time it was
7  important to secure this scene and to direct people to go
8  home?
9      A.  Well, it was clearly getting -- starting to
10  escalate, the situation was starting to escalate at this
11  point.
12     Q.  Right.  So the situation started to escalate,
13  right?  And there are a large number of people there.
14     A.  Uh-huh.
15     Q.  And -- okay.  Remember, Officer Tuli, the court
16  reporter can't write down "uh-huh" so could you use --
17     A.  I'm sorry.  Yes, ma'am.
18     Q.  Thank you, sir.  There were enough officers
19  present at the scene right now to -- sufficient enough to
20  start directing people to go home.
21     A.  Well, we're de-escalating.  We're trying to
22  de-escalate this from going any -- or getting any worse.
23     Q.  What was the de-escalation tactic here?
24     A.  Separate parties who are involved in the fight.
25     Q.  And where were these -- everyone is outside,

Page 125

1  right?  Where were these parties supposed to separate to?
2      A.  I think I was pretty clear when I said, go in any
3  direction except this way.  I think I was pretty clear.
4      Q.  Okay.  Just to be clear, you didn't tell them to
5  go home?
6      A.  Not yet I guess.
7      Q.  Okay.
8          (Video played.)
9  BY MS. HOUSE:
10     Q.  Okay.  What do you observe?
11     A.  Again, it's pretty choppy, but it looks like this
12  young woman is going back in the direction that I didn't
13  want her to go.  So screaming, hollering -- I'm sorry?
14     Q.  I'm going to back it up.
15     A.  Your volume went down all of a sudden.  Hold on.
16  Can you hear me?
17     Q.  Yes.  I can hear you.  Can you hear me?
18     A.  Yeah, your volume got super quiet.  I don't know
19  why.
20         MR. FRIGERIO:  Yeah, your volume is down,
21  Counsel.
22         MS. HOUSE:  Let me -- I don't know.  I
23  didn't do anything differently.  Is it still down?
24         THE WITNESS:  Yeah.
25         MR. FRIGERIO:  We can barely hear you.

Page 126

1       MS. HOUSE: Let me stop sharing the screen.
2   Can you still hear me?
3       THE VIDEOGRAPHER: We're unable to hear you.
4       (Pause in proceedings.)
5       THE VIDEOGRAPHER: Looks like she just
6   dropped out of the room for a second, so she should be
7   back here shortly.
8       (Pause in proceedings.)
9       THE VIDEOGRAPHER: Are you able to hear us?
10  Yeah. We can't hear your audio.
11      MR. FRIGERIO: Is your volume down maybe?
12      (Pause in proceedings.)
13      MR. URBIS: Is this a good time to take a
14  lunch break, let her get her technical issues worked out
15  or --
16      MR. FRIGERIO: As soon as she gets back on,
17  it's fine with me. She had to be at court anyway she said
18  at 1:15.
19      MR. URBIS: That's what I thought.
20      MS. RODRIGUEZ: I'm okay with that as well.
21      (Pause in proceedings.)
22      THE VIDEOGRAPHER: We still can't hear you.
23      MS. HOUSE: Can you hear me now?
24      MS. RODRIGUEZ: It's lower, but we can hear
25  you.

Page 127

1       MS. HOUSE: It's still lower? Is it better
2   now?
3       THE VIDEOGRAPHER: If you hit the -- there's
4   the mute button in the bottom left corner and there's a
5   little arrow. If you hit that and open up all the volume
6   options, you can adjust the speaker volume within Zoom.
7       MS. HOUSE: It's at its max.
8       THE VIDEOGRAPHER: It is maxed.
9       MS. HOUSE: How does this sound?
10      THE VIDEOGRAPHER: There we go.
11      MR. FRIGERIO: That's it.
12      MS. HOUSE: I don't know how that happened
13  because I didn't touch anything.
14      THE VIDEOGRAPHER: Every now and then it
15  happens.
16      MS. HOUSE: Yeah. That's why Officer Tuli
17  keeps staying away from technology.
18  BY MS. HOUSE:
19      Q. Let me pull back -- pull the video back up for
20  you. One moment.
21      Okay. Officer Tuli, I think we left in
22  around 9 minutes and 47 seconds in.
23      A. Okay.
24      Q. And I'm going to share my screen.
25      (Video played.)

Page 128

1   BY MS. HOUSE:
2       Q. Officer Tuli, you're going to see -- you're going
3   to see April Johnson pull A.N.E.R. towards her, okay?
4       A. Okay.
5       (Video played.)
6   BY MS. HOUSE:
7       Q. Okay. Did she do that?
8       A. Yes. That's what it appears.
9       Q. Okay. And so was she going towards that
10  direction or was she trying to pull away, to be clear?
11      A. I don't know, to be honest. I mean, I can see
12  her holding someone's arm. I'm assuming this is
13  April Johnson right here with the white dress, correct?
14      Q. Yes, sir. It's April Johnson.
15      A. And I'm assuming she's holding A.N.E.R.'s arm.
16      Q. Correct. That's correct.
17      A. I can't tell if she's going towards or coming
18  away. I can't tell.
19      Q. Okay. Would you like me to play it again?
20      A. If you want to, yes, ma'am.
21      Q. Sure. I'll play it again for you and you can
22  tell me what you observe.
23      MR. URBIS: Objection to the form. It's
24  been asked and answered. He said he couldn't tell. And
25  it's speculation to continually ask him again.

Page 129

1   BY MS. HOUSE:
2       Q. Let me be clear, Officer Tuli, it's because you
3   couldn't see the video?
4       A. You're talking about right now? Well, there's a
5   lot of things, you know. I can't really make a
6   determination if somebody was pulling away or going
7   towards something even if the video was clear. But to be
8   clear, this video is pretty choppy on our end.
9       Q. Okay. So you're saying even if the video is
10  clear, you couldn't tell me if someone's moving away or
11  going towards something?
12      A. It just depends on the video; sometimes yes,
13  sometimes no. I don't know if I would be able to tell
14  even if this video is clear. What I can see on this side
15  is a person in a white dress holding someone's arm.
16      Q. Okay. And to be clear, Officer Tuli, I'm showing
17  you this because this is your body camera footage, okay?
18      A. Yes, ma'am.
19      Q. And this is footage that you took on that night,
20  correct?
21      A. Yes, ma'am.
22      Q. And you had your body camera on and activated
23  because at that point that's what was required of you as a
24  police officer, right?
25      A. Yes.

Page 130

1    Q.   Okay.
2         (Video played.)
3    BY MS. HOUSE:
4    Q.   Okay.  At this point, would you describe
5    April Johnson as an aggressor?
6    A.   The only thing I saw there, I heard a lot of
7    noise, I heard of a lot yelling.  The only thing I can
8    see --
9         (Video played.)
10   BY MS. HOUSE:
11   Q.   I'm sorry.  I didn't mean for that to play.  I'm
12   sorry.  The only thing was what?
13   A.   The back of someone's hair.
14   Q.   The back of someone's hair?
15   A.   Yes, ma'am.  The video is really -- is really
16   choppy, but I can hear noises.  I can hear a lot of
17   yelling and a lot a screaming, but what I saw was like a
18   freeze-frame almost of the back of someone's hair.
19   Q.   Okay.  I just -- Officer Tuli, I want to make
20   sure we make the best use of this deposition.
21        I'm sorry, did someone talk?  Can you hear
22   me?
23   A.   I can hear, yes, ma'am.
24        MR. FRIGERIO:  I can hear you.
25   //

Page 131

1    BY MS. HOUSE:
2    Q.   Okay.  Officer Tuli, I want to make -- in order
3    for me to be able to do my job today, I need to be able to
4    show you this video, okay?  You understand that?
5    A.   Yes, ma'am.
6    Q.   If you believe that technology is failing you and
7    that there is some better way to do this, I'd like to
8    figure that out for you, okay?  Because I promised you
9    today that I was going to be -- there were two things I
10   promised you, that I was going to be polite.  Have I done
11   that?
12   A.   Yes, ma'am.
13   Q.   Thank you.  And I also told you that I was going
14   to be professional, correct?
15   A.   Yes, ma'am.
16   Q.   And so in order for me to be professional and to
17   do my job, I have to be able to ensure that the equipment
18   allows me to do my job, but also, in turn, allows you as
19   the deponent, to be able to see the information and
20   testify from it, okay?
21   A.   Yes, ma'am.
22   Q.   Okay.  And to be clear, when you say -- let me
23   ask you, when you state the video is choppy --
24   A.   Uh-huh.
25   Q.   -- did it look the same when you reviewed the

Page 132

1    video with the -- in the IA proceeding?
2    A.   No.  I think it's the technology here tonight or
3    today.  Normally, when we watch our body camera videos,
4    they're not choppy at all.  They're pretty clear.  I mean,
5    they might get shaky a little bit from moving around and
6    stuff, but they're not choppy.  The videos are normally
7    pretty smooth.  So I think when it's coming from your end
8    and displaying onto my end, it -- it almost looks like
9    you're taking still frames and moving one picture and
10   putting another one in.  It's just pretty choppy, but I
11   would assume it's not like that if I were looking at -- if
12   it wasn't traveling into outer space and then back down
13   into this computer, you know.
14   Q.   Okay.  I understand.  And thank you for letting
15   me know because I don't see what you see on your end,
16   okay?
17   A.   Yes, ma'am.
18   Q.   All that I see is that it looks clear from my
19   end.
20        Can we just try one thing?  Is there any way
21   that you can -- because -- can you clean off your video
22   screen?  Do you see where there's a camera on the
23   computer?
24   A.   Yeah.
25   Q.   Do you have anything, a Kleenex or something that

Page 133

1    you can do -- a cloth to wipe that camera?
2    A.   (Witness complies.)
3    Q.   Now, I'm going to try to play the video again.
4    Let me know if you believe the video still looks choppy,
5    okay?
6    A.   Yes, ma'am.
7    Q.   Okay.  Thank you.
8         (Video played.)
9         THE WITNESS:  I can't see.
10   BY MS. HOUSE:
11   Q.   Go ahead.
12   A.   It's just pictures of all of us.  I don't see
13   anything.  I don't see the video.
14   Q.   Oh, sorry.  Let me share the screen.
15   A.   You're fine.
16        (Video played.)
17   BY MS. HOUSE:
18   Q.   Let me ask you Mr. -- Officer Tuli, I'm sorry.
19   Earlier, you were able to identify several officers on the
20   scene, correct?
21   A.   Uh-huh.  Yes, ma'am.
22   Q.   Did the picture quality change between now and
23   then or was it the same?
24   A.   No, the picture quality is all the same.
25   Q.   Okay.  I'm going to continue playing.

Gary Tuli

Page 134

1    A. Yes, ma'am.

2        (Video played.)

3    BY MS. HOUSE:

4    Q. Sir, as soon as you heard someone state "She got

5    a weapon," what did you do?

6    A. I don't know if I heard that when I was on scene.

7    Q. Okay. Your body camera picked it up, correct?

8    A. Yes, but remember I have hearing problems.

9    Q. Do you know if any officers said anything about a

10   weapon that night?

11   A. I don't know. I do know later on in the incident

12   when the 13-year-old, the -- Ms. Johnson's son, when he

13   wanted to fight me, there was definitely people yelling

14   "gun" or "go get my gun" or something, making, you know,

15   I'm pretty sure were threats to hurt us, hurt a police

16   officer but --

17   Q. Well, okay. But sir, specifically about this,

18   someone is saying, "She got a weapon." Do you know at

19   this point in time if anyone did anything to respond to a

20   threat that there was a weapon at the -- on the scene at

21   that point?

22   A. I don't know if anybody heard that.

23   Q. Okay. I am going to continue playing the video.

24   A. Yes, ma'am.

25       (Video played.)

Page 135

1    BY MS. HOUSE:

2    Q. Okay. Do you see the woman over here?

3    A. Yeah. I see what you were talking about now when

4    you were -- you know, it's a little clearer now when you

5    were talking about her pulling the arm away from --

6    Q. Okay.

7    A. I see that now, yes. Sorry.

8    Q. No, no problem. Thank you. So can you describe,

9    please, what you view in this video?

10   A. I'm assuming this is Ms. Johnson here? She's

11   pulling somebody away, and there's people standing around.

12   It looks like there's -- there's -- looks like the crowd

13   is starting to escalate things. Things are starting to

14   get a little out of hand.

15   Q. And do you see my mouse [sic], sir?

16   A. Yes, ma'am.

17   Q. There's a woman right here. Did you see what she

18   was doing or do you want me to rewind?

19   A. You can rewind it, but no, I didn't see.

20   Q. Okay. I'm going to rewind what your camera

21   picked up.

22   A. Okay.

23       (Video played.)

24   BY MS. HOUSE:

25   Q. Do you see the woman?

Page 136

1    A. Yeah.

2    Q. Okay. In that particular scene, who would you

3    say was the aggressor in this second confrontation?

4    A. I would assume it was April. I mean, I'm going

5    off of what I remember.

6    Q. Okay.

7    A. I wasn't dealing with that other lady.

8    Q. Okay. But can you describe to me what did April

9    do in order to make her seem like the aggressor at this

10   point?

11   A. At this point, I don't know.

12   Q. Okay. April Johnson pulled A.N.E.R. away from

13   the situation. That's what you observed in this shot

14   right now, correct?

15   A. Yes, ma'am.

16   Q. Okay. And she's saying, "not mine, not mine,"

17   right?

18   A. Yes, ma'am.

19   Q. Okay. And would you state that by pulling her

20   child away that that was the right thing to do?

21   A. Yes, sure. Yes, ma'am.

22   Q. Okay. And then you saw with my mouse in the

23   screen that there was a lady lunging towards

24   April Johnson. Did you see that?

25   A. I can see a woman over there struggling with what

Page 137

1    appeared to be an officer.

2    Q. And an officer had to hold her back, right?

3    A. Sure. Yes, ma'am.

4    Q. Okay. In this case, April Johnson wasn't the

5    aggressor, correct, at this point?

6    A. At this point, again, this is -- my camera picks

7    all this stuff up. Who knows what I'm looking at right

8    now.

9    Q. Okay. But sir, I'm just talking about right now

10   -- this is not a trick question. At this point --

11   A. No, no. Yeah, I agree, yeah. Looking at the

12   body camera, it does seem like April Johnson walked off.

13   Q. Okay. Thank you. I am going to keep playing.

14       (Video played.)

15   BY MS. HOUSE:

16   Q. Now, Mr. Tuli, you were closer to April Johnson

17   prior to this particular scene, right?

18   A. I think so.

19   Q. Okay. And if April Johnson were an aggressor,

20   you would have been telling her, "that's enough, go,"

21   right?

22   A. Maybe.

23   Q. Okay. But, in fact, you walked away from

24   April Johnson towards the group of girls over here, over

25   there, correct?

Page 138

1    A.  That's what it appears, yes, ma'am.
2    Q.  And you're telling them, "That's enough.  That's
3  enough.  Go."  Correct?
4    A.  Yes, ma'am.
5    Q.  Did they listen to you?
6    A.  I think so.  I can't remember.  I didn't see the
7  rest of the video for a long time, but I think they
8  listened to me, yes, ma'am.
9    Q.  Are you sure?
10    A.  No.  Again, this is based on my memory, but I
11  think they listened.  I didn't have to physically restrain
12  any of them.  I would assume.
13    Q.  Okay.  And, Officer Tuli -- I'm sorry.  I don't
14  mean to talk over you.  I'll let you finish.
15    A.  I'm sorry.
16    Q.  Officer Tuli, before you told them go in any
17  direction you want to go, you recall telling them that,
18  right?
19    A.  Yes, ma'am.
20    Q.  But here you're telling them go, did you tell
21  them where to go?
22    A.  Yeah, away.
23    Q.  Okay.
24        MS. HOUSE:  It is 1:15.  I do have court I
25  have to jump in a court proceeding.  Can we pause and take

Page 139

1  a lunch break here?  All right.  And we can be back in an
2  hour.
3        MR. FRIGERIO:  I'd ask the court reporter,
4  what are we doing on time, is it about what, three-some
5  hours?
6        THE REPORTER:  Three hours and 22 minutes.
7        MR. FRIGERIO:  Okay.
8        MS. HOUSE:  Thank you all.
9        THE REPORTER:  Off the record at 1:16 p.m.
10        (Lunch recess taken, 1:16 p.m. - 2:17 p.m.)
11        THE REPORTER:  Back on the record at
12  2:17 p.m.
13  BY MS. HOUSE:
14    Q.  Thank you.  Officer Tuli, before we took a break,
15  we were watching your body camera footage.  Do you recall?
16    A.  Yes, ma'am.
17    Q.  Okay.  And we -- we already established that you
18  arrive to the scene.  There was a victim.  I believe,
19  like, two altercations so far.  Jenny Ybarra is the
20  aggressor, then there's a woman with the purple hair.
21  Then you had -- there was another lady being held back by
22  an officer.  And we're going to continue on from there.
23    A.  Okay.
24    Q.  And is that a fair and accurate representation of
25  what we went over this morning?

Page 140

1    A.  Yes, ma'am.
2    Q.  Okay.  Thank you.  And I'm sorry, Officer Tuli.
3  I don't want to talk over you, so I'm going to try to
4  check myself to not talk over you, but also operator error
5  as to not play the video when you're talking.  I think
6  when I try to adjust the Zoom screen, it starts playing.
7  But I'm going to try to do my best to work out that
8  technical issue on my end.
9    A.  If I were the judge, I'd say you're doing fine,
10  so ...
11    Q.  Thank you for your mercy.  Okay.  One moment.
12  I'm going to pull up your body camera footage, okay?
13    A.  Yes, ma'am.
14    Q.  Let me know, Mr. Tuli -- Officer Tuli, if you
15  can't hear the volume.
16    A.  Okay.
17        (Video played.)
18  BY MS. HOUSE:
19    Q.  I'm going to try to move this panel.
20        At this particular time, Officer Tuli,
21  April Johnson is not in your body camera view, right?
22    A.  Yes, ma'am.
23    Q.  Okay.  And from this point, she's not the
24  aggressor at this particular occasion, correct?
25    A.  Yes, ma'am.

Page 141

1    Q.  Okay.  And when you say "yes, ma'am," you mean
2  yes, correct?
3    A.  Yes, correct.
4    Q.  Okay.  Thank you.  I'm going to keep playing your
5  body camera video footage for you.
6    A.  Yes, ma'am.
7        (Video played.)
8  BY MS. HOUSE:
9    Q.  Can you tell me who this officer is stepping in
10  right here?
11    A.  That appears to be Officer Cavazos.
12    Q.  Okay.
13        (Video played.)
14  BY MS. HOUSE:
15    Q.  Is this Osoria right here?
16    A.  Yes, ma'am.
17    Q.  Okay.
18        (Video played.)
19  BY MS. HOUSE:
20    Q.  Did you hear in the background someone calling
21  for a wagon?
22    A.  No.  I didn't hear, but that's not unusual.
23    Q.  Okay.  And can you tell me the procedure for
24  calling for a wagon, did you agree with this request?
25    A.  To be honest, I don't even remember if I remember

Gary Tuli

November 23, 2020
Pages 142 to 145

Page 142

1  knowing that a wagon was coming.
2      Q.  Okay.  If someone -- if I told you someone called
3  for a wagon, would you agree with this request?
4      A.  I would have no objections to calling for a
5  wagon.
6      Q.  Okay.  And at this time you felt like no one was
7  listening; is that fair to say?
8      A.  I wouldn't say no one, but it definitely seems
9  like the crowd is becoming more and more agitated.
10     Q.  Okay.  Are you becoming agitated at this point
11  too or no?
12     A.  No, ma'am.
13     Q.  Okay.  But the crowd is?
14     A.  That's what I remember.  Yeah, it's kind of
15  escalating.
16     Q.  At this point, do you think it would have been
17  appropriate to start telling people to go home?
18     A.  Maybe, I don't know.  Maybe.
19     Q.  Okay.  I'm going to keep playing the video.
20          (Video played.)
21  BY MS. HOUSE:
22     Q.  Okay.  Do you hear April Johnson?
23     A.  Yes, ma'am.
24     Q.  Okay.  And what is she saying?
25     A.  It sounds like she said, "They tried to run up on

Page 143

1  my daughter."
2      Q.  Okay.  And she's reporting this to an officer,
3  correct?
4      A.  Yes, ma'am.
5      Q.  So you all -- I'm sorry.  Go ahead.
6      A.  I said it appears that way.
7      Q.  Okay.
8          (Video played.)
9  BY MS. HOUSE:
10     Q.  Okay.  Can you please describe what's going on
11  here, Officer Tuli?
12     A.  She ran towards the group of people who left and
13  to keep the peace, I physically restrained her and took
14  her somewhere else.
15     Q.  All right.  And I'm going to show you -- I'm
16  going to stop sharing my screen and from my -- the exhibit
17  screen I want to show you SAPD policy, if you could look
18  at that with me.
19     A.  Okay.
20     Q.  Okay.  According to Section 200 of the Rules and
21  Regulations, I'm going to -- do you see this?
22     A.  Yes, ma'am.
23     Q.  Okay.  According to Section 200, what is this
24  called?
25     A.  Where your arrow is pointing?  It's the General

Page 144

1  Manual, Rules and Regulations.
2      Q.  Okay.  And you're familiar with this policy, sir?
3      A.  Yes, ma'am.
4      Q.  Okay.  And you are familiar with Section 3.00,
5  individual responsibilities?
6      A.  Yes, ma'am.
7      Q.  And 3.02, correct?
8      A.  Yes, ma'am.
9      Q.  Okay.  So in 3.00, 3.01 states that -- it goes
10  over abide by laws and department orders, right?
11     A.  Yes, ma'am.
12     Q.  It says, "Laws, orders, rules, regulations, and
13      procedures:  Members shall abide by the laws of the
14      United States and the State of Texas, ordinances of
15      the City of San Antonio and the departmental rules --
16      orders, rules, regulations, and procedures of the
17      San Antonio Police Department."  Right?
18     A.  Yes.
19     Q.  And do you abide by this rule?
20     A.  Yes, ma'am.
21     Q.  Then 3.02, Truthfulness of Members, are you
22  familiar with this section, sir?
23     A.  Yes, ma'am.
24     Q.  Okay.  And this section reads:  "Members shall
25      speak the truth at all times.  Reports and written

Page 145

1      communications from any member shall also reflect the
2      truth."
3          Do you recall this?
4      A.  Yes, ma'am.
5      Q.  And to your knowledge, 3.02 does relate to
6  truthfulness in a police report that you draft; is that
7  correct, sir?
8      A.  Yes, ma'am.
9      Q.  You did write a police report in this case,
10  correct?
11     A.  Yes, ma'am.
12     Q.  How many versions of your report did you submit?
13     A.  To supplement, just one.
14     Q.  Okay.  What is the difference between the
15  supplement and your original report, if you recall?
16     A.  The -- the handling officer, the officer who is
17  the arresting officer, they'll have -- they'll write the
18  initial report and then all other officers, they'll
19  document what they did on supplement reports.
20          So since I was the victim of an assault, I
21  did not have the initial report responsibility.  I had to
22  write my response on a supplement report.
23     Q.  Okay.  I'm going to show you then your reports.
24  I'm going to stop sharing the screen -- actually, this is
25  fine.

Page 146

1           Does this look familiar to you?
2     A.  Looks like a police report.
3     Q.  Okay.  Whose police report is this?
4     A.  It's mine.
5     Q.  Okay.  And how do you know?
6     A.  It has my name on it, has my badge.
7     Q.  Okay.  So your name is on as the reporting
8  officer; is that correct?
9     A.  For this supplement report, yes, ma'am.
10    Q.  Okay.  One moment, sir.  Sorry about that.
11    A.  You're fine.
12    Q.  I'm going to scroll down.  And is this a report
13  that you claimed at the beginning -- stated at the
14  beginning, excuse me, sir, that you reviewed?
15    A.  Yes.  I have read this, yes, ma'am.
16    Q.  Okay.  Is this report a true and accurate
17  reflection of the report you submitted as it relates to
18  this incident?
19    A.  Yes, ma'am.
20    Q.  And at any point in time, did you believe that
21  the information you initially reported was incorrect?
22    A.  No, ma'am.
23    Q.  Okay.  So what you -- what we see today, this
24  report, it is a true and accurate reflection of your side
25  of the story, correct?

Page 147

1     A.  Yes, ma'am.
2     Q.  Okay.  We're going to go to the -- about the
3  fourth paragraph of your report.  And actually, let's go
4  to the second one.
5          Can you read that full -- the big, actually
6  third paragraph, where it says, "There was a lot of
7  people"?
8     A.  Yes, ma'am.  "There was a lot of people there.
9  And 01 and another person were arguing" --
10        THE REPORTER:  Hang on.  You can't read that
11  fast.
12        THE WITNESS:  I'm sorry.
13        "There was a lot of people there and 01 and
14     another unknown person were arguing and it was clear
15     a fight was about to occur.  I told 01 multiple times
16     to back away and calm down."
17  BY MS. HOUSE:
18    Q.  Okay.  I'm going to stop you there, Officer Tuli.
19  Who is -- 01 is April Johnson, right?
20    A.  I believe so, yes, ma'am.
21    Q.  Okay.  Now, based on what we've already saw this
22  morning, when did you ever tell her to back away and calm
23  down based on what we saw already?
24    A.  Yeah, so when we write reports, I didn't have --
25  I wasn't able to go back and watch my body camera and

Page 148

1  write down word for word what was -- I wrote all this down
2  based off my memory of what happened that night.
3     Q.  Okay.
4     A.  And that's what we did.  Now, is it, you know,
5  it's -- that's what I wrote down.
6     Q.  Okay.  And so to answer my question, right, based
7  on what we saw, April Johnson was not the aggressor.  We
8  went over that, correct?
9     A.  Well, based on what we saw, I had to physically
10  restrain April Johnson.  I didn't have to physically
11  restrain anyone else.
12    Q.  Let me go -- before the restraint, she wasn't the
13  aggressor, correct?
14    A.  Well, yeah, according to the video, yes, ma'am,
15  that's what -- that's what we saw.
16    Q.  So when you say there were a lot of people and
17  01, April Johnson, and unknown person were arguing, you
18  were talking about the incident where you had to put her,
19  as you say, in a restraint; is that correct?
20    A.  Yeah.  I mean, I wrote down what -- what I felt.
21    Q.  Okay.  Right, but my question is, and I'm not
22  asking a trick question, Officer Tuli, because I don't
23  want you to think I'm trying to trick you.  I'm just --
24  I'm asking -- I'm just trying to understand.  The incident
25  where you said there was a lot of people and 01 and

Page 149

1  another unknown person were arguing and it was clear a
2  fight was about to occur, which fight are you talking
3  about?
4     A.  The one where I had to restrain 01 or I had to
5  restrain Ms. Johnson.
6     Q.  Okay.  Thank you.  I didn't know.  So thank you
7  for clarifying.  Because to be fair, before you had to do
8  that, several other disturbances had erupted on the scene,
9  correct?
10    A.  Uh-huh.  Yes, ma'am.
11    Q.  All right.  So you state in your report that you
12  told her to back away and calm down, right?
13    A.  Uh-huh.  Yes, ma'am.
14    Q.  You stated she continued to yell and scream at
15  the other person causing the crowd to become more and more
16  agitated, right?
17    A.  Yes, ma'am.
18    Q.  Okay.  But according to you, people said that
19  they were becoming agitated at you restraining her.  Do
20  you recall providing that testimony earlier?
21    A.  Yes, ma'am.
22    Q.  Okay.  You also stated that you had to tell
23  several people to back away and calm down, but
24  April Johnson was the main person causing a disturbance,
25  correct?

Gary Tuli

Page 150

1    A.  Yes, ma'am.
2    Q.  The disturbance April Johnson -- let me -- okay.
3  And so when you state -- I'm going to show you a body
4  camera footage.  I'm going to stop this screen.  And --
5        THE REPORTER:  You're muted.
6  BY MS. HOUSE:
7    Q.  Officer Tuli, I'm going to share with you
8  Officer Cavazos' body camera footage.
9        (Video played.)
10  BY MS. HOUSE:
11    Q.  Sir?
12    A.  Yes, ma'am.
13    Q.  This was on your body camera footage, correct?
14    A.  I thought this was Cavazos' body camera footage?
15    Q.  Right, but the same -- the same occurrence with
16  you, it showed you?
17    A.  Oh, yes, ma'am.
18    Q.  Back up.  This was on yours, correct?
19    A.  I'm sorry.  I misunderstood you.
20    Q.  Sure.  Actually, let me go back to your police
21  report for a little bit.  I'm going to stop sharing my
22  screen.
23        Okay.  Right here where it says, "01," can
24  you please read where it says 01?
25    A.  Yeah.  "01 was clearly going to fight the other

Page 151

1  party so I pulled her away by grabbing her arm.  She
2  pulled away from me in an attempt to charge the other
3  person; so I grabbed her again by holding her arm and
4  she pulled harder" --
5        THE REPORTER:  Slow down.
6        THE WITNESS:  Sorry.  "So I grabbed her
7  again by holding her arm and she pulled away harder.
8  The best way for me to secure her was to wrap my arm
9  around her and pull her away."
10  BY MS. HOUSE:
11    Q.  Okay.  I'm going to stop you there.  So you tried
12  to, according to your statement you grabbed her one time.
13  She attempted to pull away, and you then you grabbed her a
14  second time; is that correct?
15    A.  That's correct, yes, ma'am.
16    Q.  Okay.  And then you said you wrapped your arm
17  around her.  Where was your arm wrapped?
18    A.  Around your upper body area.
19    Q.  Where in her upper body?
20    A.  I don't know, her shoulder area, her upper body
21  area, her upper torso.
22    Q.  Her upper torso.  Can you please -- I can't --
23  let me -- if you could show pointing to your body where
24  you would have wrapped your arm around.
25    A.  Based on my memory, I would have grabbed her and

Page 152

1  secured her and picked her up and carried her away.
2    Q.  Okay.  So this would have been with --
3    A.  Like a bear hug kind of thing, if that's -- if
4  that makes sense.
5    Q.  Okay.  So you bear-hugged her with -- it would
6  have been with two hands, and you said you would have
7  cupped her body with your arms around her body, correct, a
8  bear hug?
9    A.  Well, that's what -- if I could go off of what I
10  remember, that's what makes sense.  If I'm going to grab
11  somebody and restrain them, I feel like I would grab them
12  from behind.
13    Q.  Okay.  You would grab them from behind, and you
14  said it was a bear hug, right?
15    A.  No.  I'm saying that that's what makes sense.  If
16  I were to grab somebody right now, I would attempt to grab
17  them in a bear hug kind of manner.
18    Q.  Okay.  Did you grab her in a bear hug that day?
19    A.  I can't remember.  I grabbed -- I feel like I
20  did.  I grabbed her.  I don't remember exactly how I
21  grabbed her.
22    Q.  Okay.  If you would have grabbed her in a bear
23  hug, like you said, that making sense, would you have to
24  file a use-of-force -- fill out a use-of-force form for
25  that bear hug?

Page 153

1    A.  No, ma'am.
2    Q.  Okay.  So bear hugs aren't included in use of
3  force?
4    A.  No.  What would be included in the use of force
5  is if somebody was injured.
6    Q.  Okay.
7    A.  If -- if you went beyond open/empty hand
8  controls, so if I use, say, my fist or a secondary weapon,
9  you know, like a baton or a TASER or pepper spray or if I
10  shot somebody or, let's say, you restrain somebody using
11  open/empty hands but they fall down and scrape their knee,
12  then you would do a use-of-force report.  But just in and
13  of itself, physically restraining somebody, you don't have
14  to fill out a use-of-force report.
15    Q.  If you choke someone, like you took your hands
16  and put them around their neck, would you have to fill out
17  a use-of-force form for that?
18    A.  Well, that would be deadly force.  You don't --
19  depends on the police department.  We do not do chokes.
20    Q.  Okay.  Thank you for -- thank you for providing
21  that information.
22        And these are policies and procedures --
23  this would be in the use-of-force policy section?
24    A.  Yes, ma'am.
25    Q.  Okay.  Let me go ahead then, I'm going to switch

Page 154

1  then to the use of force.  It's under section 501.  You
2  all do have a use-of-force policy, so thank you for
3  bringing that up, sir.
4     A.  Uh-huh.
5     Q.  Do you see it on the screen?
6     A.  Yes, ma'am.
7     Q.  Okay.  And so according to use of force, actually
8  .02 policy C, according to this policy, you are entitled
9  to -- requires officers to document use-of-force incident
10 on SAPD form number 62?
11    A.  Yeah.  That's old.  We don't do that anymore.
12    Q.  Okay, but this was the policy at the time?
13    A.  Yes, ma'am.
14    Q.  Okay.  So you're saying since then it's -- the
15 documenting has changed, correct?
16    A.  Yes, ma'am.
17    Q.  But we don't have to go into that.  Let's talk
18 about what it was then.
19    A.  Okay.
20    Q.  That night did you fill out any use-of-force
21 report as it relates to this incident?
22    A.  Yes, ma'am.
23    Q.  Okay.  Who did you fill out a use-of-force report
24 for?
25    A.  For A.N.E.R.

Page 155

1     Q.  Did you fill out a report for anyone else?
2     A.  No, ma'am.
3     Q.  So you told me -- and you stated -- we're going
4  to go down to -- scroll down to application of force and
5  under B -- actually, there's a chart, correct?
6     A.  Yes, ma'am.
7     Q.  And in this chart it explains your perception of
8  suspect's action, and it kind of goes over the --
9  actually, you tell me -- these are perception of, I
10 guess -- you tell me what this chart is, actually.  Go
11 ahead explain it.
12    A.  This is the use-of-force continuum.  Any time
13 there's any kind of force that's used, whether it be just
14 police presence or whatever, this is the -- how do you say
15 it?  This would be kind of a general guide.  If we're
16 going to use force, we would use it in this order, but
17 that doesn't mean you can't go from, just say, mere
18 officer's presence to suddenly deadly force.
19          For example, I show up, everybody is calm
20 and then a guy suddenly pulls a gun and shoots my partner
21 in the face.  Obviously, I would use deadly force at that
22 point.  But, by and large, we try to use this as a guide
23 on how our steps progress in the force continuum.
24          So it starts off with officer's presence,
25 and then it starts off with verbal commands.  And then it

Page 156

1  can go into open/empty hand control techniques, move on to
2  physical force, intermediate weapons and so on.
3     Q.  Then D, it goes over -- it's itemized.  And it
4  says, "An officer should consider the following factors
5  when assessing the need to use force."
6          Are you familiar with this list, sir?
7     A.  Yes, ma'am.
8     Q.  Has this list changed since then?
9     A.  Not that I can recall, no.
10    Q.  Okay.  So it asks, "Is the suspect submitting
11 peacefully or resisting?"
12          Right?
13    A.  Yes, ma'am.
14    Q.  Did April Johnson resist when you tried to
15 restrain her?
16    A.  Yeah.  That's why I had to restrain her.
17    Q.  What commands did you give her before restraining
18 her?
19    A.  I told her to back away, not fight people, you
20 know, normal commands that you would give people when
21 things are about to get out of control.
22    Q.  And in number 2, it says, "Was the suspect
23 armed?"
24          She wasn't armed, right?
25    A.  Not that I recall, no, ma'am.

Page 157

1     Q.  Three, "What is the nature of the crime?"
2          What was the nature of the crime at that
3  point?
4     A.  Well, at this point it was about to turn into a
5  -- it could have been a riot.  It was disorderly conduct
6  at minimal, but it was danger- -- it was about to -- from
7  what I understand, it seemed like it was going down the
8  route of immediate offense for a riot.
9     Q.  Okay.  And it seems like -- but at that time what
10 crime did you observe at that time?  Not about what it was
11 going to be, what did you observe?
12    A.  Yes, ma'am.  Like I said, disorderly conduct.
13    Q.  But was it just from April Johnson?
14    A.  No, it was from everyone.  April Johnson is the
15 only one I had to restrain though, but it was from
16 everyone though.
17    Q.  It was -- I'm sorry.
18    A.  You're fine.
19    Q.  So it's your testimony at the time you gave your
20 command, April Johnson was the only one in that crowd that
21 didn't follow your command to quiet down?
22    A.  Well, not necessarily quiet down, but definitely
23 not escalate things for sure, yes, ma'am.
24    Q.  Okay.  Number four says, "Does the suspect have a
25 previous arrest record or history showing violence?"

Gary Tuli

November 23, 2020
Pages 158 to 161

Page 158

1        You didn't know that at the time, right?

2    A.  Correct.

3    Q.  Okay.  Number five says, "Number of suspects

4  involved?"

5        How many people were in that crowd that she

6  was in?

7    A.  Like I guessed earlier, if I were to guess,

8  there's 50 to 60 people easily.

9    Q.  There were 50 to 60 people in that particular

10  crowd where April Johnson was?

11    A.  What do you mean -- I'm a little confused at what

12  you're asking.

13    Q.  You pulled April Johnson away from another group

14  of people, correct?

15    A.  Oh, yes.  She was -- she went towards a crowd

16  to -- a group, I don't know, again, based off of just what

17  I remember, I would -- if I were to guess, a crowd of 10

18  people, give or take.

19    Q.  Okay.  And how much support from officers were

20  available at this point on the ground?

21    A.  We had a good amount of officers there.

22    Q.  Okay.  Was there anyone there that could have

23  assisted you at that time?

24    A.  What do you mean?  Assisted me in doing what?

25    Q.  Restraining April Johnson or helping quiet the

Page 159

1  crowd down?

2    A.  Yeah.  It's -- it seems like I had April

3  physically under my own control.  I'm a lot stronger than

4  her, so I had her physically under control, but the rest

5  of the crowd -- when I grabbed April Johnson, the rest of

6  the crowd became extremely agitated and the other officers

7  did what officers do.

8    Q.  If you grabbed her in a choke hold, would you

9  have had to report that, fill out a use-of-force form?

10    A.  Yes, I would assume so.  Yes, ma'am.

11    Q.  Okay.  If you put your -- and I'm just giving

12  examples, hypotheticals because I don't know, okay?

13        If you had your arm around her neck --

14    A.  Uh-huh.

15    Q.  -- and would you have to have reported that?

16    A.  Not if I wasn't choking her, no.  No, ma'am.

17    Q.  Okay.  How would you know though if you were

18  choking her?

19    A.  What do you -- did she say I choked her?

20    Q.  No.  Sir, I -- I'm asking the questions, so I --

21  I don't know, right?  I don't know -- I'm not in the

22  position to answer questions, right, like that.  So if

23  you're unclear to what I'm asking, I can clarify my

24  question.

25    A.  Would I know if I choked her?  I didn't choke

Page 160

1  her, I mean, I didn't.  How would I know if I choked her?

2  I don't know, she might have passed out.  I didn't choke

3  her though.

4    Q.  Okay.  So what did you do because I'm a little

5  bit unclear as to what you did.  What did you -- how did

6  you remove her from the scene?

7    A.  I grabbed her and I walked her to the other side

8  of my car and I let her go and I calmed her down.  And we

9  brought her children over to her and she further calmed

10  down.

11        And then her 13- or 14-year-old son came

12  over and wanted to fight me.  He took his shirt off.  He

13  threatened to kill me.  You can hear somebody --

14    Q.  I'm going to -- I'm not there yet, Officer Tuli.

15  How did you grab her?  Because I'm a little bit unclear as

16  to how you grabbed her that night.  How did you grab her?

17    A.  Wrapped my arm around her and physically carried

18  her away from there.

19    Q.  Okay.  And specifically where on her body did you

20  wrap your arm around?

21    A.  Her upper area, her upper torso area.

22    Q.  Okay.  So when you say "torso," that would be

23  below the neck down?

24    A.  Her upper body.  I don't know where you're going

25  with this.

Page 161

1    Q.  I don't know what upper torso means.  I'm just

2  trying to understand, I'm sorry.

3    A.  Have you ever grabbed somebody from behind?  You

4  just grab them.  I don't know how else to describe that.

5    Q.  Sir --

6    A.  The way I wrote it in my report is I wrapped my

7  arms around her and carried her away.

8    Q.  But your report fails to state where you wrapped

9  your arms around.  Where did you wrap your arms around?

10    A.  Her upper body.  I grabbed her.  I don't know how

11  else to answer that.

12    Q.  Where in her upper body?

13    A.  Her upper body.  I don't know what you're asking.

14        MR. FRIGERIO:  Objection.  It's been asked

15  and answered multiple times.

16  BY MS. HOUSE:

17    Q.  Sir, did you grab her on her shoulder area?

18    A.  Not that I recall, no.

19    Q.  Okay.  Would it have been -- would you grab her

20  below or above her shoulders?

21    A.  I would assume below her shoulders.

22    Q.  Thank you.  That just clarifies.  Thank you.

23    A.  Okay.  You're welcome.

24    Q.  I'm going to show you Officer Cavazos' body worn

25  camera video.

Gary Tuli

Page 162

1          (Video played.)
2    BY MS. HOUSE:
3      Q.   Officer Tuli, do you see yourself in this image,
4    sir?
5      A.   Yes, ma'am.
6      Q.   Where is your arm?
7      A.   Looks like it's right above her shoulders.
8      Q.   Okay.  Yeah.  Your arm is wrapped around her
9    neck, isn't it?
10     A.   Sure.  Yes, ma'am.
11     Q.   Okay.  And you are dragging her away, correct?
12     A.   Yes, ma'am.
13     Q.   Okay.  Based on that hold, do you believe you
14   should have filled out a use-of-force report for that
15   particular contact?
16     A.   No, not at all.  No.  My intention was to grab
17   her and restrain her.  If my arm landed around her neck,
18   that's her fault.  That's not my fault.  She is the one
19   pulling away and that is absolutely not my fault.  And
20   furthermore, no, I wouldn't do a use-of-force regardless
21   because she's not injured.  I didn't make an arrest.  I
22   just broke up a fight.
23     Q.   I'm going to show you the video again.
24     A.   Okay.
25     Q.   And, sir, as you can see before --

Page 163

1          (Video played.)
2    BY MS. HOUSE:
3      Q.   -- there are a lot of officers standing around,
4    correct?
5      A.   Yes, ma'am.
6      Q.   To be fair, Officer Tuli, you probably were doing
7    the most in this instance out of any other officer to try
8    to -- as you interacted with people on the scene; is that
9    fair to say?
10     A.   I don't know what the other officers were doing,
11   but I'm a pretty outgoing guy, if that's what you mean.
12     Q.   Okay.
13         (Video played.)
14   BY MS. HOUSE:
15     Q.   How many officers would you say around here do
16   you see standing around?
17     A.   Oh, what did we guess earlier, eight or nine
18   officers.
19     Q.   Right now though in this scene?
20     A.   I can see one officer.
21         (Video played.)
22   BY MS. HOUSE:
23     Q.   Okay.  How many do you see, sir?
24     A.   Yeah.  Like I said, we were all there.  I guessed
25   earlier eight or nine.

Page 164

1      Q.   And there were a lot of officers in that
2    immediate area where April Johnson was, correct?
3      A.   Maybe not immediate enough.
4      Q.   Okay.  And -- but as soon as you walked over
5    there, you could have called for someone to go with you,
6    correct?  You could have done that?
7      A.   What do you mean, to go with me where?
8      Q.   As soon as you went to approach April Johnson,
9    you could have called an officer to go with you to
10   approach her, correct?
11     A.   I don't remember approaching April Johnson.  I
12   remember April Johnson running past me, running directly
13   past me.
14     Q.   Okay.  I'll play.
15         (Video played.)
16   BY MS. HOUSE:
17     Q.   Okay.  You see you automatically -- your arm goes
18   around her neck.  Do you see that, sir?
19     A.   Without, you know -- the video is kind of still
20   shaky, but if my arm is around her neck, that's entirely
21   her fault.
22     Q.   Okay.  Sir, you took a swing and it lands around
23   her neck, but it's her fault because of her behavior --
24     A.   No --
25     Q.   Is that what you're saying?

Page 165

1          MR. FRIGERIO:  (Inaudible).
2          THE REPORTER:  Hang on.  I'm sorry.  Y'all
3    were all talking at the same time.
4          Go ahead, Mr. Frigerio.
5          MR. FRIGERIO:  Objection to
6    mischaracterization of the video.  The video speaks for
7    itself.
8    BY MS. HOUSE:
9      Q.   Officer Tuli, I want you to look at the video and
10   see where your arm goes.
11         (Video played.)
12   BY MS. HOUSE:
13     Q.   Okay.  As soon as you do it, what do you hear?
14     A.   The crowd get upset.
15     Q.   Okay.  They're saying ooh, aren't they?
16     A.   Yes, ma'am.
17         (Video played.)
18   BY MS. HOUSE:
19     Q.   What else do you hear?
20     A.   I hear kids screaming.
21         (Video played.)
22   BY MS. HOUSE:
23     Q.   Officer Tuli, they're screaming because of your
24   actions, aren't they?
25     A.   They're screaming because of their mom's actions.

Gary Tuli

November 23, 2020
Pages 166 to 169

Page 166

1    Q.   What did their mom do at that moment that would
2  cause them to scream, sir?
3    A.   Attack somebody and have to be restrained by the
4  police.
5    Q.   Your body camera didn't show that because it
6  became dislodged, didn't it?
7    A.   Yes, ma'am.  I do believe so.
8    Q.   What we do see is your arm around her neck, yes?
9    A.   Yeah.  We see her attacking somebody after being
10 told to not attack people.  The entire crowd was --
11   Q.   Where did you see someone attacking anyone?
12   A.   She ran directly in front of me to go towards the
13 crowd screaming, "I want them.  I want them."
14   Q.   Was that an attack, sir?
15   A.   I would -- I would say it was definitely an
16 attack, an act of aggression, yes, ma'am.
17       (Video played.)
18 BY MS. HOUSE:
19   Q.   It wasn't in your police report -- what type of
20 hold is that?  How would you -- what would you describe
21 that?  That's a choke hold, right?
22   A.   No, ma'am.
23   Q.   What type of hold is that?
24   A.   Again, I grabbed her.  That's just a grab.  It's
25 not a choke hold.  A choke hold would involve me

Page 167

1  intentionally and knowingly cutting off her blood flow to
2  her brain or her oxygen supply.  I didn't do any of that.
3  That was me grabbing her.
4    Q.   How many --
5    A.   No one else had to be grabbed.
6    Q.   Okay.  And you're only using though one arm in
7  order to handle her, right?
8    A.   I say kudos to me, yes, ma'am.
9    Q.   I'm now going to show you -- I'm going to keep
10 playing the video.
11       (Video played.)
12 BY MS. HOUSE:
13   Q.   Okay.  If you saw your mom being handled like
14 that, how would that make you feel?
15   A.   I have seen my mom handled like that.  It's not
16 comfortable, but my mom shouldn't try to fight people.
17   Q.   What do you mean it's not comfortable?
18   A.   It's not comfortable.  No one likes to see their
19 mom get arrested or get detained.  It's not comfortable,
20 but if my mom was acting inappropriately or trying to
21 attack someone and the police had to restrain her, I think
22 -- I think it's warranted.  I mean, I don't know if I
23 would scream and cry and try to further attack the police.
24 I don't know if I would do that.
25   Q.   Do you believe that it would be natural for kids

Page 168

1  to be upset, that they saw their mother being restrained
2  like that?
3    A.   Like I said, I've seen my mom restrained like
4  that --
5         MR. FRIGERIO:  Objection; calls for
6  speculation.
7         MR. URBIS:  Objection; calls for
8  speculation.
9         MS. RODRIGUEZ:  Same.
10 BY MS. HOUSE:
11   Q.   I'm going to go back to your body camera footage.
12   A.   Yes, ma'am.
13   Q.   And I want to be clear, at that point no one
14 still told anyone to go home.  We've already went over
15 that several times, correct?
16   A.   Yes, ma'am.  I think at that point though it was
17 pretty obvious to both police officers and the crowd that
18 it was time to dismiss, for the crowd to disperse.  It was
19 pretty obvious.
20       (Played video.)
21       THE WITNESS:  I can't see anything.
22 BY MS. HOUSE:
23   Q.   What do you see?
24   A.   I can't see anything.
25   Q.   Okay.  Let me share the screen.

Page 169

1         I want you to listen to what you said.
2         (Video played.)
3  BY MS. HOUSE:
4    Q.   How many times did you give her a command?
5    A.   I don't know.  I just heard say, "Come here."
6    Q.   You didn't hear yourself say, "Knock it the fuck
7  off"?
8    A.   No, I didn't.  If you want to rewind it -- I'm
9  not saying I didn't say that.  I probably said that.  That
10 sounds like something I would say, but --
11   Q.   I'll rewind.
12       (Video played.)
13 BY MS. HOUSE:
14   Q.   Did you hear yourself say, "Knock it the fuck
15 off"?
16   A.   Yes, ma'am, I did.
17   Q.   Then what did you say?
18   A.   "Come here."
19   Q.   Okay.  And then as soon as you said, "Come here,"
20 you said it in an aggressive manner, correct?
21   A.   I said it.
22   Q.   In an aggressive tone?
23   A.   I think it's very clear that the only people
24 being aggressive is everyone here.  You can hear somebody
25 if you rewind what you just said --

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900      San Antonio, Texas 78232
210-697-3400                                                    210-697-3408

Gary Tuli

Page 170

1    Q. Sir, I'm only asking you --
2         MS. HOUSE: Objection; nonresponsive.
3    BY MS. HOUSE:
4    Q. I'm only asking you about your tone, okay?
5    A. And I'm --
6    Q. How would you describe your tone?
7    A. I was not aggressive. The only people that were
8    aggressive were people -- Ms. Johnson, and you can hear
9    somebody else yelling, "Hey (Redacted), calm down, calm
10   down." I was not aggressive.
11   Q. Okay. When you said, "Come here," what did you
12   do, sir?
13   A. I grabbed her and I broke up a fight.
14   Q. That's when you grabbed her neck. You said,
15   "Come here." I want you to listen to your tone of voice
16   change.
17        (Video played.)
18   BY MS. HOUSE:
19   Q. You were agitated at that point, weren't you?
20   A. Negative, ma'am.
21        MR. FRIGERIO: Objection; form.
22        MR. URBIS: Objection; argumentative. Asked
23   and answered.
24   BY MS. HOUSE:
25   Q. Sir, yes or no?

Page 171

1    A. No, ma'am.
2         MR. URBIS: Same objection.
3         MS. RODRIGUEZ: Same objection.
4    BY MS. HOUSE:
5    Q. You were mad because she wasn't listening to you,
6    right?
7         MR. URBIS: Objection; calls for
8    speculation.
9         MS. RODRIGUEZ: Objection; same.
10   BY MS. HOUSE:
11   Q. Sir, I'm asking about why you were mad. So,
12   Officer Tuli, you were mad because she wasn't -- you felt
13   you weren't being listened to, right?
14   A. (Inaudible).
15        MS. RODRIGUEZ: Objection.
16        THE REPORTER: I didn't hear your answer.
17        THE WITNESS: I said no. I was not mad at
18   all.
19   BY MS. HOUSE:
20   Q. How were you feeling at this moment?
21   A. Not mad.
22   Q. What were you feeling?
23   A. Like I needed to get this call done.
24   Q. I'm going to keep playing.
25        (Video played.)

Page 172

1    BY MS. HOUSE:
2    Q. Who are you telling "Stop it" to?
3    A. April Johnson, ma'am.
4    Q. Okay. And why are you telling her to stop it?
5    A. Because she's trying to pull away from me to go
6    and fight people.
7    Q. How do you know she was pulling away from you to
8    go fight people?
9    A. How do you know she wasn't?
10   Q. Sir, my question to you is how do you know --
11   A. I was there. I saw her --
12   Q. -- she was pulling away to fight?
13        THE REPORTER: Hang on. You're both talking
14   at the same time. I can only get one voice.
15        THE WITNESS: Sorry, ma'am.
16        I was there. I saw her try to fight people
17   multiple times.
18   BY MS. HOUSE:
19   Q. But, sir, you're dragging her away. You saw
20   that, correct?
21   A. Yes, ma'am.
22   Q. She's only being dragged in the direction that
23   you are taking her, right?
24   A. Because she's pulling away to go back the other
25   direction.

Page 173

1    Q. Sir, could it be that she's pulling away to get
2    her neck out of your arm?
3    A. I wouldn't have had my arms around her in the
4    first place if she wouldn't try to fight people.
5    Q. What -- she wasn't saying anything during this
6    time, right?
7    A. Not that I can recall. I don't know.
8    Q. But your body camera only picks up you saying
9    something and the screams in the background, right?
10   A. Sure.
11   Q. It doesn't pick up April Johnson saying anything;
12   is that true?
13        MR. FRIGERIO: Objection; form. That's --
14   it's inaccurate of the record. You can hear her clearly
15   speaking.
16        MR. URBIS: Join the objection.
17   BY MS. HOUSE:
18   Q. Okay. I'll rewind and I want to you to tell
19   me -- and I don't want your attorney to say it. You tell
20   me what April Johnson is saying as her neck is in your
21   arm.
22        MR. URBIS: Objection; asked and answered.
23        MS. RODRIGUEZ: Same.
24        (Video played.)
25   //

Gary Tuli

Page 174

1  BY MS. HOUSE:
2      Q.  What did you hear April Johnson say?
3      A.  There's a lot of stuff.  I can't make out what
4  anybody is saying at that point except me.
5      Q.  What did you hear April Johnson saying?
6          MR. FRIGERIO:  Objection --
7          MR. URBIS:  Objection; asked and answered.
8          THE WITNESS:  I couldn't make out what
9  anybody was saying except myself.  It sounds like I was
10 saying, "Stop it, stop it, stop it."
11         (Video played.)
12 BY MS. HOUSE:
13     Q.  At this point, is this where your body camera
14 became dislodged?
15     A.  Yes, ma'am.  And just to be clear, I can hear her
16 at that point, "Get my daughter, get my daughter."
17     Q.  Do you know at that point whether or not your
18 neck -- your arm was still around her neck?
19     A.  I carried her all the way to the other side of my
20 car; so probably -- I probably still had a hold on her.
21     Q.  But where your body camera dislodged, it wasn't
22 on the other side of your car; is that correct?
23     A.  I don't remember.  I don't know where my body
24 camera fell off.
25     Q.  Who picks up -- Officer Stopper picks up your

Page 175

1  body camera, right?
2      A.  If I remember correctly, yes.
3          (Video played.)
4  BY MS. HOUSE:
5      Q.  Did you hear what was said in the background?
6      A.  No, ma'am.
7      Q.  Okay.  I'm going to play it again.
8      A.  Okay.
9          (Video played.)
10 BY MS. HOUSE:
11     Q.  "You literally have to get people out of here."
12 You heard that, right?
13     A.  I don't -- I couldn't make -- again, I'm trying
14 but --
15     Q.  Is that -- does this -- okay.
16     A.  Sure.
17     Q.  Is that because -- well, you're saying "sure,"
18 but I want to understand if you can hear or not.
19         Have you been having any problems hearing
20 any of the video as a result of your disability?
21     A.  No, no, it's not that.  It's, you know,
22 everything is happening so fast, I can't -- I mean, if
23 somebody said, "You literally have to get people out of
24 here," okay, I'll take your word for it.  I have no
25 problem with that being said.

Page 176

1      Q.  Sir, I'm just asking you what you hear on the
2  video.
3      A.  I hear a lot of yelling.  That's what I hear.
4          (Video played.)
5  BY MS. HOUSE:
6      Q.  Did you hear that?  "You literally" --
7      A.  Yes.
8      Q.  Okay.  It didn't take a bystander to tell the
9  officers that they have to get people out of there; is
10 that correct?  Is that fair to say?
11         MR. FRIGERIO:  Object to form.
12 BY MS. HOUSE:
13     Q.  Sir?
14     A.  I don't know who she's talking to.
15         (Video played.)
16 BY MS. HOUSE:
17     Q.  Okay.  Who do you see right here?
18     A.  I'm assuming that's Ms. Johnson.
19     Q.  Yes.  What do you hear Officer Stopper tell her
20 to do?
21     A.  I didn't make out what he said.
22         (Video played.)
23 BY MS. HOUSE:
24     Q.  What do you hear her telling her kids to do?
25     A.  I don't know.  "Go to the car."  That's what it

Page 177

1  sounds like.
2      Q.  Yes, sir.
3      A.  "Go to the car" or "go get the car," something
4  like that.
5      Q.  Said, "Go to the car."  You said it right first,
6  "Go to the car," right?  Okay.
7          (Video played.)
8  BY MS. HOUSE:
9      Q.  What -- she said she's going to go get her son.
10 Did you hear that?
11     A.  Yes, ma'am.
12     Q.  Okay.
13         (Video played.)
14 BY MS. HOUSE:
15     Q.  You see April Johnson here?
16     A.  Yes, ma'am.
17     Q.  Where are you at this point?
18     A.  I can't tell.  I don't know.
19     Q.  Okay.  April Johnson didn't escape from you once
20 you dragged her off, right?
21     A.  Yeah.  I never said she did.
22     Q.  Okay.  How did she end up out of your care,
23 custody and control?
24     A.  I let her go so she can calm down.  And she did
25 calm down.  I took her away from the crowd that she wanted

Gary Tuli

Page 178

1  to fight. She calmed down. She screamed for her kids.
2  We brought her kids over. Her son with no shirt wanted to
3  fight me, threatened to kill me.
4      Q. Sir, I'm only -- I'm asking a specific question.
5  I just asked how she got here, okay?
6      A. Yeah, but she wasn't under arrest. My intention
7  was never to arrest her. My intention was to keep her
8  from fighting people and she calmed down.
9          (Video played.)
10 BY MS. HOUSE:
11     Q. Okay. She told you all that she was going to go
12 get her son. That was her son on the ground, right?
13     A. I don't know. I think so.
14     Q. Okay. And her son is a juvenile, correct?
15     A. Yes, ma'am.
16     Q. In fact, all of her kids there were juveniles,
17 right?
18     A. Yes, ma'am.
19     Q. I'm going to show you Section 611 of the
20 San Antonio Police Department policy, Mentally Ill
21 Persons. Are you familiar with this section?
22     A. Yes, ma'am.
23     Q. I'm also going to show you -- did you ever review
24 procedures on juvenile persons?
25     A. Well, yes, ma'am.

Page 179

1      Q. Okay. In the course of your procedures, do you
2  ever ascertain as to whether or not the child's present --
3  the child's parents are present on the scene?
4      A. It depends on what's going on, but yes.
5      Q. Okay. And under mentally ill persons, on .08,
6  course of action, are you familiar with this section?
7      A. Yes, ma'am.
8      Q. Okay. And this child is a youth under the age of
9  17, right?
10     A. Yes, ma'am.
11     Q. At that time did you know as to whether or not he
12 had a mental illness?
13     A. I don't think so.
14     Q. Did you ever take the time to ask if the child
15 had a mental illness?
16     A. Not that I recall, no, ma'am.
17     Q. Did you give the mom an opportunity to tell you
18 that the child had a mental illness?
19     A. I don't recall -- I recall him attacking or
20 trying to attack me and Mom yelling at him to stop.
21     Q. Sir, do you recall giving Mom the opportunity to
22 tell you he had a mental illness?
23     A. I don't know if that was an appropriate time to
24 ask about mental illnesses. I don't know.
25     Q. But she did tell you he had mental illnesses,

Page 180

1  correct?
2      A. I don't remember. Does he? I don't know. I
3  can't remember.
4      Q. Okay. I'm going to show you body camera --
5          (Pause in proceedings.)
6  BY MS. HOUSE:
7      Q. Officer Tuli, I'm showing you your body camera
8  footage, okay?
9      A. Yes, ma'am.
10     Q. At this time you have your body camera footage?
11     A. Okay.
12     Q. And you see April Johnson, correct?
13     A. Yes, ma'am.
14     Q. Do you recall this interaction?
15     A. No. This looks like a still frame. I don't
16 necessarily know, no.
17     Q. I'm going to play it for you to refresh your
18 memory.
19     A. Okay.
20         (Video played.)
21 BY MS. HOUSE:
22     Q. Who is talking?
23     A. Sounds like me.
24     Q. That's your voice, yes, sir.
25         (Video played.)

Page 181

1  BY MS. HOUSE:
2      Q. Okay. Officer Tuli, that's caught on your
3  camera.
4      A. Okay.
5      Q. Do you recall now hearing that, sir?
6      A. I'm listening to it but, I mean, you don't expect
7  me to remember every single conversation I had that night.
8  That was almost four years ago.
9      Q. Sir, she told -- your body camera caught it and
10 you were present where she told you about the mental
11 illnesses for her child, correct, according to this
12 footage?
13     A. Yes, but --
14     Q. In fact, that night --
15     A. You're asking -- you're asking me if I recall it.
16 No. I don't recall that.
17     Q. At that night you all did end up booking the son,
18 correct?
19     A. Correct.
20     Q. I'm going to ask the court reporter to give me a
21 time. Where are we as to actual deposition testimony?
22         THE REPORTER: You have four hours and
23 20 minutes in. Probably minus 10 minutes for the first
24 break.
25         MS. HOUSE: Okay.

Gary Tuli

November 23, 2020
Pages 182 to 185

Page 182

1  BY MS. HOUSE:
2      Q.  I'm going to go back to your body camera footage.
3          (Video played.)
4  BY MS. HOUSE:
5      Q.  At this time, Officer Stopper still has your body
6  camera?
7      A.  Okay.
8          (Video played.)
9  BY MS. HOUSE:
10      Q.  So the young boy is in custody of Officer
11  Stopper, correct?
12      A.  Apparently.
13      Q.  Well, that's who has your body camera, right?
14      A.  Is he with Stopper right now?
15      Q.  Okay, sir --
16      A.  In this part -- I don't know.  I don't see the
17  boy.  I saw somebody and then -- that's why I'm asking.
18      Q.  I'll keep playing?
19      A.  If he's with Stopper right now then sure, yeah.
20      Q.  I'll keep playing so that you see this.
21          (Video played.)
22  BY MS. HOUSE:
23      Q.  Actually, I'm going to fast-forward too.
24          (Video played.)
25  //

Page 183

1  BY MS. HOUSE:
2      Q.  That's your voice saying you found your body
3  camera, correct?
4      A.  Sure.
5      Q.  Yes or no, sir?
6      A.  I'm sorry.  Yes, ma'am.
7      Q.  Okay.
8          (Video played.)
9  BY MS. HOUSE:
10      Q.  Sir, you're talking very fast here, aren't you?
11      A.  I don't know.  I feel like that's my normal
12  voice, but okay.
13      Q.  Sir, are you?  Yes or no?
14      A.  Am I talking really fast?  I feel like I always
15  talk like that.
16          MR. FRIGERIO:  Form of the question.
17  BY MS. HOUSE:
18      Q.  I'm going to keep playing.
19          (Video played.)
20  BY MS. HOUSE:
21      Q.  How would you describe your tone?
22      A.  I'm stern.  I'm being stern.
23          (Video played.)
24  BY MS. HOUSE:
25      Q.  Officer Tuli, what was the purpose of you

Page 184

1  interacting with this child at this point?
2      A.  I can't remember.  Probably to see if he was
3  going to jail or not.  He came up and he made threats on a
4  police officer.  It was probably just to see if I was
5  going to take him to jail or not.
6      Q.  He was in the custody of Officer Stopper, wasn't
7  he?
8      A.  Yeah, people -- you arrest people all the time
9  and they go to different officers' cars and different sets
10  of handcuffs get taken out and Officer Stopper could have
11  been going home early.  Who knows.  I have no idea.
12      Q.  Officer Tuli, I'm going to go back to your police
13  report.
14      A.  Yes, ma'am.
15      Q.  Okay.  In your police report, and I'm going to
16  show you, it states, "As she pulled" -- and this is back
17  to April Johnson.
18          "As she pulled away harder, the best way for
19  me to secure her was to wrap my arm around her and pull
20  her away."
21          And you did this, correct?  You wrapped your
22  arm around -- above her shoulder, correct?
23      A.  Sure.  Yes, ma'am.
24      Q.  Okay.  "As I pulled her away, the crowd began to
25  scream and yell at me, and April Johnson's 13-year-old son

Page 185

1  began to ball his fist at me and challenge me to a fight."
2          Is that what you stated?
3      A.  Yes, ma'am.
4      Q.  Okay.  You said, "She kept screaming and saying I
5  want my daughter."
6          Is that what you stated?
7      A.  Did I write that in the report or did I say it
8  because we heard her say that?
9      Q.  I'm sorry.  Do you see the report in front of
10  you?
11      A.  Yeah.  I was trying to catch up to where you were
12  reading.  I was trying to figure out where you were
13  reading from.
14      Q.  Oh, okay.  I'm going to place the mouse where
15  it's reading.  Do you see the mouse, if you can?
16      A.  Yeah.  There it is.  I see it.
17      Q.  Okay.  So --
18      A.  Oh, yeah, I see what you're talking about.  "I
19  just want my daughter."  Yeah.
20      Q.  Okay.  I'm going to skip to -- let's see.
21          "As I was talking to 01," do you see that?
22      A.  Yes, ma'am.
23      Q.  "As I was talking to 01, I observed a large fight
24  where J1 and AP1 were involved."
25          So I'm -- one of these is A.N.E.R., correct?

Gary Tuli

Page 186

1    A.  AP1 would be, yes, ma'am.
2    Q.  Okay.  And J1 is April Johnson's son?
3    A.  Yeah.  The -- what is it called, the legend or
4  the key of all these different names, they're normally on
5  the reporting person's report, but I would assume J1 is
6  the 13-year-old.
7    Q.  "And I walked over to the fight and began to
8  break it up."
9        So you're saying April Johnson's daughter
10  and son, they were fighting.  You went over to break it
11  up, right?
12    A.  Yes, ma'am.
13    Q.  You said, "At that point, AP1" -- and that is
14  A.N.E.R., "was yelling and instigating a fight."
15        Correct?
16    A.  Uh-huh.
17    Q.  And you told her to back away, right?
18    A.  Yes, ma'am.
19    Q.  You said she closed distance on you, right?
20    A.  Yes, ma'am.
21    Q.  You pushed her back lightly, right?
22    A.  Yes, ma'am.
23    Q.  And "She took a bladed stance."  Correct?  That's
24  what you said?
25    A.  Uh-huh.

Page 187

1    Q.  You stated, "She balled her fist up and struck me
2  in the face with a closed fist."  Correct?
3    A.  Yes, ma'am.
4    Q.  And "she called me a white motherfucker."  Is
5  that correct?
6    A.  Yes, ma'am.
7    Q.  Okay.  You told me that this statement was true,
8  right?
9    A.  Yes, ma'am.
10    Q.  Okay.  You also stated that -- you said earlier I
11  didn't -- I didn't -- when I wrote this statement I didn't
12  review, and correct me if I'm wrong, any of the video
13  footage.  Was that your statement?
14    A.  Yes, ma'am.  You don't normally -- you can't
15  really see the video footage until it goes to Internal
16  Affairs or until it uploads.
17    Q.  Okay.  So you don't see the video footage before
18  writing a police report; is that correct?
19    A.  In general, yes, ma'am.  There's -- we got new
20  body cameras.  Now you can -- you can watch a -- you can
21  watch a video if you have the docking station or whatever,
22  but in general, no, you don't watch the video before you
23  write the report.
24    Q.  That's fair.  So because there's been
25  advancements in technology since then, right?

Page 188

1    A.  I don't know if I would call it advancements --
2    Q.  Okay.
3    A.  -- but yeah, cameras are better.  Cameras are
4  better because they're more -- they're more user friendly.
5    Q.  Understood.  And you understand that there's a
6  reliance on your police report for it to be accurate; is
7  that fair to say?
8    A.  Yes, ma'am.
9    Q.  Because based on what you say, people can end up
10  going to jail, correct?
11    A.  I know.  Right.
12    Q.  Okay.  And based on what you say, those
13  penalties, if they are true, could be severe; is that fair
14  to say?
15    A.  Yes, ma'am.
16    Q.  All right.  So you're saying you didn't have the
17  body camera footage, so you're relying strictly on memory,
18  correct?
19    A.  I wrote my report based on how I remembered the
20  facts that night.
21    Q.  Okay.  But all of the reports that you have
22  written in your career up until this point were always
23  based on the facts as you remembered it at that time; is
24  that correct?
25    A.  I would -- they're at least close to all of them.

Page 189

1  Like I said, sometimes you can watch body camera footage
2  and stuff, but by and large no, you can't, so ...
3    Q.  So they're all really based on generally, for the
4  most part, your memory, right?
5    A.  Yes, ma'am.
6    Q.  Have you before this ever gotten it wrong where
7  -- has your memory ever failed you?
8    A.  Everyone's memory fails them.
9    Q.  In this instance, did your memory fail you?
10    A.  Not at all.
11    Q.  Okay.  Well, I want to go over -- I'm going to
12  play a video for you.  One moment, okay?
13        (Video played.)
14  BY MS. HOUSE:
15    Q.  As soon as April Johnson came over where her son
16  was on the ground, can you tell me in your words what
17  happened?
18    A.  To be honest, I don't know if I was paying
19  attention to April Johnson anymore.  I don't remember.
20    Q.  You don't remember?
21    A.  Yeah.  I don't know if I was paying attention to
22  her anymore.  You're talking about the video clip where we
23  just saw her -- where her son is laying on the ground and
24  there's a bunch of people standing around?
25    Q.  Yes, sir.

Page 190

1    A.  Yeah.  I don't -- to be honest, I don't know if I
2  was paying attention to April Johnson anymore at that
3  point.  I don't know what was going on.
4    Q.  Okay.  I'm going to show you a clip.  One moment,
5  okay?
6    A.  Yes, ma'am.
7        (Video played.)
8  BY MS. HOUSE:
9    Q.  Officer Tuli, I'm going to direct you to view
10 Officer Groce's front dash cam.
11        (Video played.)
12 BY MS. HOUSE:
13   Q.  Now, is this the fight that you were referring
14 to?  You stated that April Johnson's son and daughter were
15 involved in a fight.  Is this the fight you were referring
16 to?
17   A.  I have no idea.
18   Q.  Okay.  I'll keep playing.
19   A.  Okay.
20       (Video played.)
21 BY MS. HOUSE:
22   Q.  Do you see yourself walk in the scene?  Do you
23 recall?
24   A.  Yeah, I don't --
25   Q.  Okay.

Page 191

1    A.  I don't know.
2    Q.  Do you recall the officer that you went with in
3  order to break up this alleged fight?
4    A.  No.
5    Q.  Okay.  You see these two officers though to the
6  left, right, walk up?
7    A.  Yes, ma'am.
8    Q.  I'm going to play it again because I really want
9  you to watch when the fight starts and when the fight
10 stops.
11       (Video played.)
12 BY MS. HOUSE:
13   Q.  Okay.  This right here would be -- is (Redacted)
14 -- is A.N.E.R., okay?
15   A.  Okay.
16   Q.  And is this her brother?
17   A.  I don't know.  I guess.  I don't know.  I have no
18 idea.
19   Q.  Okay.  Do you recall this fight ever happening?
20   A.  I'm trying to orient myself to see where this --
21 I'm assuming that's the fight that I went and broke up,
22 but I'm trying to orient where his body -- where his --
23 what's it called, his Coban footage would be, so it seems
24 about right.
25   Q.  Okay.  I'm going to keep playing.

Page 192

1    A.  Okay.
2        (Video played.)
3  BY MS. HOUSE:
4    Q.  All right.  There's an officer here, correct,
5  right here?  Is that an officer you see?
6    A.  Appears to be, yes, ma'am.
7    Q.  And someone -- someone's grabbed to the ground,
8  correct?  Did you see that?
9    A.  Sure.  Yes, ma'am.
10   Q.  Okay.  At this point is the fight over?
11   A.  I guess.
12   Q.  Between the kids?
13   A.  I guess.
14   Q.  Okay.
15   A.  I don't -- I don't know.  This is --
16   Q.  Do you see -- who do you see fighting right now
17 then?
18   A.  I can't make out a single person there.
19   Q.  Do you see anyone fighting though?
20   A.  Earlier it looked like people were fighting, yes,
21 ma'am, but --
22   Q.  I'm going to back it up.
23       (Video played.)
24 BY MS. HOUSE:
25   Q.  Right now kids are standing around, right?

Page 193

1    A.  Am I missing something?  There was a fight right
2  -- there was --
3    Q.  Right, but right now --
4    A.  In the bottom left-hand corner, did I -- there
5  was a fight there, correct?
6    Q.  Is there a still a fight going on?
7    A.  Well, it's paused.
8    Q.  Okay.  Is there still a fight going on right now?
9    A.  I can't tell.  That is a big gaggle of people.  I
10 cannot tell what's going on in that crowd right there.
11   Q.  There's two officers coming right here.  Do you
12 see those two officers?
13   A.  Yes.
14   Q.  Are the officers breaking up any fight right now,
15 do you see?  That you can tell?
16   A.  No.  I can't -- honestly, I can't tell what's
17 going on.
18   Q.  Okay.  Do you see them breaking up a fight, yes
19 or no?  Just yes or no.
20   A.  I can't hear any-- -- I mean, it absolutely looks
21 like they were breaking up a fight to me, yes, ma'am.
22   Q.  Who was fighting?
23   A.  There's a whole gaggle of people there fighting.
24 And then the officers have to get involved; so again,
25 there's -- there's all kind of people pulling on each

Gary Tuli

Page 194

1   other and --
2       Q.   What people do you see pulling on each other?
3       A.   I mean, you want me to -- I don't know if you can
4   see what I'm pointing at, but there's multiple individuals
5   pulling on each other throughout this entire clip you just
6   showed me, all the way from --
7       Q.   I'm going to play the clip.  If you could tell me
8   where to stop where you see individuals pulling on each
9   other, okay?
10      A.   Okay.
11      Q.   And you can just tell me where to stop so you can
12  point it out.  You can tell me the direction on the screen
13  and I will use my mouse to point to the direction and you
14  can tell me yes or no, okay?
15           And I'm sorry, you know, Officer Tuli, this
16  being your first deposition, generally we'd be in person,
17  right?
18      A.   Yes, ma'am.
19      Q.   And you could point yourself so I really
20  apologize.
21      A.   Oh, I apologize.  I'm sorry.  The 'Rona has got
22  us all, you know, hidden.
23      Q.   Yes, sir.  Yes, sir.  Okay.  So I'm going to play
24  it.  Let me know where you want me to stop and just tell
25  me where there's a fight, okay?

Page 195

1       A.   Yes, ma'am.
2            (Video played.)
3            THE WITNESS:  Push stop.
4   BY MS. HOUSE:
5       Q.   Okay.
6       A.   There's somebody pulling -- looks like somebody
7   is pulling somebody in a dress.
8       Q.   Right here?
9       A.   Yes, ma'am.
10      Q.   Okay.  And this is A.N.E.R.
11      A.   Oh, okay.  Somebody had to hold her back.  Okay.
12      Q.   Okay.  And is this a fight or what would you
13  consider this?
14      A.   It looks like somebody is dragging somebody.
15      Q.   Okay.  So someone is trying to stop a fight from
16  happening; is that fair to say?
17      A.   Yeah.  Sure.
18      Q.   Okay.  I'm going to keep playing and you tell me
19  when to stop.
20      A.   Yes, ma'am.
21           (Video played.)
22           THE WITNESS:  There's more people there.
23  Look at all those people fighting.  Looks like fighting to
24  me.
25  //

Page 196

1   BY MS. HOUSE:
2       Q.   Okay.  Someone is running from the left to right,
3   correct?
4       A.   Looks like fighting to me, yes, ma'am.
5       Q.   Okay.  And you believe that looks like fighting.
6   Okay.  I'm going to press play.
7            (Video played.)
8            THE WITNESS:  More fighting.  Looks like
9   more fighting.
10  BY MS. HOUSE:
11      Q.   Okay.  So more people are coming from the left,
12  right?
13      A.   Yes, ma'am.
14      Q.   Okay.  I just want you to tell me when you think
15  it starts to die down a little, okay?
16      A.   Yes, ma'am.
17           (Video played.)
18           THE WITNESS:  People are still fighting.
19  BY MS. HOUSE:
20      Q.   Okay.  Around this, at least for a pause, a
21  second, did it start to die down?
22      A.   Yes, ma'am.  It's kind of hard to tell though
23  when you're watching a video with no sound and no context.
24  You know, for all we know, people are yelling, screaming.
25  I can't tell.

Page 197

1            Based on what you just showed me, it clearly
2   looked like a fight was happening.  And you said that that
3   was A.N.E.R. getting held back by somebody, you know.
4       Q.   Well, but this is -- this is Officer Groce's
5   front view of his dash cam.
6       A.   Yes, ma'am.  I understand that.
7       Q.   And so obviously, the sound inside is not as --
8   would not be as good as someone that has a body camera on;
9   is that fair to say?
10      A.   In general, our body cameras are better than
11  Coban.  With that said, what I'm trying to say is this is
12  clearly a volatile, violent situation and it's escalating
13  further and further because of other people, not --
14      Q.   Okay.  All right.
15      A.   General --
16      Q.   I'm not -- to be clear, Officer Tuli, I'm not --
17  I am not at this moment trying to blame anything on the
18  police.  I'm trying to understand what I -- what is
19  being --
20      A.   And I'm trying to clarify that.  So when police
21  -- when we take actions, something like this, we can see
22  clearly that you said it was A.N.E.R. getting pulled away,
23  all these people are fighting, police are showing up.
24  Whether or not it's calmed down, I can't tell because I
25  don't know if everyone started singing Kumbaya right

Gary Tuli

Page 198

1  around then, but -- I don't know. There's a large group
2  of people. We're vastly outnumbered, you know. I don't
3  know when the fight stopped.
4      Q. Okay. Do you recall seeing this video in your
5  Internal Affairs interview, sir?
6      A. To be honest, I don't recall seeing this video at
7  all. It doesn't mean I didn't see it. I just don't
8  recall.
9      Q. Okay. So let me tell you, this is you and
10  Officer Carrasco right here entering from the left, okay?
11      A. Okay.
12      Q. And can you explain what you're doing at this
13  point?
14      A. No.
15      Q. You don't know?
16      A. No. How do you know that's -- I'm not denying
17  that that's me, but I'm a lot taller and a lot bigger than
18  Officer Carrasco, and those two officers look the same
19  size. I'm not saying that that's not me. I'm just
20  saying.
21      Q. I'm sorry. I believe it may be you and Officer
22  Cavazos.
23      A. I'm a lot bigger than Officer Cavazos also.
24      Q. So you're thinking that's not you?
25      A. I don't know that. I'm just saying those two

Page 199

1  officers look like the same size, and I'm way bigger than
2  both of those two officers.
3      Q. I'll keep playing.
4      A. Yes, ma'am.
5      Q. When A.N.E.R.'s [sic] son was arrested, were you
6  there in the immediate area?
7      A. I don't recall.
8          (Video played.)
9  BY MS. HOUSE:
10      Q. Do you see yourself right here, sir?
11      A. Oh, that is, yes -- yes, ma'am, I do see that.
12      Q. And would this be the vehicle that you stated you
13  slammed A.N.E.R. on?
14      A. I don't know if I slammed her. I restrained her.
15          MR. FRIGERIO: Object to the form.
16  BY MS. HOUSE:
17      Q. So you would have been in this area. Does this
18  refresh your memory that you were somewhere there?
19      A. If that's A.N.E.R. getting arrested, then yes,
20  ma'am.
21      Q. Okay. Thank you, sir. I'm going to stop it
22  right here, sir, and I'm going to share something else
23  with you.
24          Sir, what's your relationship with Sarah
25  Carrasco?

Page 200

1      A. She's a co-worker.
2      Q. I'm going to show you her --
3          MR. URBIS: Excuse me, Counsel. Before we
4  continue, can we take a short five-minute break?
5          MS. HOUSE: Sure.
6          MR. URBIS: Thank you.
7          THE REPORTER: Off the record at 3:38 p.m.
8          (Recess taken, 3:38 p.m. - 3:47 p.m.)
9          THE REPORTER: Back on the record at
10  3:47 p.m.
11          MS. HOUSE: Can I please get a time
12  announcement please?
13          THE REPORTER: Yeah. I've got roughly four
14  hours and 16 minutes, something like that, taking out all
15  the breaks.
16          MS. HOUSE: Four hours and 16 minutes?
17          THE REPORTER: Yes, ma'am.
18          MS. HOUSE: Because I'm allotted seven hours
19  for actual deposition testimony, not including breaks.
20          THE REPORTER: Yeah. I was taking out the
21  minutes that we stopped. That's what you have on the
22  record.
23          MS. HOUSE: Thank you so much.
24          THE REPORTER: You're welcome.
25  //

Page 201

1  BY MS. HOUSE:
2      Q. Okay. Officer Tuli, I know it's been a long day.
3  Is this the longest you've ever had to provide any type of
4  testimony?
5      A. It's getting close.
6      Q. Oh, tell me about the longest.
7      A. I had a DWI, a DWI one time that I went and took
8  the stand. I don't know, like 9:20 in the morning or
9  something and we went to lunch, and I don't think I was
10  done until close to 4:30, 4:40.
11      Q. Okay. Well, I'm going to do my best to try to,
12  you know, get you done in time to have dinner.
13      A. I have to go to work after this, so ...
14      Q. No rest. Okay. All right. I'm going to go back
15  to your police report. I just want to finish up what you
16  wrote in your report. Okay?
17      A. Yes, ma'am.
18      Q. So you stated -- and I'm going to point with the
19  mouse. It says, "at the time." Do you see that?
20      A. Yes, ma'am.
21      Q. Okay. Actually, can you go ahead and read that
22  please, sir?
23      A. Yes, ma'am. It says, "At that time I immediately
24  struck her back in the face with a closed fist and
25  grabbed her arms and pulled them behind her back.

Page 202

1    Officer Cavazos and Officer Osoria assisted me with
2    pulling her hands behind her back, placing her in
3    handcuffs."
4        Want me to keep going?
5    Q.  We can -- yeah, let's go ahead and stop for now.
6    Thank you, sir.
7    A.  Okay.
8    Q.  Okay.  And I'm going to stop sharing the screen.
9        And then I'm going to pull up body camera
10   footage from Sarah Carrasco, okay?
11   A.  Yes, ma'am.
12       (Video played.)
13   BY MS. HOUSE:
14   A.  I don't hear anything.
15   Q.  I'm sorry.  It was on mute.
16   A.  Is there sound on the video?
17   Q.  It was on mute.  Sorry, sir.  That was my fault.
18   A.  Okay.
19   Q.  Let me rewind.
20       (Video played.)
21   BY MS. HOUSE:
22   Q.  Okay.  I'm going to ask you, Officer Tuli, if you
23   recognize anyone from Officer Carrasco's body camera,
24   okay?
25   A.  Okay.

Page 203

1        (Video played.)
2    BY MS. HOUSE:
3    Q.  Did you recognize the woman in the striped shirt
4    from the beginning?
5    A.  No, ma'am.
6    Q.  Okay.  You remember the woman in the purple hair,
7    correct?
8    A.  Oh, from my video.  Yes, ma'am.
9    Q.  Yes, sir, from your body camera.  I want you to
10   see whether or not you see some purple hair enter in
11   Officer Carrasco's body camera footage, okay?
12   A.  Okay.
13       (Video played.)
14   BY MS. HOUSE:
15   Q.  Do you see my arrow here, sir?
16   A.  Yes, ma'am.
17   Q.  And maybe, if you recognize the clothing, do you
18   recognize these women?  You had an interaction with these
19   women in the beginning.
20   A.  Yeah.  Well, if you're saying that the purple
21   hair lady, then sure, but --
22   Q.  Okay.  And these are the women that you had to
23   give directives to, right?
24   A.  Sure.
25   Q.  Okay.  But according to this, at this point it --

Page 204

1    they're still here on the scene, according to Officer
2    Carrasco's camera, right?
3    A.  Yes, ma'am.
4    Q.  Okay.  I'm going to keep playing.
5        (Video played.)
6    BY MS. HOUSE:
7    Q.  Okay.  I believe this is you, but you can tell me
8    and correct me if I'm wrong if that is not you, okay?
9    A.  Okay.
10       (Video played.)
11   BY MS. HOUSE:
12   Q.  Is that you, sir?
13   A.  I think so.
14       (Video played.)
15   BY MS. HOUSE:
16   Q.  Was that your voice?
17   A.  Yes, ma'am.
18   Q.  Okay.  So that's you.  And who is the officer to
19   the left of you, the African-American gentleman?
20   A.  Probably Willie Hooten.
21   Q.  Oh, that's Willie Hooten?
22   A.  Probably.
23   Q.  Okay.  I'm going to keep playing, okay?
24   A.  Yes, ma'am.
25       (Video played.)

Page 205

1    BY MS. HOUSE:
2    Q.  Okay.  You start talking to April Johnson here.
3    Do you hear your voice, sir?
4    A.  Yes, ma'am.
5    Q.  And what do you tell her?
6    A.  I don't know.  "Get back.  You're next."  I don't
7    know.  Is that what I said?
8    Q.  Yes, sir.  You said, "Calm down or you're next."
9    You recall saying -- I'm going to let you hear it again.
10   Are you ready?
11       (Video played.)
12   BY MS. HOUSE:
13   Q.  What is she saying to you?
14   A.  To be honest, I don't even know if I'm talking to
15   her or not.  I don't know.
16   Q.  Okay.  What do you hear April Johnson saying?
17   A.  Nothing.
18   Q.  Okay.  I'm going to play it and see if you hear
19   something, okay?
20   A.  Okay.
21       (Video played.)
22   BY MS. HOUSE:
23   Q.  You heard yourself say, "Back up because you're
24   next," right?  You already testified to that.
25   A.  Okay.

Gary Tuli

Page 206

1          (Video played.)
2    BY MS. HOUSE:
3      Q.  Did you hear that, sir?
4      A.  I heard "back up."  I heard her say something.  I
5    heard somebody scream, "Don't talk to her" or "Don't touch
6    her."
7      Q.  I'm going to play it again.
8          (Video played.)
9    BY MS. HOUSE:
10     Q.  Okay.  On Officer Carrasco's body camera, there's
11   a bright light in the back.  Here's April Johnson right
12   here.  Do you see April Johnson?
13     A.  Yes, ma'am.
14     Q.  Okay.  Behind her is A.N.E.R.?
15     A.  Okay.
16     Q.  So you've already stated you're here in this
17   immediate area, because you're telling April Johnson "Back
18   up or you're next."
19          (Video played.)
20   BY MS. HOUSE:
21     Q.  What did the girl say?
22     A.  The girl who is screaming?
23     Q.  Yeah.
24     A.  Yeah, "Don't talk to her like that" or "Don't
25   touch her like that."

Page 207

1      Q.  "Don't talk to her like that."
2      A.  Okay.
3      Q.  That's A.N.E.R. talking to you.
4      A.  Okay.
5      Q.  I'm going to keep playing it.
6          (Video played.)
7    BY MS. HOUSE:
8      Q.  Okay.  Who is this, sir?
9      A.  I don't know.
10     Q.  Okay.  I'm going to keep playing it.  I'm going
11   to play it -- how about this.  I think maybe it will be
12   easier if I play it through, and then we'll go over the
13   footage.  Would that help?
14     A.  Sure.
15     Q.  Okay.
16          (Video played.)
17   BY MS. HOUSE:
18     Q.  Who do you see -- sir, who do you see?
19     A.  Yeah, I see A.N.E.R. punch me in the face, and
20   then me strike her back immediately.  And then Ms. Johnson
21   turns around and runs towards the --
22     Q.  You saw the strike in the face?
23     A.  That's what it looks like from where I'm at, yes,
24   ma'am.
25     Q.  Okay.  Well, let's go.  I would like to see that.

Page 208

1          (Video played.)
2    BY MS. HOUSE:
3      Q.  Okay.  So this is A.N.E.R. right here, right?
4      A.  Yes, ma'am.
5      Q.  And she's yelling at you, right?
6      A.  Sure.
7      Q.  Yes, sir, yes or no?
8      A.  Yes, ma'am.
9      Q.  I'm sorry.  I couldn't hear.
10     A.  I said yes.
11     Q.  Okay.  And she's saying, "Don't talk to her like
12   that," right?
13     A.  Uh-huh.
14     Q.  Okay.  I'm going to pull up, stop sharing your
15   report.  And at the bottom of the first page of your
16   report, you say, in the last paragraph, "She was yelling
17   and instigating a fight."
18          Was that the fight she was instigating by
19   telling you not to talk to her mom like that?
20     A.  Yes, ma'am.  Sure.  Yes, ma'am.
21     Q.  Okay.  And why didn't you include in your report
22   that she said that to you?
23     A.  I wrote down how -- the thing -- how I remembered
24   it.  I wrote down in my report how I remembered it
25   happening.

Page 209

1      Q.  And then --
2      A.  She clearly was aggressive toward me.  She was
3    violent and she punched me in the face.  I made an arrest.
4      Q.  Yes, sir.  But in your report, you're allowed to
5    use quotes as to what people were saying; is that correct?
6      A.  Yes, ma'am.
7      Q.  In fact, you did because you quoted what
8    April Johnson said in your report; is that correct?
9      A.  Yes, ma'am.
10     Q.  The only thing that you quoted A.N.E.R. saying
11   was calling you a white motherfucker, right?
12     A.  Yes, ma'am.
13     Q.  Why didn't you include her telling you not to
14   talk to her mother like that?
15     A.  Probably because that wasn't pertinent to my
16   report.
17     Q.  Ah.  Was it pertinent to your interaction with
18   her?
19     A.  With A.N.E.R.?
20     Q.  Yes, sir.
21     A.  Yeah.  If you call racial slurs, I think that
22   should be documented.
23     Q.  So, no.  Okay.  I asked you specifically, okay,
24   because you said calling people racial slurs.  So I'm not
25   sure you're listening to my question.  So let me rephrase,

Page 210

1 okay?

2   A. Okay.

3   Q. Let me re-ask it.

4   A. Okay.

5   Q. Why didn't you -- I asked you specifically -- we
6 were talking about why you didn't include "Don't talk to
7 her like that," A.N.E.R. referring to her mother, why you
8 didn't include it in your report. You said probably
9 because it wasn't pertinent to your report.

10      So then my question was why was it not
11 pertinent to your report?

12   A. People scream at us all the time. If people
13 scream at us and call us racial slurs and then attack us,
14 that's probably more important than somebody yelling
15 random things about, "hey, don't talk to her like that,"
16 or "you can't touch me when you place me under arrest." I
17 don't have to (audio distortion) on that ticket. You
18 understand?

19   Q. Okay. But, Officer Tuli, as soon as she said
20 that, you responded to her, correct?

21   A. I think I responded to her striking me in the
22 face, yes, ma'am.

23   Q. Sir, your attention was drawn to A.N.E.R. --
24 actually, your attention was drawn to A.N.E.R. as soon as
25 she screamed at you, as you stated. She was yelling at

Page 211

1 you, right?

2   A. Yes, ma'am.

3   Q. Okay. Her yelling was relevant, yes?

4   A. Well, her closing distance on me is what's
5 relevant. I told her to back off.

6   Q. My question is her yelling was relevant, yes?

7   A. Anybody screaming at police officers you should
8 probably pay attention to them.

9   Q. You included her yelling in your report, yes?

10   A. Yes.

11   Q. Okay. You didn't include exactly what she
12 allegedly yelled at the time, at that time right there.

13   A. Okay.

14   Q. Correct?

15   A. I wrote down what I remembered happening, what I
16 thought was important in my report.

17   Q. So here's what I want to know, Officer Tuli.

18   A. Yes, ma'am.

19   Q. In all of the reports/accounts --

20   A. Uh-huh.

21   Q. -- you gave to other people about what happened
22 between you and A.N.E.R., you never did mention she told
23 you, "Don't talk to her that way." You never did mention
24 it, correct?

25   A. Maybe I forgot. I don't know.

Page 212

1   Q. Okay. Yes or no, sir? You never did mention it?

2   A. I don't know. This was almost four years ago. I
3 don't know.

4   Q. Do you remember mentioning it?

5   A. No.

6   Q. If I told you that you never mentioned it, would
7 you have any reason to believe that I was not telling you
8 the truth?

9   A. No.

10   Q. Okay. That's fair. So now that you are hearing
11 her say, "Don't talk to her like that," are you used to
12 kids in her position yelling commands at you?

13   A. Unfortunately, yes, ma'am, I am.

14   Q. And in this particular case with her yelling the
15 command, right, nothing more, not punching you, nothing
16 more, what would have been an appropriate response?

17   A. Exactly what I did, hey -- I pushed her back,
18 created some space between me and her, and that's the most
19 appropriate response right then.

20   Q. At that time when you saw Officer Carrasco's
21 camera view, there were quite a few officers over there,
22 correct?

23   A. Yes, ma'am.

24   Q. So since this is Officer Carrasco's camera, we
25 know that Sarah Carrasco was there, right?

Page 213

1   A. Uh-huh.

2   Q. You said Willie Hooten was there, right? Yes,
3 sir?

4   A. Yes, ma'am.

5   Q. It was you, correct?

6   A. Yes, ma'am.

7   Q. Do you recall other officers that were there in
8 that immediate area?

9   A. I mean, since that was right at the time when she
10 struck me in the face, yes. I would say for sure Osoria
11 was there.

12   Q. Okay.

13   A. And for sure Cavazos was there.

14   Q. Okay. Osoria, Cavazos, Carrasco, Willie Horton?

15   A. Hooten.

16   Q. Hooten, sorry. What's your chant for him again?

17   A. "Willie. Willie."

18   Q. That's right. "Willie." Sorry. I don't want to
19 get it wrong because I know that's your friend.

20      And you were there?

21   A. Yes, ma'am.

22   Q. And maybe other officers too?

23   A. Maybe.

24   Q. So we're talking about one, two, three, four,
25 five so far?

Page 214

1    A.   Yes, ma'am.
2    Q.   Based on your knowledge of these officers, was
3  there anyone present that was not capable of restraining
4  A.N.E.R.?
5    A.   Apparently, none of us were able to restrain her.
6  It took three officers to restrain her.
7    Q.   Let's go through that then.  Let's talk about the
8  restraint.  I'm going to go back to the video.
9    A.   Yes, ma'am.
10   Q.   Because you said you clearly saw something.  And
11 you know, there's a lot of things, to be fair, that have
12 been unclear, but you said you clearly saw a punch,
13 correct?
14   A.   Well, I don't know if I saw it on this video but
15 I'm saying I know she socked me right then.
16   Q.   Okay.  But you said -- okay.  So I want to clear
17 it up for the record, because you said you clearly -- I
18 asked you what happened in the video, and you said I
19 clearly saw her hit me, punch me.
20   A.   To clarify, because I was standing there and I
21 remember her punching me right then.
22   Q.   So not -- your testimony is from what you
23 remember, not necessarily this video, correct?
24   A.   Yes.  Nothing in this video is very clear, to be
25  -- to be fair, so ...

Page 215

1    Q.   Well, let me ask you because I'm -- I am at
2  9 minutes and 10 seconds.  Do you see A.N.E.R. standing
3  right here?
4    A.   If that's her, I would say okay.
5    Q.   Okay.  Was that more clear?  Because I'm playing
6  the video.  I'm going to play the clip and stop it because
7  it's very quick.  Tell me if you recognize this child.
8         (Video played.)
9  BY MS. HOUSE:
10   Q.   She enters right here.  Do you see my mouse?
11   A.   Okay.  Yes, ma'am.
12   Q.   I'm going to keep playing.
13        (Video played.)
14 BY MS. HOUSE:
15   Q.   Okay.  Do you see the child right here?
16   A.   Yes, ma'am.
17   Q.   Okay.  And she's actually pulling up -- do you
18 see her pulling her top up?
19   A.   It appears, sure.
20   Q.   Okay.  And there's an officer standing right
21 here, right?
22   A.   Okay.  Yes, ma'am.
23   Q.   Okay.  Do you know who that is?
24   A.   Based off this frame, no.
25   Q.   Let me rewind and you tell me, okay?

Page 216

1    A.   Okay.
2         (Video played.)
3         THE WITNESS:  That's Cavazos, I think.
4  BY MS. HOUSE:
5    Q.   Okay.  That's Cavazos?
6    A.   I think so.
7    Q.   And then there's a white light over to the left,
8  correct?
9    A.   Uh-huh.
10   Q.   Between 9:10 and 9:11, you see something
11 going up.  When she goes up, I'm going to play it, but
12 nothing ever goes across that -- nothing breaks this white
13 light because this light right here, Officer Tuli, is
14 coming from behind.
15   A.   Okay.
16   Q.   Right?  You see the white light?
17   A.   Yes, ma'am.
18        (Video played.)
19 BY MS. HOUSE:
20   Q.   Okay.  She doesn't break the white light when she
21 says, "Don't talk to her like that."  Did you notice that,
22 sir?
23   A.   You mean -- yeah, it's a camera.  It's a video
24 camera.  There's all kind of stuff preventing view of all
25 of it.  There's people.  There's the bright light.

Page 217

1  There's somebody's arm, apparently.  There's all kind of
2  stuff blocking things.
3    Q.   Her arm went up as she said, "Don't talk to her
4  like that."  But the only thing that goes across -- can
5  you explain why the only thing that actually goes across
6  is your arm?
7         I'm going to show you.  I'm going to play
8  the clip.
9         (Video played.)
10 BY MS. HOUSE:
11   Q.   You saw her hand go up and say, "Don't talk to
12 her like that."  Did you see that, sir?  Or you need me to
13 play it again?
14   A.   So, again, it's pretty choppy here, but from what
15 I just saw, you can see her hand reach up and strike me in
16 the face.
17   Q.   All right.  So let's --
18   A.   It's pretty choppy but you can -- from what I'm
19 looking at over here, it looks -- it looks like you can
20 see her when she actually strikes me in the face, so...
21   Q.   Okay.  Sure.  And so I'm going to play the clip
22 and we're going to go over what you see.  One moment.
23   A.   Yes, ma'am.
24        (Video played.)
25 //

Page 218

1  BY MS. HOUSE:
2      Q.  Okay.  It went very quickly and I paused it.
3      A.  Uh-huh.
4      Q.  That would have been where she's standing -- it
5  looks -- her left hand is up, correct?
6      A.  I don't even know if that's her hand.  That looks
7  like somebody's shirt.  I have no idea what I'm looking at
8  there.
9      Q.  Okay.  Let's do it again.
10         (Video played.)
11  BY MS. HOUSE:
12     Q.  Whose face is right -- this is A.N.E.R.'s face
13  right here.
14     A.  Okay.
15     Q.  Yes, sir?
16     A.  Yes, ma'am.  Sure.
17     Q.  Okay.  And this is April Johnson right here,
18  correct?
19     A.  Yes, ma'am.
20         (Video played.)
21  BY MS. HOUSE:
22     Q.  You said her hand goes up and that's where she
23  punches you.
24     A.  I just saw it.  It's not showing it right this
25  second, but I just saw it a second ago.

Page 219

1      Q.  Okay.
2      A.  I don't know if it's -- I don't know if it's
3  because the connection is lagging or what but...
4      Q.  I'm going to play it again.
5      A.  Okay.
6         (Video played.)
7  BY MS. HOUSE:
8      Q.  Okay.  Right here you see your arm reach across
9  to her neck.  Did you see that, sir?
10     A.  To her neck?
11     Q.  Yes, sir.  Did you see --
12     A.  No.  Did you see that?
13     Q.  I'll go.  You describe what you see.
14         (Video played.)
15  BY MS. HOUSE:
16     Q.  Her hand went up and then it went down, right?
17     A.  Again, I didn't see that this time at all, so...
18     Q.  Okay.  Tell me when to stop when you see her hand
19  go up.  How about that?
20         (Video played.)
21         THE WITNESS:  Okay.  There it went.
22  BY MS. HOUSE:
23     Q.  When?  When did you see her hand go up?
24     A.  Again, it's kind of hard because we're FaceTiming
25  or whatever this is called, but I don't know how to push

Page 220

1  pause and push play, but I can see her hand reach up and
2  that's --
3      Q.  Tell me when to stop when you think her hand went
4  up to punch you.  Let me rewind.
5         (Video played.)
6         THE WITNESS:  There -- again, right there.
7  BY MS. HOUSE:
8      Q.  Okay.  Right here is where she would have hit
9  you?
10     A.  Well, obviously that's me trying to restrain her
11  at that point.
12     Q.  And as you're trying to restrain her, what did
13  you do?
14     A.  I -- so when she struck me, I immediately did a
15  compliance strike.  I did a reactionary compliance strike
16  and I grabbed her, and two other officers grabbed her with
17  me.  And we had to force her into handcuffs because she
18  wouldn't -- she wouldn't put the handcuffs on.
19     Q.  How many compliance strikes did you give her?
20     A.  One.
21     Q.  And was this open hand?
22     A.  No, ma'am.
23     Q.  It was closed fist?
24     A.  Yes, ma'am.
25     Q.  And where did you -- what was your target with

Page 221

1  the closed fist?  Her face?
2      A.  Yes, ma'am.
3      Q.  Okay.  And I'm still not seeing where she hit
4  you.  So, Officer Tuli, you said she hit you.  I don't see
5  it here.  And maybe this is not the right video for you.
6  I don't know, but I want to be clear because I want to
7  give you the opportunity to show where she hit you.
8         Just yell out "stop" when you want me to
9  stop the video as to where you think it would have been
10  the time for her to hit you, okay?
11         MR. URBIS:  I'm going to object.  Again,
12  this question has been asked and answered several times.
13  He's identified when he thought it happened.  And it's
14  unclear by playing one-second clips what happened to me,
15  but just objection.
16  BY MS. HOUSE:
17     Q.  Officer Tuli, counsel has stated you've already
18  identified where it happened.  I stopped it where I
19  believed you said it happened, but you didn't confirm
20  that.  So I want to be clear for the record as to where
21  that happened.
22         So again, Officer Tuli, because you
23  didn't -- when you yelled "stop," that would have been --
24  it was your body in the scene where you stated that you
25  gave her a compliance strike, okay?

Page 222

1    A.  Okay.
2    Q.  So if you could just yell out "stop" so I that
3  can mark on -- for the record where it stops on the video,
4  that will help me.  Because counsel sees something and
5  understands something that I don't see, okay?
6    A.  Okay.
7        MR. URBIS:  Same objection.
8        THE WITNESS:  Yeah.  It's happening really
9  fast, but...
10  BY MS. HOUSE:
11    Q.  When she said, "Don't talk to her like that," you
12  didn't hear "white motherfucker" at this point, right?
13    A.  No, ma'am.
14    Q.  Okay.
15        (Video played.)
16  BY MS. HOUSE:
17    Q.  Okay.  As soon as she said, "Don't talk to her
18  like that," there's a shadow that comes across.  Did you
19  see that, sir?
20    A.  No.  To be honest, no.
21    Q.  Okay.  I'm going to play it again.
22        (Video played.)
23        THE WITNESS:  Yeah.  Again, I just saw her
24  hit me again.  We keep pausing this and going back.  It's
25  clear that she advances on me.  It's clear that I tell her

Page 223

1  to back up.  I put my hand out and she strikes me.  I
2  don't know how else to point that out.  With the lag here,
3  it's not hitting at the right time, but from where I'm
4  looking, it's very clear that she's advancing on me.
5  She's yelling at me and I tell her to back up.
6    Q.  Okay.  This is what I'm going to do.  Do you see
7  where my mouse is right here?
8    A.  Yes, ma'am.
9    Q.  I want you to tell me at what time she does that.
10    A.  Okay.
11        MR. URBIS:  Same objection.
12        MS. HOUSE:  There's an objection.
13        MR. URBIS:  Objection; asked and answered.
14  I mean, he's identified roughly when it's happened.  And
15  to keep playing this back, at least now more than five
16  times, and he's already stated multiple times when he
17  thought it happened.  So, again, just repeated asked and
18  answered.  Same question over and over.
19  BY MS. HOUSE:
20    Q.  Officer Tuli?
21    A.  Yes, ma'am.
22    Q.  Did the punch happen at the same time that she
23  told you don't talk to her mother like that?  When her arm
24  went up and she told you, don't talk to her mother like
25  that, that's when you said the punch happened, right?

Page 224

1    A.  I'm not sure, ma'am.  She struck me in the face.
2  We arrested her.
3    Q.  So to be clear, you didn't tell any -- for sure;
4  you don't know when it happened?
5    A.  No, I did.  I said --
6        MR. FRIGERIO:  Object to form.
7        THE WITNESS:  -- it happened.  I pointed it
8  out multiple times and you keep saying you don't see it.
9  I can't make you see things.
10  BY MS. HOUSE:
11    Q.  Where are you pointing it out, Officer Tuli?
12  Because I don't see where you pointed it out.  Because by
13  the time you --
14        MR. URBIS:  Objection.  Argumentative; asked
15  and answered.
16  BY MS. HOUSE:
17    Q.  Sir, where are you pointing it out?  Where?
18        MR. URBIS:  Objection.  Argumentative; asked
19  and answered.
20  BY MS. HOUSE:
21    Q.  Is it at 9:10?
22    A.  I'm not entirely sure the seconds.  I'm looking
23  at the clock and the video at the same time.
24        (Video played.)
25  //

Page 225

1  BY MS. HOUSE:
2    Q.  Okay.  Would it have been when her hand went up
3  right there?
4    A.  That wasn't it.  There's another one.
5    Q.  Okay.  So it's not -- so she said don't --
6    A.  That's when --
7        THE REPORTER:  Hang on.  One at a time,
8  please.
9        THE WITNESS:  Sorry.  The hand -- what
10  appeared to be a hand flailing that you just pointed at,
11  that's not what I'm talking about.  There's another hand
12  that reaches across and strikes me in the face that
13  belongs to A.N.E.R.  She is clearly advancing on me in this
14  video.  I am clearly telling her to get away from me.  I
15  create some space and she strikes me in the face.
16  BY MS. HOUSE:
17    Q.  There's an officer right here, right?
18    A.  Yes, ma'am.
19    Q.  To the right.  Okay.  So where did you see her
20  clearly strike you?
21    A.  Again, I pointed -- I pointed it out multiple
22  times.  It wasn't the little hand flailing.  She hit me
23  with her right hand.  Two other officers saw it happen.  I
24  don't know where we're going with this.
25        (Video played.)

Gary Tuli

November 23, 2020
Pages 226 to 229

Page 226

1  BY MS. HOUSE:
2     Q.  Okay.  I don't see in this video, sir, where her
3  hand went up again after she said, "Don't talk to her like
4  that."  So I'm going to play it one more time and you can
5  point after she says, "Don't talk to her like that" where
6  her hand goes up again.
7     A.  Okay.
8        MR. URBIS:  Objection; asked and answered.
9        MS. RODRIGUEZ:  Same.
10       (Video played.)
11  BY MS. HOUSE:
12    Q.  And you're saying her hand went up again after
13  that.  That's what you saw?
14    A.  Yes, ma'am.  That's what I felt.
15    Q.  Okay.  In that clip, when did she call you white
16  motherfucker at that time, that you heard?
17    A.  So when I wrote my report -- again, we've gone
18  over this.  You know, I wrote it off -- based off my
19  memory.  After -- months later after I was able to watch
20  the videos, turns out she didn't call me a white
21  mother-f'er.  She called a white bitch or white asshole
22  or something, but it was like 10, 20 seconds after she hit
23  me, not before she hit me.
24    Q.  Well, later on she did say "I didn't punch his
25  white ass."  That's what she said, didn't she?

Page 227

1     A.  Yes, ma'am.  Something like that.
2     Q.  But that would have been when she was already in
3  handcuffs, correct?
4     A.  I don't remember if we were still struggling her
5  -- or struggling with her to put her in handcuffs, but
6  nonetheless, she -- she uses racial slurs against me.
7     Q.  At any time -- but -- so she didn't call you
8  white motherfucker to be clear, right?  Right?
9     A.  To be honest, I don't know.  I'm saying I wrote
10  down the way I remembered it.  I don't know if she called
11  me a white mother-f'er, but I wrote it down the way I
12  remembered it, so...
13    Q.  At that time you didn't remember -- you said you
14  thought you remembered it that way.  And you wrote down
15  what you thought you remembered then, correct?
16    A.  Yes, ma'am.
17    Q.  And then you said months later after you reviewed
18  it, you found out she didn't call you white motherfucker.
19  You said you thought she called you white asshole or
20  white-something else, right?
21    A.  Yeah.  Months later, yes, ma'am.
22    Q.  Okay.  At any point in time were you able to
23  amend this police report and clarify to anyone saying,
24  hey, guys, she didn't call me white motherfucker?
25    A.  No.  We don't -- you don't get to -- you don't

Page 228

1  get to do that.
2     Q.  Right.  Because based on your statements, they
3  rely on the information of the police report at the time
4  that you create it, correct?
5     A.  Yes, ma'am.
6     Q.  Okay.  I'm going to show you -- what was your
7  response when she said, "Don't talk to her that way" -- I
8  want you to listen to what you said to her at that moment,
9  okay?
10    A.  Okay.
11    Q.  All you're doing is listen to what she said.
12       (Video played.)
13  BY MS. HOUSE:
14    Q.  You said, "Shut up."  Did you hear that, sir?
15    A.  No.  But so what?
16    Q.  I'm not arguing with whether or not it was wrong.
17  I want you to --
18    A.  Well, I didn't mean to say so what.  I meant to
19  say okay if I did say that.  So what's the -- yeah.  Am I
20  not allowed to say shut up?
21    Q.  I'm not saying what you can or cannot do right
22  now at this point.  I'm just asking whether -- about you
23  saying -- you said as soon as she said, "Don't talk to her
24  that way," your response, verbal response was "Shut up,"
25  okay?  So I want you to listen again.

Page 229

1        (Video played.)
2  BY MS. HOUSE:
3     Q.  Okay.  Did you hear it, sir?
4     A.  Yes.
5     Q.  Okay.  Thank you.  I'm going to stop showing --
6  if I can find the screen -- this particular view.
7        I'm going to show you -- just to be clear,
8  you told a lot of people your story as to April Johnson
9  hitting you, correct?
10    A.  Sure.  Yes, ma'am.
11    Q.  Okay.  Because right after --
12    A.  April Johnson --
13    Q.  I'm sorry.  A.N.E.R. hitting you, right?
14    A.  Yes, ma'am.
15    Q.  Did you ever tell -- who was your sergeant at the
16  time?  Who was your sergeant?
17    A.  Sergeant Reed Hensley.
18    Q.  Okay.  Did you ever tell Sergeant Hensley that
19  you had to drag April Johnson away?
20    A.  I don't know.  I don't remember.
21    Q.  Did you ever tell Sergeant Hensley that you --
22  that April -- A.N.E.R. told you, Don't talk to her that
23  way?
24    A.  I don't remember.
25    Q.  Did you tell Sergeant Hensley that as soon as she

Gary Tuli

November 23, 2020
Pages 230 to 233

Page 230

1 told you that you told A.N.E.R. to shut up?
2    A. I don't remember.
3    Q. Okay. Did you tell Sergeant Hensley that
4 A.N.E.R. called you white motherfucker?
5    A. I don't remember.
6    Q. Okay. I'm going to show you what is Officer
7 Willie Hooten's camera.
8        (Video played.)
9 BY MS. HOUSE:
10    Q. What happened as soon as you restrained the
11 child?
12    A. What do you mean? I don't remember.
13    Q. Well, you said you slammed her against the car
14 and I asked you if that was a vehicle --
15        MR. FRIGERIO: Object. He never said he
16 slammed her against it.
17        MS. HOUSE: Okay. One moment.
18        Can we take like a five-minute break?
19        THE WITNESS: Okay.
20        MS. RODRIGUEZ: Sure.
21        THE REPORTER: Off the record at 4:24 p.m.
22        (Recess taken, 4:24 p.m. - 4:31 p.m.)
23        THE REPORTER: Back on record at 4:31 p.m.
24 BY MS. HOUSE:
25    Q. Officer Tuli, I'm going to show you another body

Page 231

1 camera. This is Officer Christopher Cavazos' body camera.
2 Okay?
3    A. Yes, ma'am.
4    Q. And we just got done seeing Sarah Carrasco's.
5 Now I'm going to go back to Officer Cavazos' camera.
6        So at 13 -- around 13:21 I'm starting it.
7 Let me know -- could you hear that?
8    A. I can hear it. I can't see anything though.
9    Q. Okay. Thanks for letting me know.
10        (Video played.)
11 BY MS. HOUSE:
12    Q. Now, when the interaction between you and
13 A.N.E.R. occurred, tell me if you don't see your hands
14 going around her neck and pulling her back. Because her
15 head goes back and she's jolting forward, okay?
16        (Video played.)
17 BY MS. HOUSE:
18    Q. Where are you here? This is you, sir, right?
19    A. Oh, okay. Yes, ma'am.
20    Q. And this is April Johnson.
21    A. Okay. Yes, ma'am.
22    Q. Okay. Right? Yes?
23    A. Yes.
24        (Video played.)
25 //

Page 232

1 BY MS. HOUSE:
2    Q. Okay. This is A.N.E.R. to the left, correct?
3    A. Yes, ma'am.
4    Q. I'm going to back it up. Actually, let me go
5 ahead and play it fully, and then I'll ask you about it.
6        Would that help?
7    A. Sure. Yes, ma'am.
8        (Video played.)
9 BY MS. HOUSE:
10    Q. Can you describe your first contact with A.N.E.R.
11 according to this clip?
12    A. No.
13        (Video played.)
14 BY MS. HOUSE:
15    Q. I want to ask you the first time you physically
16 touch her in this clip, okay?
17        (Video played.)
18 BY MS. HOUSE:
19    Q. Had you touched her -- you hadn't touched her at
20 that point?
21    A. I -- I don't know.
22    Q. Sir, do you recall when she says, Don't talk to
23 her like that, you've testified she was coming towards
24 you, correct?
25    A. Yes, ma'am.

Page 233

1    Q. And at that point, you hadn't had the opportunity
2 to touch her because she was walking toward you at that
3 moment, correct?
4    A. If I remember right, she was closing distance on
5 me and I pushed her back.
6    Q. Correct. Right. But at that point before she
7 talked to you, you hadn't closed distance, right?
8    A. Well, I never closed distance. It was her. She
9 closed distance on me.
10    Q. But you never pushed her back in order to stop
11 her closing distance before she said, "Don't talk to her
12 like that," right?
13    A. I pushed her back when she was too close to me.
14    Q. Did that happen before or after she says, "Don't
15 talk to her like that"?
16    A. I can't remember.
17    Q. I'm going to show you the video.
18    A. Okay.
19        (Video played.)
20 BY MS. HOUSE:
21    Q. Okay. What did April -- April Johnson said,
22 "This is my son right here" when she came over, right?
23    A. Sure. Yes, ma'am.
24    Q. Okay. You're saying "sure." Did you hear it or
25 do you want me to replay?

Gary Tuli

November 23, 2020
Pages 234 to 237

Page 234

1    A. Yeah, I heard her.
2    Q. And you told her at that point to back up, right?
3    A. I don't know who I was talking to. There's a lot
4  of people there. You can barely see. You can barely see
5  what is visible. There's a bunch of bodies blocking the
6  camera, there's arms, there's all kind of stuff. I have
7  no idea if I was talking to April Johnson or if I was
8  talking to A.N.E.R. or anyone else. I don't know.
9    Q. Is there an arm blocking this camera view right
10  now?
11    A. Right there. I mean, you keep pausing it. You
12  keep pausing the video. You'll play it for a couple of
13  seconds and then ask a different question.
14    Q. I'll play it back and I'll ask you who -- you're
15  telling April Johnson to back up. I will play it.
16    A. (Inaudible).
17        THE REPORTER: I couldn't hear what you
18  said.
19        (Video played.)
20  BY MS. HOUSE:
21    Q. Who is telling her to back up?
22    A. Was that Carrasco? I think that was Carrasco.
23    Q. Okay.
24        (Video played.)
25  BY MS. HOUSE:

Page 235

1    Q. Okay. Now, you had already admitted you told her
2  that she was next. Do you remember giving that in earlier
3  testimony, sir?
4    A. I don't know who I was talking to. And you can't
5  tell who I was talking to by looking at this video.
6    Q. But you can hear your voice here, correct, sir?
7    A. I could have been yelling at numerous people. I
8  have no idea who I told to back up or to go away.
9        I know A.N.E.R. closed distance on me,
10  yelled at me, struck me in the face, and I immediately
11  returned a compliance strike and took her --
12    Q. Officer Tuli, I'm not --
13        MR. FRIGERIO: Let him -- wait a minute.
14  I'm going to object. You need to let him finish his
15  answer before you ask another question.
16        MS. HOUSE: I'll object to nonresponsive. I
17  will object then to nonresponsive.
18        MR. FRIGERIO: You also need to let him
19  finish his answer.
20  BY MS. HOUSE:
21    Q. I'm only asking you, Officer Tuli, what you see
22  in this video. What do you see in this body camera --
23    A. (Inaudible).
24        MR. URBIS: Objection. Asked and answered.
25        THE REPORTER: I'm sorry. What?

Page 236

1        THE WITNESS: I see chaos in this video. I
2  see people getting arrested, people running up and
3  interfering with officers' duties. I see people attacking
4  police officers. I see people screaming at police
5  officers. I see officers yelling back. There's chaos in
6  this video.
7  BY MS. HOUSE:
8    Q. Before we got here, Officer Tuli, how many people
9  is your body camera footage going to back up before we got
10  here that you told to go home?
11    A. I don't know.
12    Q. If I told you there were none, would you have
13  reason to believe that I wasn't telling the truth?
14    A. No.
15    Q. Okay. There were many officers on the scene at
16  this point, correct?
17    A. Yes, ma'am.
18    Q. There were still a lot of people on this -- at
19  this point, correct?
20    A. Yes, ma'am.
21    Q. At any point in time, you could have told people
22  to go home.
23    A. It's clear that people weren't listening to us
24  regardless. We could have told them to go to Six Flags.
25  No one would listen. It's clear no one was listening to

Page 237

1  us, no one; not Ms. Johnson, not A.N.E.R., not her son,
2  not Ms. Ybarra. No one was listening to officers. No
3  one.
4    Q. So you did give a directive as to where they
5  should go at the beginning of this tape, right?
6    A. Yeah. The only reason anybody was arrested or
7  anything is because that one person struck a police
8  officer. The other person who is in handcuffs right now
9  on the floor in this video, he threatened to kill police
10  officers. That it.
11    Q. I'm going to keep playing the footage.
12    A. Okay.
13        (Video played.)
14  BY MS. HOUSE:
15    Q. Okay. Right here, do you see this arm where my
16  mouse is pointing?
17    A. Yes, ma'am.
18    Q. Okay. And would that be where you punched
19  A.N.E.R. in the -- you said -- you called it a compliance
20  strike in the face?
21    A. Yes, ma'am. Probably.
22    Q. So right here, this is you to the right, correct?
23    A. Oh, I don't know. All I see is random arms and
24  silhouettes. I see some purple, some purple in a dress
25  and a light. I don't know if it's my arm or anyone else's

Page 238

1  arm.
2      Q.  Okay.  I'll play and you can tell me whether or
3  not this is you.
4      A.  Okay.
5          (Video played.)
6  BY MS. HOUSE:
7      Q.  Did you recognize yourself in this clip, sir?
8      A.  Yes, ma'am.
9      Q.  And can you tell me where -- where were you?  And
10  what were you -- where were you?
11     A.  Standing there on the other side of what appears
12  to be Ms. Johnson.
13     Q.  Okay.  So that was you giving her a directive.
14         (Video played.)
15  BY MS. HOUSE:
16     Q.  This is you right there passing by to the right,
17  correct?  You said on the other side of Ms. Johnson.  This
18  is you right here where I'm pointing in the arrow,
19  correct?
20     A.  Sure.  I can't see.  But okay.
21     Q.  Okay.  You said that was your arm and you see the
22  hair flying right here, correct?
23     A.  Yes.
24     Q.  All right.  And she goes back, right?  A.N.E.R.
25  goes back.  I'm going to play it again.  Can you tell me

Page 239

1  where you pushed her to stop her from closing distance?
2          (Video played.)
3  BY MS. HOUSE:
4      Q.  You heard you say "Shut up," correct?
5      A.  Sure.  I don't know.  Sure.
6      Q.  You don't know, sir?
7      A.  I don't know if I heard myself say shut up, but I
8  have no qualm with -- or I have no issues.  If you think I
9  said it, I probably did say it.  It's something I say
10  sometimes.
11     Q.  I'm going to share with you -- I'm going to share
12  with you Officer Hooten's body camera.
13     A.  Okay.
14         (Video played.)
15  BY MS. HOUSE:
16     Q.  Did you see that, sir?
17     A.  Yeah.  She tried to attack those people.  And I
18  grabbed her and stopped her from doing it.
19     Q.  You saw your arm around her neck, correct?
20     A.  I grabbed her.
21     Q.  Where is your arm?
22     A.  My arm was -- so I grabbed her.  I mean, are
23  you -- I don't understand where you're going with this.  I
24  grabbed her.  She's shorter than I am.  She's lighter than
25  I am.  I grabbed her and carried her away from a fight

Page 240

1  that she was about to engage in.  I don't know what the
2  issue is.
3          MR. FRIGERIO:  We've already gone over this
4  at least 20 times.  So I'm going to object to that.
5  BY MS. HOUSE:
6      Q.  Based on Officer Hooten's video, which I'm
7  playing for the first time, where did you see her arm?
8  Where was -- excuse me.  Where did you see your arm
9  located on her body?
10     A.  If my arm was anywhere above her shoulders or
11  anything, that was entirely her fault.  She would have
12  never been grabbed at all had she not attacked people.
13         (Video played.)
14  BY MS. HOUSE:
15     Q.  I'm going to move this clip.
16         (Video played.)
17  BY MS. HOUSE:
18     Q.  Okay.  This is you right here, right?
19     A.  Yes, ma'am.
20     Q.  And what is April Johnson yelling to you?  And
21  who is this officer right here?
22     A.  That looks like Officer Carrasco.
23     Q.  And what is she telling you?
24     A.  "She's trying to get my daughter."
25     Q.  Okay.  April Johnson is in distress, isn't she?

Page 241

1      A.  Sure.
2      Q.  And she's letting you all know that someone is
3  trying to get her daughter, correct?
4      A.  Well, she's trying to attack people also.
5      Q.  Sir, right here, she's not attacking anyone,
6  right?
7      A.  Because we pulled her away.  She tried to.
8  People in distress, they don't attack people.
9      Q.  Officer Tuli --
10     A.  Yes, ma'am.
11     Q.  -- I'm asking specific questions.  In order for
12  this to work, you have to listen to me, right?
13     A.  I'm sorry.
14         MR. FRIGERIO:  You're being argumentative
15  with the witness and I'll object to that.
16         MR. URBIS:  Objection; argumentative.
17  BY MS. HOUSE:
18     Q.  Officer Tuli, in order for you to answer a
19  question, you have to listen to a question, right?
20     A.  Yes, ma'am.
21         MR. URBIS:  Objection; argumentative.
22  BY MS. HOUSE:
23     Q.  And when I ask a question, Officer Tuli, these
24  questions require specific answers.  Is that fair to say?
25     A.  I feel like I'm giving specific answers, but I'll

Gary Tuli

November 23, 2020
Pages 242 to 245

Page 242

1  try to be better.
2      Q.  Thank you, sir.
3          (Video played.)
4  BY MS. HOUSE:
5      Q.  Who is this officer right here, sir?  Is that
6  Officer Cavazos?
7      A.  Yeah.  It's kind of blurry.  But it looks like it
8  could be Cavazos.  Yes, ma'am.
9      Q.  And do you see A.N.E.R. right here where I'm
10 pointing my mouse, in the purple dress?
11     A.  Yes, ma'am.
12         (Video played.)
13 BY MS. HOUSE:
14     Q.  Okay.  And you see her coming -- this is where
15 she would be talking to you, right, to the left?
16     A.  Yes, ma'am.
17         (Video played.)
18 BY MS. HOUSE:
19     Q.  Okay.  What are you doing for her to head -- her
20 head to jerk like that?  What's going on?
21     A.  I'm trying to arrest her.  What do you mean?
22     Q.  Okay.  I'll ask.  It's jerking back and forth.
23 What physical touch would cause her head to jerk forward
24 and backward?
25             And if you want me to play the clip again,

Page 243

1  I'll play the clip again.
2      A.  It could be all kind of things.  I don't know
3  what you mean by -- I guess what I'm saying is, you said
4  her head is jerking back and forth.  I don't know.  She
5  struck me.  I did a compliance strike right back.  And
6  then immediately went to use open/empty hands and placed
7  her under arrest.  She's clearly not getting in handcuffs
8  cooperatively.
9      Q.  You stated that -- as she's talking, she comes
10 towards you, right?
11     A.  Yes, ma'am.
12     Q.  And you stated you pushed her back lightly.  Can
13 you show me in this clip where you pushed her back?
14         (Video played.)
15 BY MS. HOUSE:
16     Q.  Okay.  Here, sir, you see A.N.E.R. putting up her
17 top right here?
18     A.  Yes, ma'am.
19         (Video played.)
20 BY MS. HOUSE:
21     Q.  Okay.  Her head goes back and then it goes
22 forward.  I want you to watch, sir.
23         (Video played.)
24 BY MS. HOUSE:
25     Q.  Did you see her head go forward, back forward

Page 244

1  back?  Do you see that, sir?
2      A.  Yes.  Did you -- (inaudible).
3      Q.  No, that's -- Officer Tuli -- Officer Tuli --
4          THE REPORTER:  You're talking at the same
5  time.
6          MR. FRIGERIO:  He has to be able to answer
7  the question.  You can't interrupt him after you've
8  answered the question (inaudible) --
9          MS. HOUSE:  But he's also asking me a
10 question.
11 BY MS. HOUSE:
12     Q.  And so, Officer Tuli, let me explain how this
13 works.  You cannot ask me questions unless you're asking
14 me to explain the question that I am asking, okay?  So I
15 am asking the questions, sir.
16     A.  Okay.
17     Q.  So what type of physical touch did you exert on
18 A.N.E.R. that would cause her head to go back and forth
19 like that?
20     A.  I -- like I said multiple times, I struck her
21 with a closed fist --
22     Q.  Okay.
23     A.  -- as a compliance strike to her -- as a response
24 to her striking me directly in the face unprovoked, by the
25 way.  She struck me in the face.  It took me and three

Page 245

1  other officers to arrest her.
2          The fact that she jerked back and forth, I'm
3  not a physicist.  I don't know.  But I don't know what would
4  cause her head to do that.  But I responded to a -- an
5  attack of a police officer with the exact appropriate --
6  with exactly the appropriate amount of force used.
7      Q.  I'm going to play it again.  Tell me where you
8  pushed her in order to stop her from closing distance.
9          (Video played.)
10     A.  Stop right here.  And she gets a push right
11 around this time and --
12     Q.  Okay.  Can you pause?  I want to see the push.
13 So pause -- we're going to -- because she's coming forward
14 according to this clip, to you, right?
15     A.  Yes, ma'am.  Yes, ma'am.
16     Q.  Okay.  And you said you pushed her right here.
17 So let me play where you're saying -- I see that 3.0 --
18 3 minutes and one second into Officer Willie Hooten's body
19 camera you push her.  I'm going to press play.
20         (Video played.)
21 BY MS. HOUSE:
22     Q.  Okay.  The only time you see her go back is when
23 her head goes back and forth.  A push would not cause her
24 head to go back and forth.  Is that fair to say, sir?
25     A.  Yeah.  I mean, I didn't shove the crap out of

Gary Tuli

Page 246

1  her. I created some space. I put my hand out, you know.
2  I put my hand out and gave her a push and then she
3  attacked me.
4      Q.  Okay.
5          (Video played.)
6  BY MS. HOUSE:
7      Q.  April Johnson is yelling out that her daughter is
8  14, correct, sir?
9      A.  Yes, ma'am.
10     Q.  She's also yelling out as she watches you
11  interact with her daughter, correct?
12     A.  She watches three officers have to forcibly take
13  her daughter into custody, yes, ma'am.
14     Q.  I'm going to continue pressing play, sir.
15         (Video played.)
16  BY MS. HOUSE:
17     Q.  And this is the vehicle where you had (Redacted),
18  correct?
19     A.  Well, this is where we ended up, yes, ma'am.
20     Q.  A.N.E.R.  Okay.
21         (Video played.)
22  BY MS. HOUSE:
23     Q.  Around 3:47, someone says, "Pull her shirt up."
24  Okay? I want you to listen for that, okay?
25     A.  Yes, ma'am.

Page 247

1          (Video played.)
2  BY MS. HOUSE:
3      Q.  Okay.  Do you hear her -- actually, it's A.N.E.R.
4  saying, "Can you pull my shirt up?"  Do you hear her?
5      A.  Yeah.  We had -- Officer Osoria, she tried to
6  pull her shirt up and she wouldn't let us.  So we took her
7  away from this crowd.  And we tried to fix her shirt
8  again.  She still wouldn't let us.  And then we put her in
9  the back of the patrol vehicle.
10     Q.  All right.  But here she's asking for you all to
11  pull her shirt up; is that correct?
12     A.  We already tried.
13     Q.  Okay.  But, sir, right here she's saying, "Pull
14  my shirt up."  Right?
15     A.  Okay.
16     Q.  Okay.
17         (Video played.)
18  BY MS. HOUSE:
19     Q.  Do you hear someone in the background saying,
20  "Pull her shirt up.  Her titties are hanging out"?
21     A.  Sure.  Yeah.  I heard that.
22     Q.  So if your claim was that she wasn't letting you
23  pull her shirt up, her words don't match what you said her
24  body was doing.  Is that fair to say?
25         MR. FRIGERIO:  Objection; form.

Page 248

1          THE WITNESS:  You can look at Jessica's
2  camera and Cavazos' camera.  We're sitting there trying to
3  get her shirt.  I even told her to stop moving.  And she
4  doesn't stop moving.  She -- we walk her away.  We put her
5  somewhere where -- out of view because she still won't let
6  Jessica -- by the way, I don't think it would be
7  appropriate for myself or Cavazos to adjust her shirt.
8  But she won't let Jessica fix her shirt.
9  BY MS. HOUSE:
10     Q.  I'm going to play this again.  And based on
11  Willie Hooten's camera, tell me where you hear yourself
12  telling her to stop moving so you can --
13     A.  You can't hear it on Willie Hooten's camera.  But
14  go and listen to it on Jessica's camera.  You can hear me
15  telling her fix her shirt, fix her shirt.  And she won't
16  allow us to fix her shirt.
17     Q.  Tell me when you told her to stop moving so you
18  can fix her shirt.  Where can we find that?
19     A.  Okay.  So again, if you look at the other camera,
20  it was clear that we made a solid attempt to fix her shirt
21  or fix her top.  She didn't allow us.  At no point in this
22  interaction did we decide, hey, you know, let's let all
23  these people look at her.  She did not allow us to fix her
24  shirt.
25         Then when we tried to get her away from the

Page 249

1  crowd, she starts yelling fix my shirt, at which point
2  it's clearly not safe to just stop right there and adjust
3  things.  So we tried to adjust her shirt on the other
4  side, and she still did not let us.  So we put her in the
5  back of the vehicle.  This is all her fault.
6          And it's all on camera.  It doesn't matter
7  if it's on Willie Hooten's camera or not.  It's all on
8  Jessica's camera multiple times, hey, Jessica, fix her
9  shirt, fix her shirt.  And she does not allow us to do it
10  because she -- I don't know why.  But she didn't allow us
11  to do it.
12     Q.  Are you upset right now, Officer Tull?
13     A.  Not even -- not even a little bit.
14     Q.  Okay.  I don't want to make you upset because I
15  told you I was going to be polite and professional so that
16  wasn't my goal.
17         MR. FRIGERIO:  Object; argumentative.
18         THE WITNESS:  No.  If I'm coming off as
19  upset, I'm sorry.  I didn't mean to.  I'm not upset at
20  all.  I can get very animated when I talk.  You've been
21  watching videos of me for several hours now.  You can see
22  I get pretty animated, so...
23         But I'm not upset at all.
24  BY MS. HOUSE:
25     Q.  I'm going to show you Officer Reed Hensley's body

Gary Tuli

Page 250

1  camera now.
2      A.  Yes, ma'am.
3      Q.  Can you see it?
4      A.  Yes, ma'am.
5      Q.  Okay.  I want to make sure I shared the screen.
6          (Video played.)
7  BY MS. HOUSE:
8      Q.  Okay.  This is you, sir, right?
9      A.  Yes, ma'am.
10     Q.  And you are explaining to Sergeant Hensley what
11  happened, correct?
12     A.  Yes, ma'am.
13     Q.  Okay.  And is this the part where you call a
14  debriefing?
15     A.  I guess you can call it that.  Yes, ma'am.
16     Q.  And there's a lot of officers around as you all
17  are talking, right?  We see an officer here?
18     A.  Yeah.
19     Q.  Okay.
20         (Video played.)
21  BY MS. HOUSE:
22     Q.  Did you see yourself bring an 8-year-old kid over
23  there at that point in the video that I showed you?
24     A.  I thought Sarah brought the kids over.
25     Q.  Okay.

Page 251

1          (Video played.)
2  BY MS. HOUSE:
3      Q.  You told Sergeant Hensley that A.N.E.R. squares
4  up, right?
5      A.  Uh-huh.
6      Q.  In all the videos that we've seen -- there's been
7  several shots.
8      A.  Uh-huh.
9      Q.  At no point does she square up.  Is that fair to
10  say?
11     A.  No, not at all, ma'am.  She -- she clearly --
12  that video we just saw with -- with Willie Hooten, she
13  clearly squared up.  She fixed her top and squared right
14  up to me and screamed at me.  That is a clear -- that is a
15  clear, for lack of a better term, "square up."
16     Q.  So you're considering her squaring up when --
17  well, she was walking towards you as she said, "Don't talk
18  to my mama that way," wasn't she, sir?
19     A.  Yep.  She was fixing her top getting ready to
20  fight.  It was clear.
21     Q.  Sir, she was walking towards you as she talked to
22  you.  Because you said that she was closing in, quote,
23  "she closed distance on you."  That's in your police
24  report, right?
25         MR. URBIS:  Objection.  Argumentative; asked

Page 252

1  and answered.
2  BY MS. HOUSE:
3      Q.  Sir?
4      A.  Yes, ma'am.
5      Q.  When you square up, are you still approaching
6  someone at that point?
7      A.  Depends on who the person squaring up is.  It
8  depends.
9          Have you ever had anybody square up on you?
10  People do all kind of different things when they square up
11  on you.
12     Q.  And, Officer Tuli, as much as I'd love to answer
13  your questions, the deposition format doesn't allow me to.
14     A.  I understand.  I'm sorry.
15     Q.  I'm sorry.  And I'm not trying to be rude.
16     A.  No.  That was one of those, what do they call
17  it -- you know what I'm talking about.  Sorry.
18     Q.  I understand.  I'm going to rewind a little bit.
19  But you told Sergeant Hensley she called you a white
20  motherfucker; is that correct?
21     A.  Yes, ma'am.
22     Q.  We now know that wasn't a true statement?
23     A.  We do know that she did call me a racial slur.
24  And I told you I was only off by a few seconds.
25     Q.  But it didn't happen at the time that you said it

Page 253

1  happened, right?
2      A.  It still happened.
3      Q.  Right.  But you said it was off by a few seconds.
4  But to be clear, it didn't happen at the time that you
5  said it happened, right?
6      A.  Yeah, because I was remembering.  We're in a --
7  we're at the, you know, the back end of a riot here.
8  Adrenaline is running high.  Officers are finally starting
9  to get things under control.
10         Yeah.  I had no problem with explaining the
11  story to Sergeant Hensley the way I did.
12     Q.  Okay.
13     A.  That was the way I was remembering it.
14     Q.  But based on -- who was going -- who had the --
15  who was the ultimate -- who was going to ultimately
16  determine whether or not A.N.E.R. was going to jail that
17  night?
18     A.  It was going to be Sergeant Hensley and myself
19  and Officer Osoria.
20     Q.  So a collectively -- you all made the decision
21  that she was going to go?
22     A.  Yes, ma'am.
23     Q.  If Sergeant Hensley disagreed that she shouldn't
24  go, but you and Officer Osoria said she should, what would
25  have happened then?

Gary Tuli

Page 254

1     A.  We would have listened to Sergeant Hensley.
2     Q.  Okay.
3     A.  He's the supervisor.
4     Q.  Okay.  Thank you for clarifying.
5         (Video played.)
6  BY MS. HOUSE:
7     Q.  Okay.  You said the girl was 15.  You heard that?
8     A.  Yes, ma'am.
9     Q.  But she wasn't 15, was she?
10    A.  No, apparently not.
11    Q.  You heard her mother say, "My daughter is 14"
12  several times that night, correct?
13    A.  Okay.
14    Q.  Yes, sir?  "Yes" or "no"?
15    A.  I heard her mother yelling all kind of stuff.
16    Q.  Do you -- we went over the video, sir, and you
17  heard her say, "My daughter is 14."  Yes, sir?
18    A.  Going over the video is one thing.  We -- when I
19  was telling my sergeant what happened, I was telling him
20  how I was remembering it was happening.
21        Whether she was 14 or 15, the facts are she
22  attacked a police officer for no reason at all and I put
23  her under arrest.
24        MS. HOUSE:  Objection; nonresponsive.
25  BY MS. HOUSE:

Page 255

1     Q.  A.N.E.R. at that time on that incident was 14,
2  yes?  Just "yes" or "no."
3     A.  Yes, ma'am.
4         (Video played.)
5  BY MS. HOUSE:
6     Q.  Okay.  Here, you're telling Sergeant Hensley that
7  you pulled her back.  In your report, officer report --
8  I'm going to pull up your officer report.  I'm going to
9  stop sharing here.  I'm going to pull up your officer
10  report.  And we can scroll down as much as you would like
11  for us to do.  Tell me where you state you pulled A.N.E.R.
12  back.
13        I have the police report up.  Just tell me
14  and I can point my --
15    A.  I don't see it.
16    Q.  I'm going to move down to the second page so you
17  can see the rest of your report.
18    A.  Okay.  Yeah.  I don't see where I wrote that.
19    Q.  Okay.  Not a problem.  I'm going to go back to
20  the video.
21    A.  Okay.
22        (Video played.)
23  BY MS. HOUSE:
24    Q.  You said you pulled her back before she
25  squares -- squared up.

Page 256

1     A.  Okay.
2     Q.  Your police report says, "I pushed her back
3  lightly."
4     A.  Okay.  Sounds like my police report is more
5  accurate.
6     Q.  Okay.  There's a discrepancy between, again, what
7  you told Sergeant Hensley and what's in your report here.
8     A.  Yeah.  What I told Sergeant Hensley isn't an
9  official police report.  There's all kind of --
10    Q.  Great.  You're right.  What you told Sergeant
11  Hensley is not an official police report.  Agreed.  Okay?
12  Because an official police report is what we put on the
13  screen earlier.  It's the form you fill out, right?
14    A.  Yes, ma'am.
15    Q.  And when does Sergeant Reed Hensley see your
16  police report?
17    A.  When we submit it the next day.
18    Q.  Okay.  Next day.  By that time, A.N.E.R. was
19  already incarcerated, correct?
20    A.  Yes, ma'am.
21    Q.  Okay.  I'm going to keep playing the tape.
22        (Video played.)
23  BY MS. HOUSE:
24    Q.  You slammed her up against the car is what you
25  told Sergeant Hensley, right?

Page 257

1     A.  Okay.
2     Q.  "Yes" or "no"?
3     A.  Oh, yes, ma'am.
4     Q.  Okay.  Do you believe that that force was
5  appropriate, to slam her up against the car?
6     A.  Yes, ma'am.  I think what I did was the exact
7  appropriate amount of force necessary to effect an arrest.
8     Q.  Who was with you at that time, sir?  It was
9  another officer with you.
10    A.  When we arrested A.N.E.R. or --
11    Q.  When you arrested A.N.E.R.
12    A.  It was myself, Officer Cavazos, and Jessica
13  Osoria.
14    Q.  Okay.  I'm going to go back to your police
15  report, and I'm going to ask where you put in your police
16  report that you slammed A.N.E.R. against the car, okay?
17    A.  Yeah.  I don't see it there.
18    Q.  Okay.  I'm going to go back down so you can see.
19  Go ahead.
20    A.  I don't see it there either.
21    Q.  All right.  In fact, what it says is, on the
22  second line, it says -- on the second line, it says,
23        "Officer Osoria assisted me with pulling her hands
24     behind her back and placing her in handcuffs."
25        Do you see that?

Page 258

1    A.   Yes, ma'am.
2    Q.   Okay.  The first line says, "At that time I
3    immediately struck her back in the face with a closed
4    fist and grabbed her arms, pulled them back -- pulled
5    them behind her back."
6         Is that correct?
7    A.   Yes, ma'am.
8    Q.   Okay.  So, according to this, you struck her in
9    the face with a closed fist.  And you told me earlier you
10   only struck her once; is that correct?
11   A.   Yes, ma'am.
12   Q.   The one time you struck her, was it -- if you
13   could describe to me -- I'm going to stop sharing the
14   screen.  Can you describe to me exactly how you punched
15   her?  Can you show us in the camera how you punched her?
16   A.   I don't know -- do you want me to act out a
17   punch?  I don't know.  It was a reactionary compliance
18   strike --
19   Q.   Okay.
20   A.   -- based on her actions striking me.  It happened
21   extremely fast.  Once I struck her, we put her in
22   handcuffs and arrested her.
23   Q.   Okay.  Can you act out your punch, please?
24   A.   (Witness complies.)
25   Q.   Okay.  It went up?  Your punch went up by her

Page 259

1    chin?
2    A.   I'm sorry.  This is silly.  But what do you want
3    me to do?  This is --
4    Q.   I would like to know -- I wasn't there,
5    Officer Tuli.  And I apologize if what I'm asking you
6    seems silly, okay?  I'm not trying to be silly.  Because I
7    don't believe that taking your time right now should be
8    played with; is that fair?
9    A.   Thank you, ma'am.
10        MR. FRIGERIO:  Object to the sidebar remarks
11   of counsel.
12   BY MS. HOUSE:
13   Q.   Could you please just demonstrate -- because I
14   wasn't there.  And we've seen the camera footage.  Can you
15   demonstrate what it looked like?
16        MR. URBIS:  Objection; asked and answered.
17   He's already done it and --
18        MS. HOUSE:  Okay.
19   BY MS. HOUSE:
20   Q.   To be clear, I've seen two different ways that
21   you did it; one went up and one went like this
22   (indicating).  So if you could just -- which one would be
23   more accurate?  The first one that went up or would it be
24   the second one where you just went like this?
25   A.   Ma'am, again, I don't know how -- this is silly.

Page 260

1    I mean, you want me to punch at a screen?  What -- this is
2    strange.
3    Q.   You don't punch at screens.  You punch at people,
4    right?
5    A.   Yeah.  People who punch at me, yes, ma'am,
6    absolutely.  Violent people need to be arrested for
7    assaulting a police officer.  They get struck back, yes,
8    ma'am.
9    Q.   If your daughter punched you, would you punch her
10   back?
11   A.   My daughter wouldn't punch me.  If my daughter
12   punched a police officer, I would expect though that a
13   police officer punched her back and arrested her.  I would
14   expect that a police officer used the appropriate level of
15   force to arrest my daughter if she punched a police
16   officer, yes, ma'am.
17   Q.   Okay.  And you believe that if a child punches
18   you, an appropriate level of force would be to punch them
19   back?
20   A.   It depends.  But in this situation, absolutely,
21   yes, ma'am.
22   Q.   What made this situation different?
23   A.   She assaulted me really hard.  I don't know what
24   else.  Are you asking me if children should not be
25   arrested?  I don't know what you -- what you --

Page 261

1    Q.   That's not what I asked.
2    A.   The General Manual, the Code of Criminal
3    Procedure, everything allows me to take the action that I
4    took.  I -- again, I was assaulted by a violent teenager
5    who I didn't know was a teenager at the time.  I had no
6    idea who this girl was.  I never met her before in my
7    life.  She assaulted me.  I did a compliance strike and
8    used open/empty hands to arrest her.  I don't know what
9    else there is to say about that.
10   Q.   Okay.  You just said you didn't know she was a
11   teenager.
12   A.   Right.  I don't -- there was so many people
13   there.
14   Q.   When did you find out she was a teenager?
15   A.   I can't recall.  Probably at some point in the
16   arrest process.
17        MR. URBIS:  Can I ask during this break
18   where we are on our time?
19        THE REPORTER:  Just give me a second to
20   figure it out.  It was five hours and 23 minutes when we
21   started at 4:24.  So if anybody wants to help me out with
22   the time.
23        MR. URBIS:  About 6.20?
24        THE REPORTER:  Yeah, about 6.20.
25        MR. URBIS:  Okay.

Gary Tuli

November 23, 2020
Pages 262 to 265

Page 262

1         MS. HOUSE: I'm sorry. I didn't hear. How
2   much time do we have left?
3         THE REPORTER: Forty minutes.
4         MS. HOUSE: You said 40 minutes?
5         THE REPORTER: Yes, ma'am.
6         MS. HOUSE: Thank you.
7   BY MS. HOUSE:
8     Q.  Okay. Officer Tuli, I'm going to share with you
9   -- continue to share with you Officer Hensley's body
10  camera footage, okay?
11    A.  Yes, ma'am.
12    Q.  I'm going to start at 31:028.
13        (Video played.)
14  BY MS. HOUSE:
15    Q.  Okay. To be clear, this is you, right,
16  Officer Tuli?
17    A.  I can't tell. If you say so, yes, ma'am. I
18  can't tell.
19    Q.  Listen for the voice if you can't see the
20  picture, please.
21        (Video played.)
22  BY MS. HOUSE:
23    Q.  This is you, right? To the right, correct?
24  My -- okay.
25        (Video played.)

Page 263

1   //
2   BY MS. HOUSE:
3     Q.  You're talking to Sergeant Hensley, right?
4     A.  Yes, ma'am.
5     Q.  Who is this right here?
6     A.  I can't tell.
7     Q.  Okay.
8         (Video played.)
9   BY MS. HOUSE:
10    Q.  What does he mean by "pulled your punch"?
11    A.  Did I hit her softly.
12        (Video played.)
13  BY MS. HOUSE:
14    Q.  You said if you would have punched her, she would
15  have died. Did you hear yourself say that?
16    A.  Yes, ma'am. I was making a joke to my
17  supervisor.
18    Q.  So you think it's worth joking about that if you
19  punch someone they would have died?
20        MR. FRIGERIO: Objection; argumentative.
21        THE WITNESS: Do I answer that?
22  BY MS. HOUSE:
23    Q.  Yes, sir. You answer.
24    A.  Oh, yeah. I think it's okay to make jokes. Yes,
25  ma'am.

Page 264

1     Q.  But your goal was when you punched, you said your
2   goal was to make contact with her face and that's what you
3   did, right?
4     A.  Well, yes, ma'am.
5     Q.  Thank you.
6     A.  My goal was to effect an arrest.
7     Q.  What other -- what other alternatives could you
8   have used in order to effect an arrest?
9     A.  I could have used a TASER. I could've used a
10  stick or baton. I could have used pepper spray. I could
11  have tackled her. I don't know. What do you mean?
12  There's all kind of ways to effect an arrest.
13    Q.  Let me explain what I mean. There's an
14  escalation when it comes to tactics that you use for use
15  of force; is that correct?
16    A.  Yes, ma'am. So at this point, I -- we used every
17  single level of force necessary to get to where we were.
18  We started off with verbal presence or with mere presence.
19  Then we went on to verbal de-escalation. Then we went to
20  physically restraining people. And then it went to actual
21  use of force when she struck me. We walked up the force
22  continuum perfectly.
23    Q.  Okay. And I don't have a lot of time,
24  Officer Tuli. So I just want to be clear, were you
25  injured?

Page 265

1     A.  Yes, ma'am. I had pain and I had some swelling
2   in my left face.
3     Q.  You had swelling in your left face?
4     A.  Yes, ma'am.
5     Q.  Where --
6     A.  Redness and swelling right on the left side.
7   Yes, ma'am.
8     Q.  Where did you get hit? Point to your face where
9   you got hit.
10    A.  Right around this area (indicating).
11    Q.  Okay. You got hit up here, upper -- right below
12  your eye?
13    A.  Yes, ma'am.
14    Q.  Okay. So left below eye. Okay.
15        Did you get hit on the other side below your
16  eye?
17    A.  No, ma'am.
18    Q.  All right. I'm going to share with you -- I'm
19  back to Officer -- can you see the screen?
20    A.  Yes, ma'am.
21    Q.  This is still Sergeant Hensley's footage, around
22  9:04.
23        (Video played.)
24  BY MS. HOUSE:
25    Q.  Did you see where you pointed to Sergeant

Gary Tuli

Page 266

1  Hensley, sir?
2      A. Yes, ma'am.
3      Q. You pointed to your left chin area, right?
4      A. I pointed to the left side of my face, ma'am.
5      Q. You said "right here," and your hand went to your
6  left chin.
7      A. Okay. Right here, my face (indicating). I got
8  hit in the face.
9      Q. But where you pointed to Sergeant Hensley, to be
10  clear, yes or no, was the left side of your chin, correct?
11      A. I pointed to the left side of my face.
12      Q. Did you tell anyone else that night that you got
13  hit on your chin?
14      A. I don't know.
15      Q. If you did, would you have been lying?
16      A. No.
17      Q. How is it possible then that you got hit both in
18  your chin and underneath your eye?
19      A. Ma'am, I got hit in the left side of my face. I
20  got hit here, here (indicating), okay? I got hit in the
21  face.
22      Q. And I can't see you because I'm sharing my
23  screen. Where is "here"?
24      A. Here. I got hit in this side of my face.
25      Q. Okay.

Page 267

1      A. Left side of the face, I was hit here
2  (indicating).
3      Q. I asked you specifically whether or not you got
4  hit right under your eye on the left side and you --
5      A. My face. I have a whole face here. Yes, ma'am.
6  I got hit in the face. I have a whole face over here.
7      Q. Mr. Tuli, for the court reporter, she can't --
8  I'm not going to talk over you. So I'll let you respond,
9  okay?
10          I asked you before to be clear where you got
11  hit. You said underneath the left side of your eye. Do
12  you recall -- and I specifically asked you where you got
13  hit, I said, underneath your eye, right underneath your
14  eye? You said, yes, right underneath your eye because
15  that's where you pointed out the redness was, right?
16      A. Yes, ma'am.
17      Q. Okay. When I asked you, you didn't point
18  generally to the left side of your face. You specifically
19  targeted a point, right?
20          MR. URBIS: Objection. Argumentative; asked
21  and answered.
22  BY MS. HOUSE:
23      Q. Officer Tuli, where did you get hit?
24      A. In the face.
25          MR. URBIS: Objection; asked and answered.

Page 268

1  //
2  BY MS. HOUSE:
3      Q. Where?
4      A. On the left side of my face.
5      Q. Where on the left side of your face?
6      A. Right here, ma'am. I got hit right here, okay?
7  Right here (indicating). I don't know how else to say it.
8          MR. FRIGERIO: It's been asked and answered
9  at least 10 times. Let's move on.
10  BY MS. HOUSE:
11      Q. So now are you pointing to your cheek? Just to
12  be clear.
13      A. I'm pointing to my face. I got hit in the face.
14      Q. Where on your face, on the left side of your
15  face, sir?
16          MR. URBIS: Asked and answered multiple
17  times.
18          THE WITNESS: I don't know what else -- how
19  to answer this. I was struck in the face.
20  BY MS. HOUSE:
21      Q. Were you struck on your cheek? Yes or no.
22      A. This -- that counts as my face, right, ma'am?
23      Q. Yes or no, were you struck on your cheek?
24      A. Yes. This is my face. The left side of my face
25  is where I was struck, yes.

Page 269

1      Q. All I need is a "yes" or "no," not extra
2  commentary. Were you struck on your cheek? Yes or no?
3          MR. FRIGERIO: Objection, form.
4      A. (Inaudible).
5  BY MS. HOUSE:
6      Q. I'm sorry. I couldn't hear you.
7          Just your cheek, yes or no, were you struck
8  on your cheek?
9      A. Struck in -- yes, this area (indicating), yes,
10  ma'am.
11      Q. Thank you. Were you struck underneath your eye?
12  Yes or no?
13      A. Yes, ma'am.
14      Q. Okay. Were you struck on the left side of your
15  chin? Yes or no?
16      A. No, ma'am. I was struck here (indicating).
17      Q. Were you struck on the left side of your nose?
18  Yes or no?
19      A. Yeah, left side of my nose. Yes, ma'am.
20      Q. Were you struck on the left side of your lips?
21      A. Yeah, upper -- yes, ma'am.
22      Q. Were you struck on the left side of your ear?
23          MR. FRIGERIO: Objection. That's
24  ridiculous. (Inaudible).
25          MS. HOUSE: I'm going to --

Page 270

1          THE REPORTER: I'm sorry. What?
2          MR. FRIGERIO: He's not going to answer
3  silly questions like that. He's already answered it 20
4  times. Left side of his face. Let's go.
5          MS. HOUSE: I'm going to object to the
6  nonlegal objection and the sidebar.
7          MR. URBIS: I'm objecting to the continual
8  harassment, repeated questions he's answered and the
9  argumentative nature.
10         MS. HOUSE: Thank you, Counsel. Noted.
11 That's not a legal objection.
12 BY MS. HOUSE:
13     Q. Sir, I'm going to show you another -- I'm going
14 to share my screen.
15         (Video played.)
16 BY MS. HOUSE:
17     Q. Do you see this video, sir?
18     A. Yes, ma'am.
19     Q. This is a civilian video that was submitted. And
20 you see A.N.E.R., she's right here in the purple dress,
21 okay?
22     A. Uh-huh.
23         (Video played.)
24 BY MS. HOUSE:
25     Q. Okay. And here, you see you strike her, correct?

Page 271

1     A. It appears so. Yes, ma'am.
2     Q. Okay. I'm going to ask you -- all right. Sir,
3  you pulled back several times. Why is that?
4     A. What do you mean I pulled back several times?
5     Q. Your right arm pulled back several times. I'm
6  going to show you. I want you to count how many times
7  your arm pulled back.
8         (Video played.)
9  BY MS. HOUSE:
10     Q. How many times did your arm pull back, sir?
11     A. I can't tell, but -- are you asking me how many
12 times I punched her?
13     Q. Yes, sir.
14     A. Yeah, one time.
15     Q. Okay. How many times did you pull your arm back?
16     A. I don't know. That's like asking me how many
17 steps did I take. I don't know.
18     Q. I'm going to allow you to look at the video and
19 if you could tell me.
20         (Video played.)
21         THE WITNESS: The way it's coming across
22 right here -- I mean, I've seen this video before,
23 obviously. But the way it's coming across right here,
24 it's really blurry. I can't see much of anything. I can
25 see some colors and some lights. But how many times -- I

Page 272

1  mean, if you're asking me how many times I struck her,
2  easy; one time. If you're asking me how many times I
3  moved my arm and blinked my eyes, that's silly. I don't
4  know.
5  BY MS. HOUSE:
6     Q. If I tell you that A.N.E.R. says you struck her
7  multiple times --
8     A. I would tell you A.N.E.R. is a liar.
9     Q. Let me finish my question.
10     A. Oh, I'm sorry.
11     Q. Okay. Would this video support her side or
12 yours? I'm going to play it for you.
13         (Video played.)
14 BY MS. HOUSE:
15     Q. Which side would it support?
16     A. Yeah. I clearly only struck her one time. I
17 can't see what you're showing, but I'm telling you I
18 struck her one time. If I struck her multiple times, I
19 would say. I have no problem with that. I struck her one
20 time.
21     Q. Okay. And at this time, you can see her top has
22 come off. I want you to watch where her top comes off.
23         (Video played.)
24 BY MS. HOUSE:
25     Q. Do you see that her breasts have become unclothed

Page 273

1  at this point?
2     A. I can't see on this video, but I have seen this
3  video before.
4     Q. Okay. Did you see in the video her breasts come
5  exposed at that point?
6     A. To be honest, no. I don't remember the video
7  showing her -- I'm not -- her breasts clearly became
8  exposed. I don't know if it became exposed during this
9  time or off camera. I don't know.
10     Q. Do you remember when her breasts became exposed?
11     A. No. No.
12     Q. Do you believe it would be important to know when
13 a juvenile -- and at that -- in your custody when her
14 private parts became exposed to the public? Do you
15 believe that's important?
16     A. Well, to the best of our knowledge, what we need
17 to do is make sure she's no longer exposed to the best of
18 our ability, and we did that.
19     Q. Okay. I'm going to show you -- share the screen
20 with you what has been marked as Section 3.04 to you.
21         Do you see this section, sir?
22     A. Yes, ma'am.
23     Q. And what do you recognize it to be?
24     A. This is the General Manual.
25     Q. Okay. And according to this General Manual that

Gary Tuli

November 23, 2020
Pages 274 to 277

Page 274

1  you pulled up on the screen, 3.04 reads as such. I'm
2  going to scroll down to 3.04.
3      A.  Okay.
4      Q.  Okay. It says, "Responsibility to serve the
5  public." Is that correct?
6      A.  Yes, ma'am.
7      Q.  And part of 3.04 states that, in part B, "Members
8  shall be courteous, kind, patient, and respectful when
9  dealing with the public." Correct?
10     A.  Yes, ma'am.
11     Q.  "And shall strive to merit the esteem of all
12 law-abiding citizens by impartial discharge of official
13 duties." Is that correct?
14     A.  Yes, ma'am.
15     Q.  Okay. And also -- one moment. Part of the
16 section requires that: "Members shall serve the public
17 through direction, counseling, assistance, and
18 protection of life and property."
19          Correct?
20     A.  Yes, ma'am.
21     Q.  Okay. And "Members should also respect the
22 rights of individuals and perform their services with
23 honesty, sincerity, courage, and sound judgment."
24          Is that correct?
25     A.  Sure. Yes, ma'am.

Page 275

1      Q.  You believe -- I'm going to unshare my screen --
2  that it was sound judgment that A.N.E.R. -- actually, let
3  me ask you. How long was A.N.E.R. unclothed?
4      A.  From what I understand, if I remember correctly,
5  maybe a minute or so before she was able to get put in the
6  back of the police vehicle.
7      Q.  One minute?
8      A.  Maybe. Like I said, if memory serves me
9  correctly, give or take.
10     Q.  And then when she was in the police vehicle --
11 whose police vehicle was she placed in?
12     A.  I can't even remember, to be honest. I don't
13 know.
14     Q.  If I told you it was your police vehicle, would
15 you have any reason to believe that that was not the case?
16     A.  No. I would believe that. That's fine.
17     Q.  Would it be proper for her to have been placed in
18 your vehicle after having a confrontation with you?
19     A.  Yes, ma'am.
20     Q.  Do you believe that it was proper that an
21 unclothed juvenile be placed in a male police officer's
22 vehicle?
23     A.  Yes, ma'am. Based on the totality of the
24 circumstance, based on everything that was going on, you
25 know, dozens of people there, violent suspect, the best

Page 276

1  thing we can do to keep her covered up was put her in the
2  back of the vehicle where no one could see her.
3      Q.  Now, as you dragged her, no one was blocking her
4  as you -- in the video clip that we saw, no one was
5  blocking her chest. And so, to be fair, she was exposed
6  to the public. That's what happened, right?
7      A.  Yes, ma'am.
8      Q.  And you stated she was struggling. She wouldn't
9  let us -- her -- us pull her top up, right?
10     A.  Yes, ma'am.
11     Q.  Though that didn't match the audio which stated
12 she's asking, can you pull my top up, right?
13     A.  But we -- I mean, I don't know if we have time,
14 but you never went to Cavazos' camera or Jessica's camera
15 where we immediately, you know, we immediately tried to
16 address that in a large crowd of multiple men, boys and
17 such. And so based on the totality of circumstance, we
18 got her away from that crowd. She was the one who didn't
19 allow Jessica to fix her top. When we got her to the
20 vehicle, she still didn't allow Jessica to fix her top.
21 So we hid her from the public.
22     Q.  Why isn't there body camera footage that shows
23 she's not allowing that to happen?
24     A.  There is. Did I miss something? There is.
25     Q.  Sir, we didn't see body camera footage today.

Page 277

1      A.  Well, you didn't show it today, but Jessica
2  Osoria's camera for sure shows that we immediately
3  addressed that. We immediately addressed that. Did you
4  not look at that?
5      Q.  Officer Tuli, I'm not arguing with you, sir.
6      A.  I'm not -- I'm just saying you're saying things
7  and I'm correcting you. I'm not arguing with you.
8      Q.  Officer Tuli, I'm going to share your rear camera
9  with you, okay?
10     A.  Okay.
11     Q.  This is your vehicle. Can you see it?
12     A.  Yes, ma'am.
13         (Video played.)
14 BY MS. HOUSE:
15     Q.  All right. You'll see A.N.E.R. The door opens.
16 She gets in the vehicle around 15:43. Okay?
17     A.  Okay.
18     Q.  At that time -- so 15:43. I'm going to -- all
19 right. I'm just going to play.
20         (Video played.)
21 BY MS. HOUSE:
22     Q.  What do you describe is going on in your vehicle?
23     A.  A suspect is crying in the back seat.
24     Q.  And her breasts are exposed, correct?
25     A.  Yes, ma'am. Not to the public, just to clarify.

Gary Tuli

November 23, 2020
Pages 278 to 281

Page 278

1  The public cannot see her at this point. The windows are
2  tinted. No one can see inside this video. And the reason
3  we placed her in the back of the vehicle was specifically
4  because she would not allow Officer Osoria to adjust her
5  top.
6      Q. But when she was placed in the vehicle, not once
7  does your camera pick up that Officer Osoria tries again
8  to put her top up, right? You don't see that.
9      A. Well, take that up with Officer Osoria. Do you
10  want me to go in and adjust her top?
11     Q. Officer Tuli, you are right there with Officer
12  Osoria when she places A.N.E.R. in your vehicle, yes?
13     A. Yes, ma'am. And like I said --
14     Q. I'm asking the question --
15         THE REPORTER: One at a time.
16  BY MS. HOUSE:
17     Q. As soon as you see A.N.E.R. in the vehicle, I
18  want you to point out to me where as soon as this child is
19  placed in your vehicle where you see for the first time
20  someone comes to pull this child's top on her breasts.
21  Just say "stop" and I will stop the footage, okay?
22         MR. URBIS: Objection. Asked and answered;
23  argumentative.
24         MS. RODRIGUEZ: Same.
25         (Video played.)

Page 279

1  //
2  BY MS. HOUSE:
3     Q. Officer Tuli, are (audio distortion) --
4     A. I'm sorry?
5     Q. Are you watching the screen?
6     A. Yes, ma'am.
7     Q. Would this be around the time that Officer --
8  that your partner fixed her top?
9     A. Probably. But we tried multiple times before she
10  even got in the car.
11     Q. Sir, since she's been in the car, would this have
12  been the first time someone came back to fix her top?
13     A. That's what it appears, yes, ma'am. Again, to
14  clarify, no one outside the vehicle can see her right now.
15     Q. Do you see the officer, female officer to the
16  right? She has her hand on her shoulder, right? And you
17  see her right here fixing her top. Correct?
18     A. Oh, yes, ma'am. Sorry.
19     Q. I'm going to share with you your body camera
20  footage, sir. And I want to know who you told your
21  version of the story to.
22         Who did you tell your story to? After she
23  hit you, who did you tell -- who else did you communicate
24  with and told them that that girl hit you? You told
25  Officer Stopper, right? Because he's the one that had

Page 280

1  your body camera.
2     A. Sure. Yeah. Probably a lot of people.
3     Q. Who else? You told Sergeant Hensley?
4     A. Uh-huh. Internal Affairs, the -- probably the
5  Youth Services people when I took her to jail. All kind
6  of people.
7     Q. You told my client's uncle?
8     A. Oh, yeah. Yes, ma'am.
9     Q. I'm going to share the screen.
10         You told my client's brother, right?
11  Because we saw that one, right?
12     A. I think so, yeah. I told somebody who was part
13  of the family. Yes, ma'am.
14     Q. You told her mom, right?
15     A. Yes, ma'am.
16     Q. You saw that clip?
17         (Video played.)
18  BY MS. HOUSE:
19     Q. Here you're talking to Officer Carrasco.
20         Who is this right there?
21     A. Looks like Hillman.
22     Q. Officer Hillman?
23     A. Yes, ma'am.
24     Q. All right.
25         (Video played.)

Page 281

1  //
2  BY MS. HOUSE:
3     Q. Did you hear her ask, "She's like 14?" And you
4  said, "Yeah."
5     A. Okay.
6         (Video played.)
7  BY MS. HOUSE:
8     Q. Where did you say she punched you, sir?
9     A. In the face. In the jaw.
10     Q. You said, "She punched me square in the Goddamn
11  jaw right here." Didn't you say that?
12     A. Sure.
13     Q. Yes or no, sir?
14     A. I did say that.
15         (Video played.)
16  BY MS. HOUSE:
17     Q. I'm going to go -- we're going to talk about your
18  further communication.
19         (Video played.)
20  BY MS. HOUSE:
21     Q. You told April Johnson's mom she called you white
22  motherfucker; is that correct?
23     A. Yes, ma'am.
24     Q. Okay. And you also told her about the fact that
25  she's going to jail because she punched you in the face,

Gary Tuli

Page 282

1 right?
2     A.  Yes, ma'am.
3         (Video played.)
4 BY MS. HOUSE:
5     Q.  And at the end -- that was my timer, but I set a
6 little buffer.
7         (Video played.)
8 BY MS. HOUSE:
9     Q.  This -- you're talking to A.N.E.R.'s mom and
10 uncle, right?
11     A.  Yes, ma'am.
12        (Video played.)
13 BY MS. HOUSE:
14     Q.  You told the uncle that you punched her as well,
15 correct?
16     A.  Yes, ma'am.
17     Q.  Okay.  So you communicated this story to a lot of
18 people, but you stated even though there may have been
19 inaccuracies, it was your police report that everyone
20 should rely on, right?
21     A.  No.  I never said that at all.  I just said my
22 police report was more accurate.
23     Q.  Okay.  Your police report was more accurate than
24 the verbal accounts that you told because there was a lot
25 going on, right?

Page 283

1     A.  Yes, ma'am.  Absolutely.
2     Q.  Okay.  So if we were going to match up the video
3 between your police report, we should take the police
4 report because that most accurately describes how you
5 remember things happening that night, correct?
6     A.  Yes, ma'am.
7         MS. HOUSE:  Okay.  No further questions.
8 Pass the witness.
9         MR. FRIGERIO:  We'll reserve our questions.
10        MS. RODRIGUEZ:  Same.  Reserve our
11 questions.
12        MR. URBIS:  We'll reserve our questions.
13        MR. FRIGERIO:  We're done.
14        THE REPORTER:  Okay.  Can I get the order of
15 the transcript on the record?
16        MR. FRIGERIO:  Yes.  Charles Frigerio,
17 please send the original to me for signature and we will
18 order a copy as well, my standard format.
19        THE REPORTER:  Okay.
20        MS. RODRIGUEZ:  Counsel for defendants
21 Osoria and Groce as well, copies standard form.
22        MR. URBIS:  Same for the City of
23 San Antonio.
24        THE REPORTER:  And, Ms. House?
25        MS. HOUSE:  Yes.  We'll do the same.

Page 284

1         THE REPORTER:  When you say "standard form,"
2 do you mean e-tran?  Do you want it electronic or hard
3 copy?
4         MR. FRIGERIO:  I'm speaking for the Law
5 Offices of Charles Frigerio.  We are one of your regular
6 customers and y'all have that on file.
7         THE REPORTER:  Okay.
8         MS. RODRIGUEZ:  E-tran, electronic.
9         MR. URBIS:  E-tran is fine for the City.
10        MS. HOUSE:  I will take an electronic as
11 well.
12        THE REPORTER:  Deposition concluded at
13 5:47 p.m.
14        Ms. House, are you going to send me the
15 exhibits?
16        MS. HOUSE:  I will.
17        THE REPORTER:  Thank you so much.
18        And everyone wants a copy of the exhibits as
19 well?
20        MR. FRIGERIO:  I want the exhibits but not
21 the videos.
22        MS. HOUSE:  These exhibits were provided
23 prior to the deposition.  We provided everything.
24 Everything has been turned over.
25        MR. FRIGERIO:  We want copies of all the

Page 285

1 exhibits used in this deposition.
2         MR. URBIS:  Any exhibit reference, yes,
3 except for -- are you producing video also?
4         THE VIDEOGRAPHER:  That's my final question
5 here.  I know, Ms. House, you'll be taking a copy of the
6 video as we discussed earlier, but any other parties need
7 a copy of the video today?
8         MS. RODRIGUEZ:  I want to clarify which --
9 what you're entering of exhibits once you started with the
10 videos.
11        MS. HOUSE:  Okay.  We have -- and I can use
12 the Bates stamps for the City of San Antonio, because --
13 I'll use the Bates-stamp numbers.  This is COSA000271,
14 COSA000265, COSA000267, COSA000245, COSA000235,
15 COSA000236.  There's two -- 237; 249; 246; 28 through 29,
16 196 through 215, Johnson 168 through 183; Trial
17 Exhibit 70, there's A through I believe it was J -- L,
18 excuse me; A through L, 70.  There was 70, and then there
19 was 70A through L; Johnson -- Plaintiffs' Trial
20 Exhibit 71, 71A, 71B; Trial Exhibit 77; Plaintiffs' Trial
21 Exhibit 78, 79, 80, and 81.  And if I'm missing something,
22 I'll make sure that you all get that, but I believe that
23 is a fair and accurate representation of the exhibits used
24 during the deposition.
25        MR. FRIGERIO:  And to be clear, I want a

Gary Tuli

November 23, 2020
Pages 286 to 289

---

Page 286

1  copy of those exhibits attached to the deposition.
2  MS. RODRIGUEZ:  Same.
3  MR. URBIS:  So we have a clean record, same.
4  MS. HOUSE:  We do as well.
5  (Deposition concluded at 5:47 p.m.)
6  (Witness reserves signature.)
7        * * * * *
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 288

1       I, GARY TULI, have read the foregoing deposition and
2  hereby affix my signature that same is true and correct,
3  except as noted above.
4
5
6
7                        _____
                         GARY TULI
8  THE STATE OF _____ )
   COUNTY OF    _____ )
9
10      Before me, _____, on this day
11  personally appeared GARY TULI, known to me or proved to me
12  under oath or through _____ to be the person
13  whose name is subscribed to the foregoing instrument and
14  acknowledged to me that they executed the same for the
15  purposes and consideration therein expressed.
16      Given under my hand and seal of office this
17  _____ day of _____, 202_.
18
19
20
                         _____
21                       NOTARY PUBLIC IN AND FOR
                         THE STATE OF _____
22
23
24  My Commission expires: _____
25  Job No. 79982

---

Page 287

1                   ERRATA SHEET
2  WITNESS NAME:  GARY TULI
3  DATE OF DEPOSITION:  November 23, 2020
4  PAGE  LINE    CHANGE              REASON
5        _____
6        _____
7        _____
8        _____
9        _____
10       _____
11       _____
12       _____
13       _____
14       _____
15       _____
16       _____
17       _____
18       _____
19       _____
20       _____
21       _____
22       _____
23       _____
24       _____
25       _____

---

Page 289

1           UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF TEXAS
2               SAN ANTONIO DIVISION
3  APRIL JOHNSON, an        )
   individual, A.N.E.R.,    )
4  ("a minor child"), an    )
   individual,              )
5                           )
        Plaintiffs,         )
6                           )
   vs.                      )
7                           )  No. 5:19-cv-00733-DAE
   THE CITY OF SAN ANTONIO, )
8  OFFICER GARY TULI (BADGE )
   #517), individually and  )
9  in his official capacity,)
   OFFICER JESSICA OSORIA   )
10 (BADGE #1422),           )
   individually and in her  )
11 official capacity,       )
   OFFICER DANIEL GROCE     )
12 (BADGE #1182),           )
   individually and in his  )
13 official capacity, AND   )
   DOES 1 through 25,       )
14                          )
        Defendants.         )
15                          )
16
17          REPORTER'S CERTIFICATION
        ORAL VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF
                   GARY TULI
18              November 23, 2020
19      I, Rachelle Thompson, Certified Shorthand Reporter in
20  and for the State of Texas, Registered Professional
21  Reporter and Certified Realtime Reporter, hereby certify
22  to the following:
23      That the witness, GARY TULI, was duly sworn by the
24  officer and that the transcript of the oral deposition is
25  a true record of the testimony given by the witness;

---

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900        San Antonio, Texas 78232
210-697-3400                                                      210-697-3408

Gary Tuli

Page 290

```
 1          That the deposition transcript was submitted on
 2     December _____, 2020, to the witness or to the attorney for
 3     the witness for examination, signature and returned to me
 4     by _____, 202_;
 5          That pursuant to information given to the deposition
 6     officer at the time said testimony was taken, the
 7     following includes all parties of record and the amount of
 8     time used by each party at the time of the deposition:
 9          Ms. Artessia K. House - (6h50m)
                Attorney for the Plaintiffs
10          Mr. Charles S. Frigerio - (0h0m)
                Attorney for the Defendant Tuli
11          Mr. Michael J. Urbis - (0h0m)
                Attorney for the Defendant City of San Antonio
12          Ms. Clarissa Rodriguez - (0h0m)
                Attorney for Defendants Groce and Osoria
13
14          I further certify that I am neither counsel for,
15     related to, nor employed by any of the parties or
16     attorneys in the action in which this proceeding was
17     taken, and further that I am not financially or otherwise
18     interested in the outcome of the action.
19          Certified to by me this 7th day of December, 2020.
20
21     _____
                Rachelle Thompson, CSR, RPR, CRR
22              Certified Shorthand Reporter
                Texas CSR No. 4003, Expires: 07-31-21
23              Firm Registration No. 631
                Kim Tindall & Associates, LLC
24              16414 San Pedro, Suite 900
                San Antonio, Texas 78232
25              (210) 697-3400
```

Gary Tuli

November 23, 2020
Index: #1..277

## #

**#1** 4:14

**#1182** 1:12

**#1422** 1:10

**#2** 4:16

**#517** 1:8

## $

**$10,000** 86:23

**$30,000** 87:7

## 0

**000028-000029** 4:23

**01** 147:9,13,15,19 148:17,25 149:4
150:23,24,25 185:21,23

**02** 154:8

**03** 99:6

**08** 179:5

## 1

**1** 1:13 4:8,25 5:4,6,8,10,12,14,16,18,
20,22,24 6:4,6,8,10,13

**10** 4:19 6:18 50:25 62:11 158:17
181:23 215:2 226:22 268:9

**10-year-old** 22:16

**100** 2:17 50:24

**10:00** 110:9

**10:03** 1:24 7:2,4

**11** 4:20 6:15

**111** 2:2,24 7:9

**11:30** 16:15 68:7

**11:42** 89:2,3

**12:00** 69:3 89:3,5

**12th** 48:22

**13** 89:19 231:6

**13-** 160:11

**13-year-old** 78:13,20 134:12
184:25 186:6

**13:21** 231:6

**14** 115:25 246:8 254:11,17,21 255:1
281:3

**14-year-old** 19:13 160:11

**143** 6:11

**147** 4:22

**15** 22:23,24 68:9 254:7,9,21

**15-minute** 16:14 88:22

**15-year** 20:17

**154** 6:14

**15:43** 277:16,18

**16** 200:14,16

**1604** 61:18 62:11

**16414** 7:13

**168** 285:16

**17** 179:9

**178** 6:16

**18** 96:20,23

**183** 285:16

**190** 4:12

**196** 285:16

**19th** 69:6

**1:00** 110:5

**1:15** 126:18 138:24

**1:16** 139:9,10

## 2

**2** 4:9,23 6:21 89:8,9 156:22

**20** 43:15 181:23 226:22 240:4 270:3

**200** 6:12 143:20,23

**2006** 23:8

**2007** 37:19 38:17

**2009** 49:15

**2011** 49:20

**2012** 49:17,20

**2013** 40:6,16 48:20

**2014** 61:10,11 66:16

**2015** 40:18

**2017** 19:6,19 43:15 47:12 51:16,17
56:3,10 61:2 62:23 68:2,16 95:10

**2018** 51:16,17

**2019** 67:25

**202** 4:14

**2020** 1:18,23 7:4 66:16

**203** 4:16

**20th** 19:6,18 62:15,23 64:25 68:16
69:9,11 83:9 95:10

**210 207-8975** 2:18

**210 227-3243** 3:4

**210 249-2985** 2:12

**210 271-7877** 2:25

**215** 44:1 285:16

**21st** 69:8 95:10

**22** 37:14,16 139:6

**220** 44:1

**225** 43:9,10,23

**23** 1:18 261:20

**230** 43:9,10,23

**231** 4:17

**237** 285:15

**239** 4:19

**23rd** 1:23 7:4

**24** 18:23

**246** 285:15

**249** 285:15

**25** 1:13 5:3

**250** 4:20

**265** 106:2

**27** 5:5

**270** 4:8

**274** 6:19

**277** 4:11